UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHEEL PROS, LLC<br><br>      Plaintiff,<br><br> -against-<br><br>ASR MOTORSPORT, LLC,<br>NICHOLAS LANZELLO,<br>REZA NOORI,<br>JOSEPH LEAHY,<br>DAVID PALACIOS,<br>JOHN THOMPSON III and<br>DANNY HUALLANCA<br><br>      Defendants. | Civil Action No. 2:25-cv-00929-NJC-ARL<br><br>**VERIFIED FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

   Plaintiff Wheel Pros, LLC ("Wheel Pros" or "Plaintiff"), for its Verified First Amended Complaint against Defendants ASR Motorsport, LLC ("ASR Motorsport"), Nicholas Lanzello ("Lanzello"), Reza Noori ("Noori"), Joseph Leahy ("Leahy"), David Palacios ("Palacios"), John Thompson III ("Defendant Thompson"), and Danny Huallanca ("Huallanca") (collectively, the "Individual Defendants" and together with ASR Motorsport, "Defendants"), states as follows:

## NATURE OF THE ACTION

   1.  Wheel Pros brings this action for preliminary and permanent injunctive relief and damages against former employee Lanzello and ASR Motorsport, the competing entity Lanzello co-founded, along with other former Wheel Pros employees for breach of contract, misappropriation of trade secrets, breach of fiduciary duty and duty of loyalty, tortious interference, unfair competition, conversion, and unjust enrichment, arising from Defendants' brazen theft of critical company trade secrets and other confidential information and assets to start

a competing aftermarket auto accessories business.  In conjunction with the filing of this First Amended Complaint, Wheel Pros intends to file a Motion for its Preliminary Injunction.

2.    Wheel Pros discovered that while employed as Wheel Pros' Regional Vice President, Lanzello coordinated, conspired and colluded with the other Individual Defendants to take and utilize Wheel Pros' resources without authorization to create, build and operate ASR Motorsport. Defendants exfiltrated Wheel Pros' confidential and trade secret information for Defendants' benefit and solicited Wheel Pros' employees and customers on behalf of ASR Motorsport.

3.    Beginning as early as February 2024, Lanzello began soliciting Wheel Pros employees to ASR Motorsport and exfiltrating Wheel Pros' confidential and trade secret information, including sales data, product designs, and internal strategies. Defendants used such information to form a new competing entity, to develop and prepare to launch in the market competing wheel products, and to divert business opportunities – all for the benefit of ASR Motorsport. The Individual Defendants' coordinated a plot to deceive Wheel Pros into believing they were loyal employees, all while diverting corporate secrets and confidential information beginning almost ten (10) months before Lanzello's employment termination in November 2024. Their malfeasance continued through the departures of the other Individual Defendants, each of whom subsequently joined ASR Motorsport.

4.    Since the termination of Lanzello's employment in November 2024, additional Wheel Pros employees have been improperly solicited by Lanzello and have been hired to work for ASR Motorsport. Defendants' continued and coordinated efforts to poach Wheel Pros' personnel reflect a deliberate attempt to disrupt Wheel Pros' operations and leverage the specialized knowledge and training of its workforce to gain an unfair competitive advantage in the

automotive accessories market, all in violation of Lanzello's post-employment non-solicitation restrictions.

5. As described further below, the conduct of the Individual Defendants while employed by Wheel Pros, the timing and manner of their departures, and ASR Motorsport's development of wheels modeled after Wheel Pros' most successful designs that directly compete with Wheel Pros' products and which are being marketed directly to Wheel Pros' customers, demonstrate an ongoing, unlawful, and concerted effort to compete unfairly. While Lanzello was the driving force behind Defendants' illicit scheme, the evidence to date confirms that the other Individual Defendants intentionally and knowingly engaged, and directly participated in, such conduct, all while acknowledging that they may be sued.

6. Since Lanzello's employment termination, Plaintiff has also discovered that Lanzello, along with his wife who was previously employed by Wheel Pros, took significant cash funds belonging to Wheel Pros. It was only upon Wheel Pros' discovery of the missing funds and its outreach to Lanzello and his wife that Lanzello returned $473,445 of the funds (approximately $363,296 in cash and $110,149.94 in checks), in three separate tranches, to Wheel Pros.

7. Despite being trusted employees of Wheel Pros, the Individual Defendants conspired to intentionally misuse Wheel Pros' confidential and trade secret information for purposes of unfairly competing with Wheel Pros and to destroy Wheel Pros' business, in violation of their contractual, statutory and common law duties to Wheel Pros.

8. Wheel Pros will continue to be severely and irreparably harmed if Defendants are permitted to continue their unlawful activities.

9. In conjunction with the relief set forth in this First Amended Complaint, Wheel Pros seeks a preliminary and permanent injunction restraining and enjoining Defendants from

using and/or disclosing Wheel Pros' confidential and proprietary information and trade secrets; continuing to benefit from Lanzello's and the other Individual Defendants' unlawful actions during and after their employment with Wheel Pros; and ordering Defendants to destroy or return all of Wheel Pros' sensitive, proprietary, and confidential information which they still possess or control and to transfer to Wheel Pros any benefits they have obtained through their malfeasance, including patents, patent applications or other intellectual property.

10.    Wheel Pros further seeks preliminary and permanent injunctive relief to restrain Defendants from (i) directly or indirectly competing against Wheel Pros; (ii) soliciting and hiring Wheel Pros' employees; and (iii) soliciting or accepting business from any Wheel Pros' customers.

11.    Wheel Pros further seeks declaratory relief that all patents, inventions, designs, creations, developments and product developed while the Individual Defendants were employed with Wheel Pros or that can be traced to the improper disclosure and use of Wheel Pros' trade secret or confidential information are assigned and belong to Wheel Pros.

12.    Wheel Pros further seeks preliminary and permanent injunctive relief mandating Lanzello return all stolen and misappropriated cash funds, with interest, to Wheel Pros.

## PARTIES & JURISDICTION

13.    Wheel Pros is a Delaware limited liability company, with its headquarters located in Denver, Colorado.

14.    Upon information and belief, Lanzello is a citizen of the United States and a resident of Nassau County, New York.

15.    Upon information and belief, Noori is a citizen of the United States and a resident of Suffolk County, New York.

16.     Upon information and belief, Leahy is a citizen of the United States and a resident of Orange County, California.

17.     Upon information and belief, Palacios is a citizen of the United States and a resident of Riverside County, California.

18.     Upon information and belief, Thompson is a citizen of the United States and a resident of Gwinnet County, Georgia.

19.     Upon information and belief, Huallanca is a citizen of the United States and a resident of Nassau County, New York.

20.     Upon information and belief, ASR Motorsport is a Delaware limited liability company with a principal place of business located in New York. ASR Motorsport is authorized to conduct business in New York.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter presents a federal question arising under the Defend Trade Secrets Act of 2016 18 U.S.C. § 1836(c).

22.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), as they arise from the same nucleus of operative facts as the federal claim under the Defend Trade Secrets Act.

23.     This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2) because, *inter alia*, a majority of the Defendants reside in the District, a substantial part of the events giving rise to Wheel Pros' claims occurred in the District, and Lanzello is located in this Court's jurisdiction and exfiltrated Wheel Pros' trade secrets and confidential information while working out of Wheel Pros' New York office. Further, all Defendants conduct business in the State of New York, derive substantial

revenue from interstate commerce including commerce originating in New York, and jointly conspired and colluded to commit tortious acts for their mutual benefit and for the purpose of damaging Plaintiff's business, reputation, and goodwill within the State of New York which are the subject of this First Amended Complaint.

## FACTS

**A.    Wheel Pros' Business and Protection of its Trade Secrets.**

24.    Wheel Pros is a leader in the aftermarket wheel and accessories industry that designs, markets, and distributes branded automotive aftermarket wheels, performance tires, and accessories. Wheel Pros serves over 10,000 retailers and has network of distribution centers spanning North America and Australia. Wheel Pros has a portfolio of proprietary brands with hundreds of custom wheel styles.

25.    The automotive accessories industry is highly reliant on the ability to design, market, and distribute a diverse portfolio of branded products, such as aftermarket wheels, performance tires, and accessories, that cater to consumer preferences. Success in this industry depends on maintaining strong relationships with retailers, leveraging an extensive distribution network across regions, and continually innovating proprietary brands with custom styles to meet market demands.

26.    Wheel Pros developed and strengthened its relationships with customers, vendors, and retailers at substantial cost, through investment in its employes, and by refining and improving its design, pricing and distribution processes and other operations over several years.

27.    Wheel Pros' success is based, in substantial part, on confidential and trade secret information developed and used by Wheel Pros, which information is not disclosed or available to the general public or to Wheel Pros' competitors. If misappropriated, Wheel Pros' confidential and

trade secret information would confer an immediate and unfair economic advantage to a competitor.

28.    Wheel Pros' confidential, proprietary and trade secret information is critical to maintaining and enhancing a competitive position in the aftermarket wheel and accessory industry and maintaining and expanding its customer relationships. Accordingly, Wheel Pros takes significant measures to maintain the secrecy of its confidential and trade secret information and prevent disclosure to competitors and others, including: (a) requiring employees to execute non-disclosure and other restrictive covenant agreements; (b) maintaining and promulgating policies related to information non-disclosure and information security, systems access and device use; (c) maintaining and promulgating policies restricting employees from engaging in conflicting or competitive activity during employment; (d) implementing electronic security measures, such as use of passwords; and (e) employing physical security measures, such as placing locks on offices, doors and file cabinets.

29.    Wheel Pros limits disclosure and access of its confidential, proprietary and trade secret information to employees who agree to the terms of non-disclosure. Wheel Pros granted the Individual Defendants access to its protected information subject to their agreements not to disclose or use Wheel Pros' information except for the benefit of Wheel Pros.

**B.    Lanzello's Employment with Wheel Pros.**

30.    In 2004, Lanzello began working for Wheel Pros' predecessor, MHT Luxury Wheels, Inc. ("MHT"), which had been a competing designer, marketer and distributor of branded automotive aftermarket wheels. As an integral step in its long-term growth strategy, Wheel Pros acquired MHT in 2019, establishing the combined company as the world's largest automotive aftermarket wheel platform.

31.     As a result of Wheel Pros' acquisition of MHT, Lanzello became employed by Wheel Pros in 2019 as its Regional Vice President – Northeast, based in Plaintiff's Farmingdale, New York office. Lanzello remained in the position of Regional Vice President until Wheel Pros terminated his employment on November 20, 2024. As Regional Vice President, Lanzello was a member of Wheel Pros' senior leadership and occupied a high-level position of trust within Wheel Pros. At the time of his termination from employment, Lanzello was highly compensated.

32.     As Regional Vice President, Lanzello directed and oversaw Wheel Pros' aftermarket wheel business in the Northeast Region, which included, among other responsibilities: overseeing day-to-day operations and performance; establishing and growing key relationships, including with customers, suppliers, and other business partners; setting strategic priorities; overseeing sales and managing Wheel Pros' sales employees; participating in product design; and making personnel decisions.

33.     In his position as Regional Vice President, Lanzello was granted unfettered access to Wheel Pros' most sensitive and valuable confidential, proprietary and trade secret information, including, but not limited to, Wheel Pros': pricing methodologies, costs, sales and other financial information; distribution methods and operations; product design processes and planned designs; marketing and branding strategies; strategic business plans; customer identities, preferences and histories; target and prospective customers; and terms of agreements with vendors, suppliers, and other third-party business partners, all of which are integral to Wheel Pros' competitive position in the automotive accessories market. Among other things, Lanzello was actively involved in Wheel Pros' proprietary wheel design program that utilizes segmented design teams, aggregation and analysis of market and sales research, and review and refinement by dedicated design

committees.  Lanzello participated in each step of the program and appointed committee members responsible for reviewing, refining and approving design concepts.

### C.    Lanzello's Agreements with Wheel Pros.

34.    As a condition of his employment with Wheel Pros, on November 14, 2019, Lanzello entered into a non-disclosure agreement.  *See* Ex. A ("**Lanzello Non-Disclosure Agreement**").

35.    The Lanzello Non-Disclosure Agreement[1] expressly defines Wheel Pros' "Confidential Information" as follows:

> "Confidential Information is information that is not generally known in the industry in which Wheel Pros is engaged, in the possession, ownership or control of Wheel Pros or its employees. Confidential information includes, but is not limited to, information related to wheel and cap designs (whether patentable, patented or not), trade secrets, programs, business plans, inventions (whether patentable, patented or not), processes, formulas, existing or contemplated products, technical data, services, technology, concepts, computer programs, plans, studies, techniques, designs, specifications, patterns, contracts, presentations, and business information, and including information related to any research, development, manufacture, purchasing, engineering, know-how, sales or marketing methods, competitive analyses, methods of doing business, customer lists, or customer usages or requirements," (Lanzello Non-Disclosure Agreement, ¶1(a)).

36.    By signing the Non-Disclosure Agreement, Lanzello promised to:

> "hold all Confidential information that has been, or may be obtained, in trust and confidence." (Lanzello Non-Disclosure Agreement, ¶2).

37.    Lanzello acknowledged he would:

> "not use for [his] own purposes, nor disclose to others, either during or after employment, except as required by Wheel Pros, any Confidential Information." (Lanzello Non-Disclosure Agreement, ¶2).

38.    Lanzello also agreed that:

> "[a]ll written materials and other tangible objects, including copies, made or compiled by employee or made available to employee in the course of Employee's

---

[1] Section letters/numbers do not correspond with section letters/numbers in the Lanzello Non-Disclosure Agreement. Please refer to the cited paragraph of the Lanzello Non-Disclosure Agreement, following each provision.

employment, shall be the property of Wheel Pros and shall be delivered to Wheel Pros upon termination of employment or at any other time upon request. Employee shall maintain and keep a record of his work on behalf of the Company in the manner directed by the Company or, in the absence of specific direction, in a manner sufficient to document his activities on behalf of the Company. All record and data recorded or generated by Employee during the course of his employment shall remain the property of the Company." (Lanzello Non-Disclosure Agreement, ¶6).

39.     Further, Lanzello acknowledged that:

"all Developments[2] made by employee, alone or jointly with others, whether or not during normal business hours or on Company premises, which are within the scope of Wheel Pros' business, which result from, or are suggested by, any work Employee or others may do on behalf of Wheel Pros, shall be and are the property of Wheel Pros.  Employee agrees and does hereby assign to Wheel Pros all right to such Developments made during Employee's employment." (Lanzello Non-Disclosure Agreement, ¶4).

40.     Lanzello confirmed that the obligations in his Non-Disclosure Agreement would survive the termination his employment, and that Wheel Pros would be entitled to recover from Lanzello all attorneys' fees incurred to enforce Wheel Pros' rights." (Lanzello Non-Disclosure Agreement, ¶9).

41.     Under the Lanzello Non-Disclosure Agreement, Lanzello explicitly promised that he would not compete with Wheel Pros during his employment:

"[D]uring employment with Wheel Pros, Employee agrees that Employee will not compete, or without the advance written approval of Wheel Pros, engage in any activity that may constitute a conflict with Wheel Pros' interests regarding Confidential Information or Developments.  Any question whether a particular activity may constitute a conflict of interested shall be resolved by obtaining Wheel Pros' written approval before engaging in that activity." (Lanzello Non-Disclosure Agreement, ¶9).

---

[2] Under the Lanzello Non-Disclosure Agreement "Developments" are defined as "inventions (whether or not patentable), product designs (whether or not patentable), new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property created during Employee's employment." (Lanzello Non-Disclosure Agreement, ¶1(b)).

42.    The Lanzello Non-Disclosure Agreement is governed by "the laws of the State of New York" (Lanzello Non-Disclosure Agreement, ¶7).

43.    On June 6, 2021, in consideration for Lanzello's continued employment with Wheel Pros and his participation in incentive equity opportunities, Lanzello signed a Unit Grant Agreement, pursuant to which he agreed to certain non-compete, non-solicitation and non-disclosure obligations. *See* Ex. B ("**Unit Grant Agreement**").

44.    Pursuant to the Unit Grant Agreement,[3] Lanzello agreed that during his employment and for a period of five (5) years thereafter, he would not compete against Wheel Pros in any state where Wheel Pros, its parent, or subsidiaries conduct business:

> Non-Competition. During his employment and for a period of five (5) years thereafter, Lanzello would not "directly or indirectly, own any interest in, manage, control, participate in (whether as an owner operator manager, consultant, officer, director, employee, investor, agent, representative or otherwise), consult with, render services for or otherwise engage in any business or entity which directly or indirectly competes with the business of supplying manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories for vehicle models or brands currently or planned be supplied, manufactured and/or distributed" by Wheel Pros. (Unit Grant Agreement, ¶9(a)).

45.    Lanzello also agreed under the Unit Grant Agreement that he would not solicit Wheel Pros' employees during his employment and for five (5) years thereafter:

> Nonsolicitation. During the period of Executive's employment with the Partnership, Employer or any of their respective Subsidiaries and for five (5) years following any Separation, Executive shall not, and shall not cause any of his or her Affiliates to, directly or indirectly, solicit (except pursuant to a general solicitation which is not directed specifically to any officer, manager or employee of the Partnership or any of its Subsidiaries) or hire, retain or engage any officer, manager or employee of the Partnership or any of its Subsidiaries (collectively, the "Company Employees"), or encourage any such Company Employee to leave his or her employment or hire any such

---

[3] The Lanzello Non-Disclosure Agreement and Unit Grant Agreement are collectively referred to in the Complaint as "the Employment Agreements."

Company Employee who has left such employment; provided, however, that nothing in this Section 9(b) shall prevent Executive or any of his or her Affiliates from soliciting or hiring any former Company Employee whom has not been employed by the Partnership or any of its subsidiaries for the twelve (12) month period preceding such solicitation or hiring." (Unit Grant Agreement, ¶9(b)).

46.    Lanzello further agreed he would not "disclose to any unauthorized Persons or use for his own account any Confidential Information" at any time without Wheel Pros' prior written consent. (Unit Grant Agreement, ¶8).

47.    Lanzello specifically acknowledged and agreed that the restrictive covenants in the Unit Grant Agreement are "necessary for … proper protection of confidential and proprietary information" and are "reasonable, do not preclude [Lanzello] from earning a livelihood, nor do they unreasonably impose limitations on [Lanzello's] ability to earn a living."  (Unit Grant Agreement, ¶ 9(e)).

48.    Lanzello agreed that his violation of the Unit Grant Agreement would cause harm to Wheel Pros that "outweighs any potential harm to [Lanzello] of enforcement by injunction or otherwise."  (Unit Grant Agreement, ¶ 9(e)).

49.    The Unit Grant Agreement expressly authorizes Wheel Pros in the event of a breach or threatened breach, to "obtain specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security)." (Unit Grant Agreement, ¶ 9 (d)). The Unit Grant Agreement also expressly authorizes Wheel Pros to recovery costs, including attorneys' fees, incurred in enforcing its terms. (Unit Grant Agreement, ¶ 13(k)).

50.    In addition to the contractual obligations outlined above, Lanzello was required during his employment with Wheel Pro, to comply with Wheel Pros' applicable employee policies,

including the Conflict of Interest and Business Ethics Policy, which mandated avoiding any conflict between personal interests and the best interests of Wheel Pros.

51.     Based on his tenure and role as Regional Vice President, Lanzello was also bound by certain common law duties, including a fiduciary duty and an undivided duty of loyalty to Wheel Pros, both of which required the performance of duties in a manner that advanced Wheel Pros' best interests.

**D.     Defendants Noori, Palacios, Leahy, Thompson and Huallanca and their Obligations under Non-Disclosure Agreements.**

52.     Defendants Noori, Palacios, Leahy, Thompson and Huallanca are former Wheel Pros employees who resigned shortly after Wheel Pros terminated Lanzello's employment and are currently working for ASR Motorsport.

53.     Each of these Individual Defendants[4] are former MHT employees who, along with Lanzello, joined Wheel Pros following its acquisition of MHT.

54.     These Individual Defendants held various managerial and/or sales positions at Wheel Pros:

      a.     Noori was employed by Wheel Pros as the General Manager for Wheel Pros New York and New Jersey territories and worked closely with, and reported directly to, Lanzello. Noori resigned from Wheel Pros effective December 16, 2024 and is employed by ASR Motorsport as General Manager of its New York division, reporting to Lanzello.

      b.     Palacios was employed by Wheel Pros as the General Manager of Wheel Pros' Riverside, California profit center. Palacios resigned from Wheel Pros

---

[4] All individual defendants joined Wheel Pros in 2019, except for Huallanca who joined in 2020.

December 9, 2024 to begin employment with ASR Motorsport as General Manager of its Los Angeles division, reporting to Lanzello.

c.     Leahy was employed by Wheel Pros as a Sales Manager at Wheel Pros' Los Angeles profit center, and at the time of his resignation from Wheel Pros, was a top sales employee for Wheel Pros in Los Angeles. Leahy resigned from Wheel Pros effective November 20, 2024, to begin employment with ASR Motorsport as a Sales Executive in its Downey, California profit center, reporting to Palacios.

d.     Huallanca was employed by Wheel Pros as a Sales Manager at Wheel Pros' New York profit center, and at the time of his resignation, was a top sales employee for Wheel Pros in its Northeast Region. Huallanca resigned from Wheel Pros effective December 16, 2024 to begin employment with ASR Motorsport as a Sales Executive in its New York profit center, reporting to Noori.

e.     Thompson was employed by Wheel Pros as a Sales Manager at Wheel Pros' Atlanta profit center, and at the time of his resignation, was a top sales employee for Wheel Pros in the Southeast Region. Thompson resigned from Wheel Pros on December 3, 2024 to begin employment with ASR Motorsport as a Sales Executive in its Atlanta profit center.

55.     As a condition of their employment with Wheel Pros, each of these Individual Defendants executed a Non-Disclosure Agreement substantially similar to the one signed by Lanzello.   These agreements contain express confidentiality, invention assignment, and non-

competition obligations during employment, and are governed by the laws of their respective jurisdictions. *See* Exs. C–G (the Individuals Defendants' "Non-Disclosure Agreements").

56.    Under their respective Non-Disclosure Agreements, Noori, Palacios, Leahy, Thompson, and Huallanca each agreed to hold all Confidential Information obtained during their employment in trust and confidence, and promised not to use or disclose such information for their own purposes or to engage in any competing activity during their employment without advance written approval from Wheel Pros.

57.    The Non-Disclosure Agreements further provide that all records, data, and tangible materials generated or accessed during the course of their employment remain the exclusive property of Wheel Pros and must be returned upon termination.

58.    Each of these Individual Defendants acknowledged that their obligations under the Non-Disclosure Agreements would survive the termination of their employment.

**E.    Lanzello's Termination for Founding and Operating a Competing Business and Misappropriating Wheel Pros' Confidential Information and Trade Secrets While Being Employed By Wheel Pros.**

59.    On November 18, 2024, Wheel Pros discovered that a website for Arena Wheel Co. ("Arena Wheel"), an affiliated brand of ASR Motorsport, listed Lanzello as its founder. Arena Wheel's website indicated that it markets and sells aftermarket custom wheels in direct competition with Wheel Pros, and with respect to Lanzello, stated:

> Arena Wheel Co. debuted January 2025 on Long Island in New York by automative after-market industry veteran Nick Lanzello. His intention is to deliver the most incredible, high-quality and beautiful after-market wheels and products to the millions of people who love enhancing the look of their vehicles. Nick's purpose is to help drivers enjoy their cars more and to add a little excitement to the fairly dull roadways.[5]

---

[5] Upon information and belief, Arena Wheels removed this statement from its website after Wheel Pros initiated its investigation into Lanzello's and ASR Motorsport's unlawful activities; however, Wheel Pros' retained screenshots.

60. Wheel Pros immediately investigated the matter and scheduled two representatives to meet with and interview Lanzello on November 19, 2024, at Wheel Pros' offices in Farmingdale, New York.

61. To Wheel Pros' surprise, Lanzello was not present at Wheel Pros' New York office on November 19, 2024. When contacted by telephone, Lanzello told Wheel Pros' representatives that he was in a Southeastern state helping his daughter move her belongings. Lanzello misrepresented his actual whereabouts, as Wheel Pros later discovered Lanzello had made travel arrangements to be in the Los Angeles area on November 19, 2024, where ASR Motorsport's co-founder, Art Hale, Jr. ("Hale")– Lanzello's former colleague at Wheel Pros and the former CEO of MHT, who himself had been subject to recently expired non-compete restrictions – was located. Lanzello was meeting with Hale and other Individual Defendants about ASR Motorsport.

62. Wheel Pros' representatives interviewed Lanzello by telephone. When questioned regarding his interest in or involvement with Arena Wheels, Lanzello denied any connection and claimed he was unaware that Arena Wheels' business related to aftermarket wheels[6].

63. Lanzello admitted he knew Hale was starting ASR Motorsport, but stated his only involvement had been providing Hale with contact information for a marketing company. Incredibly, Lanzello represented that he believed ASR Motorsport's business was related to "golf stuff," and that he had no idea why "some idiot" put his name on the website as a founder.

64. As part of Wheel Pros' investigation, Lanzello was asked to confirm several points, including that: (a) he had not used his work computer or email in connection with Arena Wheels,

_See_ Ex. H (Arena Wheel Co. Website, Contact Us (as of November 18, 2024) (_available at_ https://www.arena-wheel.com/contact-us).
[6]Unbeknownst to Wheel Pros at the time, during Wheel Pros' investigation, Lanzello instructed another Wheel Pros' employee who was on site in the New York office, to hide evidence of ASR Motorsport's existence, texting him, "As soon as [] disappears make sure to remove anything Arena," followed by, "Or ARS [sic]."

(b) had no business or ownership interest in Arena Wheels, (c) had not spoken with or involved any current Wheel Pros employees with Arena Wheels, and (d) was fully committed to Wheel Pros with no intention of leaving the company or joining Arena Wheels in the future. Lanzello affirmed each of these points during the investigation and repeatedly denied knowledge about, or involvement with, ASR Motorsport or any other competitor.

65.    Following the conclusion of the telephone call with Lanzello on November 19, 2024, a Wheel Pros representative observed a notepad on Lanzello's desk opened to a page of handwritten notes entitled "ASR To Do!!"  The to-do list itemized several tasks related to starting up a business: "ADP-Payroll, Insurance, 401k, Commission Structure, Ownership Plan (Performance Shares), Websites Development, Marketing Plan."  *See* Ex. I (notepad with ASR "to do" list).

66.    Given the evidence of Lanzello's active involvement with ASR Motorsport and his lack of credibility, Wheel Pros placed Lanzello on leave pending the conclusion of the investigation.

67.    As a result of Wheel Pros' discovery of the notepad in Lanzello's New York office, Wheel Pros scheduled a follow-up meeting with Lanzello for the following day, November 20, 2024.  Lanzello refused to provide any additional information during the follow-up meeting, even when confronted with the notepad containing a to-do list relating to ASR Motorsport.

68.    On November 20, 2024, Wheel Pros terminated Lanzello's employment for Cause for violating the Non-Disclosure Agreement, Unit Grant Agreement, and Wheel Pros' policies prohibiting conflicts of interest and restricting the use of Wheel Pros' facilities, equipment, property and intellectual property. Wheel Pros expressly reminded Lanzello of his continuing legal obligations.

**F.      Wheel Pros Discovers Lanzello's Nefarious Conduct Despite His Reaffirming His Commitment to Wheel Pros.**

69.     On August 6, 2024, Lanzello signed a retention agreement with Wheel Pros and he received a retention payment.

70.     Following the termination of Lanzello's employment in November 2024, Wheel Pros continued to gather information about Defendants' business and activities, and learned that Lanzello never had had any intention of complying with his obligations or remaining employed with Wheel Pros.

71.     According to the Delaware Secretary of State, ASR Motorsport was formed on September 19, 2024, and per the New York Secretary of State website, registered to conduct business in New York as of October 11, 2024.

72.     On its website, ASR Motorsport describes its mission as providing "stunning, high-quality wheels and products for all types of automotive enthusiasts" and identifies Arena Wheels Co. as one of its four brands (*available at* https://www.asrmotorsport.com/about).    ASR Motorsport advertises its employees as "rock stars in the automotive after-market game," who are "veterans who've spent decades perfecting the art of after-market wheels and products." *Id*. Lanzello holds himself out as the President of ASR Motorsport, falsely indicating in his public LinkedIn profile that he left Wheel Pros in October 2024.

73.     After further investigation, Wheel Pros discovered that Lanzello had not only intentionally misled Plaintiff about his involvement with ASR Motorsport, but had in fact been acting in coordination with the other Individual Defendants for months in a concerted scheme to misuse Wheel Pros' resources, confidential information, and trade secrets to benefit ASR Motorsport, in clear violation of his contractual, statutory and fiduciary obligations.

74.     Wheel Pros learned that while the Individual Defendants were purportedly working on Wheel Pros' behalf in furtherance of Wheel Pros' best interests, they were in fact engaged in a coordinated effort to use Wheel Pros' time, computer and email systems, proprietary designs, business information, and customer and business relationships to launch and operate ASR Motorsport.

### G.     The Individuals' Early Planning of ASR Motorsport While Still Employed By Wheel Pros.

75.     Upon information and belief, beginning at least as early as February 2024 and continuing through his termination on November 20, 2024, Lanzello, in collusion with the other Individual Defendants, actively created and developed ASR Motorsport while still employed at Wheel Pros. Lanzello's efforts on behalf of ASR Motorsports included establishing a bank account, branding, budgeting, product design, customer and employee solicitation, and marketing—undertaken during Wheel Pros' business hours, using Wheel Pros' equipment and systems, and often leveraging Wheel Pros' confidential and trade secret information.

76.     More than nine (9) months before Lanzello separated from Wheel Pros and three (3) months before Hale's non-compete with Wheel Pros was to expire, Hale began sending Lanzello wheel design drawings *via* text message for Lanzello's feedback.  Specifically, on February 4, 2024, Lanzello received a text message from Hale that included images of wheels, to which Lanzello responded, "Winner, winner, chicken dinner."[7]  In the same exchange, Hale stated, "I've been drawing for three weeks," to which Lanzello replied, "Can't wait."

77.     Throughout February, March and April, 2024, Lanzello and Hale regularly exchanged text messages and discussed wheel styles, often during regular work hours.

---

[7] In subsequent communications with Hale, Lanzello uses the same "winner, winner" phrase in connection with their collaboration on naming ASR Motorsport's competing wheel products.

78.     From the outset of their discussions, Lanzello was openly enthusiastic about starting a wheel business with Hale, proclaiming that Hale was "going to crush the wheel game again," and that Lanzello "[couldn't] wait to be a part of it."  In April 2024, Lanzello wrote "[t]he timing is right to launch," and he and Hale began discussing marketing plans and brand names for a new company.

79.     On May 16, 2024, the day Hale's non-compete with Wheel Pros expired, Hale informed Lanzello that Junjie ("JJ") Chen ("Chen"), their former procurement colleague at MHT who also briefly worked for Wheel Pros, "has factories lined up" to produce wheels for ASR Motorsport.

80.     Lanzello and Hale immediately began planning an in-person strategy meeting to take place in Los Angeles in the coming weeks, and agreed to include Leahy.  Over the next two days, Lanzello and Hale brought Leahy into discussions about wheel designs for ASR Motorsport. Leahy began providing size and offset information and recommendations for certain designs.

81.     Around this same time, Lanzello also brought Noori into the planning and setting up of ASR Motorsport. Text communications between Lanzello and Noori show they were discussing potential brand names for certain ASR Motorsport product lines, with Noori suggesting the name "Ryze" that would eventually be used for ASR Motorsport's automotive suspension brand.

82.     Despite his role as an executive-level Regional Vice President with Wheel Pros, from the beginning of his discussions with Hale, Lanzello shared information about Wheel Pros' financial performance.  For example, he shared how Wheel Pros performed against its sales plan for February 2024 and told Hale about a particularly strong sales day in March 2024. Before long, Lanzello began sharing much more detailed confidential financial information about Wheel Pros.

83.    On April 30, 2024, without authorization, Lanzello sent Hale two screenshots showing Wheel Pros' total sales revenue month-to-date and total daily sales by region.  Lanzello had no legitimate work-related reason for sharing the information, which could be valuable to a competitor setting up operations.  ASR Motorsport opened and now operates four facilities, with each one located in a hub of Wheel Pros' four most profitable regions: New York, Atlanta, Dallas and Los Angeles.  These are also the locations where Lanzello and ASR Motorsport have poached Wheel Pros' top sales employees

84.    On June 7 and 8, 2024, Lanzello, Leahy, Hale, Chen and other individuals met in California to plan the next phase of ASR's development. According to Hale, during this meeting they likely discussed wheel designs, warehouses, business plans, potential personnel, and other items relevant to planning ASR Motorsport. After the first day of meeting, Lanzello emphasized in communications the urgency of getting production under way, writing: "If we decide on styles tomorrow . . . [s]amples will be here August and production parts October.  That's 3.5 months away."

85.    On the second day of the meeting, Chen wrote that "he confirmed with [Lanzello] that he needs to have parts before Christmas," which "means the full production must start in early September [and] sample confirmation" completed by August, leaving little time "for company set up, engineering back and forth, factory confirmation, mold building and testing sample confirmation," and that they "should start to release parts" the following week.  Lanzello responded: "We have all day to hammer out the details. Let's make sure we leave today with it done."

86.    Three days later, Lanzello sent a "top" mold list for wheel production to Hale and reached out to another Wheel Pros employee, Tracy Kilger, to participate in planning ASR

Motorsport and to eventually join the company. Lanzello also informed others he developed a full budget for ASR, and emphasized the urgency of "launch[ing] the corp [and] put[ting] money in the bank." In mid-July 2024, Lanzello prepared a detailed budget and forecast for the first year of ASR's operations and shared it with Hale and his son, Arthur D. Hale, III ("AD Hale"). Earlier that day, Lanzello had exfiltrated to his personal email account Wheel Pros' detailed budgeting template, which he used, virtually unchanged, to prepare a Year-1 budget for ASR Motorsport.

87.    From August 2024 and continuing into the fall, Lanzello continued participating in multiple planning discussions related to ASR Motorsports' competing product catalog. These included references to specific Wheel Pros' wheels. In a text exchange, Hale asked Lanzello whether a new design could "compete with Flux," and Lanzello replied, "100 percent." Lanzello also participated in discussions referencing the "Fuel Rebel," a known Wheel Pros design, and confirmed that Arena Wheel's team was attempting to replicate aspects of that wheel's aesthetic.

88.    On or about August 4, 2024, in group text messages, which included Hale and Individual Defendants Leahy, Palacios, Thompson, and Noori, Lanzello discussed brand names for the new entity and purchased the domain name for "Arena Wheel," which became a key ASR Motorsport product line. The same messages reflect discussions of product design, marketing concepts, and product names for ASR Motorsport.

89.    On September 5, 2024, while coordinating ASR Motorsport planning and product development, Lanzello referred in text messages to future efforts to solicit Wheel Pros' personnel by stating, "I can take anyone I want when we are ready."

90.    Lanzello continued to spearhead business operations, and in early October 2024, Lanzello signed a power of attorney as President of ASR Motorsport to authorize shipping

services, opened ASR Motorsport's bank account, opened accounts with FedEx and UPS and negotiated rates, and identified properties for ASR Motorsport's warehouses and negotiated leases.

**H.    Solicitation of Wheel Pros Customers.**

91.    Wheel Pros also discovered that while employed, Lanzello was actively soliciting Wheel Pros' customers on behalf of ASR Motorsport, thereby diverting business while still acting as a Wheel Pros' employee.

92.    On or about August 15, 2024, Lanzello had dinner with the owner of a significant Wheel Pros customer, which Lanzello described to Hale in text communications as "his big customer" that does "20 million plus a year."  After the meeting, Lanzello reported that the customer would follow Lanzello to ASR motorsport.

93.    On Tuesday, October 29, 2024 at 2:08pm, using the email account "NickL@asrmotorsport.com," Lanzello sent an email to the customer with the subject line "product master sheet" and attaching a spreadsheet entitled "product master sheet with first order for nick.xlsx," listing 667 ASR Motorsport products and soliciting orders from the customer. Lanzello wrote to the Wheel Pros' customer: "this should be what you need to get started.  Take a look and let me know if any is missing to launch on your site."  Wheel Pros only learned of this solicitation when the customer inadvertently forwarded the email exchange to Noori's Wheel Pros' email account after he had already resigned to join ASR Motorsport.

94.    That same day, on October 29, 2025, Lanzello followed up via email with a different Wheel Pros customer, confirming that he had previously sent ASR Motorsport's inventory spreadsheet. Upon information and belief, in January 2025, this customer replaced all Wheel Pros' stock with ASR Motorsport's stock.

95.     On October 23, 2024, in an email exchange, Lanzello communicated with a key Wheel Pros customer about onboarding ASR Motorsport products, stating, "We are go to onboard ASAP."

96.     On December 9, 2024, while still employed by Wheel Pros, Noori met with another significant Wheel Pros customer to solicit business on behalf of ASR Motorsport. After, Lanzello reported that Noori had "another great meeting," and that this customer was fully on board with supporting ASR, not Wheel Pros.

97.     Upon information and belief, Lanzello, along with the other Individual Defendants, solicited additional Wheel Pros' customers on behalf of ASR Motorsport while he was still employed as Wheel Pros' Regional Vice President.

**I.     Defendants' Advancement of ASR Motorsport While Benefitting from their Employment with Wheel Pros.**

98.     While on Wheel Pros' payroll, the Individual Defendants repeatedly used work hours and company resources, including confidential and trade secret information, to advance ASR Motorsport's business in their concerted scheme to unlawfully "crush" Wheel Pros.  For example, in a text exchange on July 22, 2024, Lanzello admitted he had completed work for ASR at the Wheel Pros office but had waited to email it until he returned home because he "didn't want to sign on to the internet at the office".

99.     On September 5, 2024, in text messages exchanged between Lanzello and Noori, Noori states he is "sending Arena texts while on WP calls LOL," presumably referring to Wheel Pros.

100.     In another exchange on October 4, 2024 with Chen, Lanzello confirmed he was reviewing ASR's MSRP list "at my paying job," referring to Wheel Pros.

101.    On October 24, 2024, Lanzello used his Wheel Pros' email account to send an Arena Wheel style master sheet to a third party, during working hours.

102.    On October 27, 2024, Lanzello forwarded a 2025 Planning Template—used internally by Wheel Pros to forecast product sales—to his personal Yahoo account. This document contained proprietary business information.

103.    Despite his ongoing involvement with ASR Motorsport, Lanzello continued to present himself as a loyal executive of Wheel Pros, accessing internal systems, using proprietary documents, and drawing on confidential business knowledge to support a competing enterprise.

104.    On October 24, 2024, at 9:32 a.m., Lanzello sent an email from his Wheel Pros' email account to a third-party containing what appears to be marketing photographs of aftermarket wheels on a pickup truck.  In some photographs, a logo reading "Arena Wheel Co." can be seen in the center of the wheel.  Some of these same photographs subsequently appeared on social media accounts for Arena Wheel to promote the sale of its "Mission" wheel.  *See* Exs. J-L (10.24.24 Email, Social Media Picture, Website).

105.    On November 5, 2024, Lanzello exchanged text messages with Hale, in which he disclosed Wheel Pros' sales for October, including a breakdown of sales attributed to its Fuel brand.  He concluded the conversation by stating, "It will be all ours soon," and sent an image, which upon information and belief, contained Wheel Pros' internal sales data.

106.    On Monday, November 11, 2024, during working hours and using his Wheel Pros' email account, Lanzello emailed a spreadsheet entitled "style master with rendering RESIZED NEW CLEAN VERSION.xlsx" to the email address "Thale02@gmail.com."  The recipient is believed to be Hale's son, Thomas Hale.  The attachment lists 79 aftermarket wheels that appear to be ASR Motorsport products and includes for each the brand, style name, lug pattern, rendering,

style number, finish information, vendor and other information.  Several of the wheel designs appear to infringe on Wheel Pros' design patents or patent applications.  The subject line of Lanzello's November 11, 2024 email to Thomas Hale is "Trump," an apparent attempt to conceal the improper nature of the communication and avoid detection.  *See* Ex. M (11.11.24 Email with attachment).

107.    Additional communications show the Individual Defendants had conducted onboarding and business planning with key Wheel Pros personnel while those individuals remained employed by Wheel Pros.  On October 30, 2024, Lanzello sent an ASR-branded calendar invitation titled "ASR working session," scheduled for November 4, 2024, at 12:00PM inviting Individual Defendants Noori, Palacios, Leahy,  all of whom had and were using ASR Motorsport email addresses.

108.    Further, shortly after his termination in November 2024, Lanzello instructed other Wheel Pros employees to wait until early December 2024 before tendering notices of resignation so that Wheel Pros would cover their health insurance through the end of December.

109.    ASR Motorsport also directly benefited from Lanzello's misuse of Wheel Pros' inventory.  On or about October 24, 2024, ASR Motorsport reimbursed Lanzello for Wheel Pros tires used in an ASR Motorsport photo shoot. ASR's internal records reflect a $3,750 debit with a memo noting "card Wheel Pros tires for photo shoot."

110.    On October 23, 2024, Lanzello emailed Tracy Kilgar, stating that he did not have any HR forms for ASR Motorsport "other than what I have grabbed from Wheel Pros in case we need to use for a reference."  Lanzello directly and repeatedly appropriated Wheel Pros' internal confidential or trade secret materials to set up ASR Motorsport's operations.

**J.    Lanzello's Unlawful Solicitation and Coordination with Wheel Pros Employees.**

111.    Upon information and belief, Lanzello was directly and actively involved in soliciting Wheel Pros employees in direct violation of the post-termination non-solicitation obligations in his Unit Grant Agreement.

112.    Following his separation from Wheel Pros, Lanzello explicitly threatened to "wipe out [Wheel Pros] staff."

113.    Within two months of Lanzello's separation from Wheel Pros, ASR Motorsport hired at least seven former Wheel Pros employees, including three sales representatives, two general managers, an accountant, and a warehouse associate.  Each of these individuals previously worked with Lanzello at Wheel Pros and were subject to ongoing non-disclosure obligations prohibiting the unauthorized use or disclosure of Wheel Pros' confidential information.

114.    Lanzello's solicitation of Wheel Pros employees began while he was still employed at Wheel Pros and well before his employment termination.  In his own words, Lanzello admitted he had conversations about "a potential future together" at ASR Motorsport with "75 percent of Wheel Pros' employees."

115.    Text messages confirm that during his employment, Lanzello was already involved in planning the departures of key Wheel Pros employees and coordinating their onboarding to ASR Motorsport months prior to his termination.  For example, in October 2024, he discussed "bringing Tracy [Kilgar] on" for ASR Motorsport accounting while she was still affiliated with Wheel Pros.

116.    A group text exchange from October 11, 2024, involving Lanzello, Palacios, and Noori further illustrates Defendants' coordinated plans to divert Wheel Pros' vendors and personnel. In the messages, Lanzello instructs the group to "take top two or three persons per warehouse to start that you know out of the gates will be launched with us and ready to push us."

He cautioned that "this information could put us all in a lawsuit if the wrong person says something."

117.    Lanzello also offered Palacios a General Manager position at ASR Motorsport in a written offer letter dated November 2, 2024. This offer letter listed Lanzello as ASR Motorsport "President" – weeks before Lanzello's employment termination from Wheel Pros.

118.    Also prior to Wheel Pros terminating Lanzello's employment, in a November 2024 group text chain with multiple ASR Motorsport employees, including Individual Defendants Leahy and Palacios, Lanzello wrote: "If they fire me, it's coming from that [ASR] email – open season on salesmen," and "[d]oes anyone need or want an official offer letter?"

119.    Around the same time, Lanzello sent a message to a Wheel Pros' employee Rene Estrada, stating "[b]y the way, none of WP's business where you're going. You don't have to say where." Estrada joined ASR Motorsport as an employee shortly thereafter.

120.    Additional messages reflect Lanzello's solicitation and coordination of multiple resignations following his termination.  For example, on December 16, 2024, Lanzello instructed Noori to "prep your resign email" and told him, "Anything you want to email or shoot pic of, do it now." In the same exchange, Lanzello asked Noori about plans for "Rocky," referring to Rocky Ritter, who later resigned from Wheel Pros and joined ASR Motorsport.  Lanzello also suggested that another Wheel Pros employee, believed to be Huallanca, should resign as well. These conversations, coupled with Lanzello's earlier statement that he could "take anyone [he] want[s] when [they] are ready," demonstrate that his efforts to recruit and divert Wheel Pros' workforce were not only deliberate, but already well underway during his employment with Wheel Pros.

**K.**     **Defendants Use Wheel Pros' Confidential Sales Information and Wheel Pros Designs to Create and Market Competing Products for ASR Motorsport.**

121.    As part of their coordinated effort to launch ASR Motorsport as a direct competitor, Defendants misappropriated Wheel Pros' confidential design information, internal sales strategies, and technical specifications to develop and sell competing products.

122.    These actions were not coincidental or based on general industry knowledge—they were based on the Individual Defendants' detailed insight into Wheel Pros' most successful product lines, obtained through their roles as trusted employees with access to proprietary information.

123.    Indeed, on September 17, 2024, Noori sent a text message to a group including Lanzello, Thompson, Palacios, and Leahy confirming their malicious intentions and intentional misappropriation.  Referring to the collective group of Defendants, Noori wrote, "we have the A team, we will bury them." The text chain was accompanied by wheel design ideas and images that the group exchanged and discussed developing for ASR Motorsport.

124.    On December 24, 2024, Huallanca sent pricing materials to a known Wheel Pros' customer while promoting ASR Motorsport's wheels, offering "much higher" margins than Wheel Pros and emphasizing ASR Motorsport's "more competitive" pricing.

125.    On February 8, 2025, shortly after his departure from Wheel Pros, Huallanca emailed to his asrmotorsport.com email account several photos apparently taken with a mobile phone of Wheel Pros' customer list, showing all Wheel Pros customer accounts sorted by year-to-date sales, customer contact information, historical sales information, and the Wheel Pros employees who were responsible for the account. As a former employee, Huallanca was not authorized to access, retain or use such information. Based upon information and belief, Huallanca

he deliberately took this information while he was still employed with Wheel Pros' to benefit ASR Motorsport, despite his Non-Disclosure Agreement.

126.    Lanzello also brazenly stole Wheel Pros' sensitive, confidential and trade secret information.  For example, on Sunday, October 27, 2024, Lanzello forwarded an email from his Wheel Pros' email account to his personal email account attaching a spreadsheet entitled "2025 Planning Template – ASP – WTA ETv3 nc.xlsx" ("Planning Template").

127.    The Planning Template contained month-by-month average selling price during 2023 and 2024 for dozens of wheels, tires and accessories sold by Wheel Pros, along with budgeted sale prices for 2025 and anticipated year-over-year sales for each product.

128.    The Planning Template includes pricing, sales and budgeting information at the regional level and broken down by individual profit center for nine locations within the Northeast region that Lanzello oversaw for Wheel Pros. If disclosed to a competitor, the historical and forecasted pricing data and anticipated year-over-year sales would confer an immediate competitive advantage, particularly for a nascent competitor lacking established pricing methodologies or historical sales information.

129.    The information contained in the Planning Template was developed by Wheel Pros, which Lanzello had access through his employment at Wheel Pros and is not generally known to the public.

130.    This unauthorized disclosure of Wheel Pros' protected company information constitutes a violation of Lanzello's contractual obligations, statutory duties under federal trade secret laws, and common law duties owed to Wheel Pros.  Lanzello's actions were in blatant disregard of his responsibilities and directly supported the establishment and operations of a competitor to the detriment of Wheel Pros.

131.    In other communications, the Individual Defendants reference Wheel Pros' design elements and internal performance data to guide ASR Motorsport's product development decisions and gain an unfair advantage in the marketplace.

132.    For example, on July 8, 2024, in a group chat with Hale, Lanzello received a text message referencing "ADX." Lanzello noted "I like ADX" but asked Hale "But is it a no no to be close?", which upon information and belief is reference to Wheel Pros' "ATX" tractor trailer wheel brand. Lanzello then said "Can't wait to launch!!! We are going to be able to crush WP!!"

133.    In an August 2024 email exchange while the Individual Defendants were employed by Wheel Pros, Lanzello used his personal Gmail account to discuss "Dualie reference drawings" and reference specific Wheel Pros products, including the ARC and Flux wheel programs.  The emails noted when Wheel Pros' product went into production, at what stage they were in sample form, and specific design details, followed by the directive, "we need to make sure we do the same to…make it easy for the sales….".  These communications reflect the use of confidential product timelines and design strategy to shape ASR Motorsport's own product development and go-to-market approach.

134.    These communications took place while Lanzello was still employed by Wheel Pros and bound by ongoing confidentiality and assignment of invention obligations. To the extent any wheel designs were developed during that time or derived through improper means including the Individual Defendants' breach of their contractual obligations or misappropriation of trade secrets, they indisputably fall within the scope of Wheel Pros' proprietary rights.

135.    Defendants' actions constitute direct and knowing misuse of Wheel Pros' confidential information and reflect a calculated effort to develop and sell competing wheels by

copying successful Wheel Pros designs and exploiting internal performance insights by virtue of their employment with Wheel Pros.

136.    Defendants further exploited Wheel Pros' goodwill and brand recognition through external marketing efforts. A promotional advertisement for "Arena Wheel Co."—a key product line of ASR Motorsport—surfaced bearing the tagline, "brought to you by the original founders of Fuel Off-Road." Fuel Off-Road is a Wheel Pro product. The ad prominently featured the Arena Wheel brand alongside language designed to suggest continuity with prior successful ventures in the wheel industry, which was plainly intended to trade on Wheel Pros' reputation and confuse customers. These public-facing efforts to align ASR Motorsport with Wheel Pros' legacy and market standing further illustrate Defendants' deliberate campaign to divert business, erode brand loyalty, and misappropriate competitive advantage developed through their prior roles at Wheel Pros.

**L.    Wheel Pros' Efforts to Secure Defendants' Compliance.**

137.    Lanzello's own notes, including the "ASR To-Do" list found on his Wheel Pros desk, confirm his active planning and operation of ASR Motorsport during his employment. The list included tasks such as establishing ownership, payroll, insurance, and launching a website. Although he denied it at the time of his termination, Lanzello later admitted that he created the document while he was still employed with Wheel Pros.

138.    Upon discovering Lanzello's activities both during and following his employment with Wheel Pros, Wheel Pros promptly served written notice on Lanzello and ASR Motorsport of Wheel Pros' intent to enforce its contractual and other rights. *See* Exs. N and O ("Cease and Desist Letters").

139.    In written correspondence and discussions through counsel, Wheel Pros requested that Lanzello and ASR Motorsport provide assurances of compliance with their respective legal obligations; both failed to provide adequate assurances, and instead, affirmed that they intended to continue acting in violation of Wheel Pros' rights.

140.    Lanzello and ASR Motorsport rebuffed Wheel Pros' repeated good-faith attempts to secure compliance and avoid litigation. Left with no other recourse, Wheel Pros commenced this action to enforce its rights, protect its customer relationships and goodwill, and enjoin Defendants from continuing to cause severe and irreparable harm to Wheel Pros.

141.    At the time, Wheel Pros believed Lanzello had acted largely alone. However, as additional evidence has come to light, it is now clear that multiple former Wheel Pros' employees, including the other Individual Defendants, also actively participated in the unauthorized use of Wheel Pros' confidential information and the coordinated effort to launch and staff ASR Motorsport at Lanzello's direction while still employed by Wheel Pros.

**M.    Wheel Pros Discovers Lanzello Has Taken Wheel Pros Cash.**

142.    Wheel Pros' business involves collecting, retaining and depositing cash and checks from customers upon delivery of Wheel Pros' product by Wheel Pros' delivery drivers.  Wheel Pros' driver employees would then bring the cash or checks back to the local Wheel Pros' location for its file clerk to deposit into Wheel Pros' bank accounts.  Lanzello's wife and former Wheel Pros employee, Marlene Lanzello, served as the file clerk at its New York location, reported to Lanzello and was responsible for depositing such cash and checks.

143.    It was Wheel Pros' understanding that Marlene Lanzello was timely depositing the cash and checks. However, after Lanzello's termination from employment, on or about February 27, 2025, Wheel Pros discovered cash collected from Wheel Pros' customers had not been deposited into Wheel Pros' accounts.

144.    Upon further investigation, Wheel Pros learned that the missing cash involved funds that Marlene Lanzello should have deposited in Wheel Pros' bank accounts.  Wheel Pros contacted Marlene Lanzello and Lanzello to inquire about the missing cash.  Lanzello did not return all of the funds at once. After several delays, on Monday, March 3, 2025, Lanzello returned $111,043 in cash and $110,149.94 in checks made payable to Wheel Pros, which he was not authorized to retain.  On or about March 10, 2025, Lanzello returned additional cash funds belonging to Wheel Pros in the amount of approximately $98,229.  On or about March 14, 2025, Lanzello returned additional cash funds belonging to Wheel Pros in the amount of approximately $154,023. In total, Defendant returned and admitted to retaining wrongfully approximately $473,445 in cash and checks belonging to Wheel Pros ("Misappropriated Funds"). Lanzello retained possession of such funds for months, even after his employment with Wheel Pros had ended.

145.    It was only upon Wheel Pros' discovery and demand that Lanzello returned the Misappropriated Funds to Wheel Pros. Upon information and belief, Lanzello attempted to keep the Misappropriated Funds for his own benefit.

## COUNT I – BREACH OF NON-DISCLOSURE AGREEMENT

### (Against Individual Defendants)

146.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 145 of this Verified First Amended Complaint.

147.    The Non-Disclosure Agreements are valid and enforceable agreements pursuant to which the Individual Defendants each agreed to refrain at all times from improperly disclosing and using Wheel Pros' confidential information or competing against Wheel Pros during employment with Wheel Pros.

148.     Individual Defendants Noori, Leahy, Palacios, Huallanca and Thompson entered into the Non-Disclosure Agreement as a condition of their employment with Wheel Pros and as a prerequisite to their access to Wheel Pros' confidential, proprietary and sensitive business information.

149.     The Non-Disclosure Agreements are valid and enforceable agreements pursuant to which the Individual Defendants each agreed to refrain at all times from improperly disclosing and using Wheel Pros' confidential information or competing against Wheel Pros during employment with Wheel Pros.

150.     As a result of these breaches, Wheel Pros has suffered, and will continue to suffer, immediate and irreparable harm, including the loss of customer relationships and goodwill, and the unlawful use of Wheel Pros' confidential, proprietary, and trade secret information by a direct competitor, and such misuse has enabled Defendants to undercut Wheel Pros in the marketplace, divert customers, and erode Wheel Pros' competitive standing.

## COUNT II – BREACH OF UNIT GRANT AGREEMENT

### (Against Lanzello)

151.     Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 150 of this Verified First Amended Complaint.

152.     The Unit Grant Agreement is a valid and enforceable agreement, pursuant to which Lanzello agreed to certain non-disclosure, non-competition and non-solicitation obligations.

153.     Lanzello entered into the Unit Grant Agreement and agreed to abide by its terms in consideration for continued employment with Wheel Pros and participation in equity compensation opportunities.

154.     The restrictive covenants contained in the Unit Grant Agreement are reasonable in scope, necessary to protect Wheel Pros' legitimate business interests, including its confidential and

trade secret information and its goodwill and relationships with its customers and vendors, and are set forth in writing signed by the person against whom enforcement is sought.

155.    Lanzello has breached the Unit Grant Agreement through, among other things, his unauthorized use and disclosure of Wheel Pros' confidential information, his direct competition with Wheel Pros both during and after his employment with Wheel Pros, and his solicitation and hiring of Wheel Pros' employees on behalf of ASR Motorsport.

156.    As a result of Lanzello's actions, Wheel Pros has suffered and will continue to suffer immediate and irreparable harm, including through the loss of customer relationships and goodwill, and through unauthorized use by a direct competitor of Wheel Pros' sensitive, proprietary and confidential information, which provides Defendants with the blueprint and knowhow to immediately compete against Wheel Pros, undercut Wheel Pros in the marketplace, steal Wheel Pros' customers, and diminish Wheel Pros' goodwill.

**COUNT III**
**VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1832, 1836 *ET SEQ*.**

(Against all Defendants)

157.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 156 of this Verified First Amended Complaint.

158.    Wheel Pros maintains and has maintained a vast amount of confidential, proprietary, and trade secret information, including, but not limited to, information concerning its strategic business plans; products; designs; customer details, preferences and purchase histories; target customers; pricing, cost, sales and other financial information; distribution methods; marketing strategies; growth strategies; design processes; referral sources; and business relationships, all of which provide Wheel Pros with a competitive advantage in the market.

159.    This confidential and trade secret information relates to, among other things, products or services that are used in, or intended for use in, interstate commerce.

160.    Wheel Pros takes significant measures to keep such information secret and confidential, such as maintaining the information on its secure computer systems and limiting access to only those that need the information to perform their jobs.

161.    Further, employees with access to Wheel Pros' confidential and trade secret information are required to enter into agreements with Wheel Pros: (i) prohibiting the disclosure or use, of Wheel Pros information; and (ii) requiring the return of any confidential information upon termination of their employment with Wheel Pros.

162.    Wheel Pros also maintains and promulgates policies relating to information non-disclosure and security, systems access and device use, and implements technological and physical security measures to protect its trade secrets.

163.    As a result of these security measures, Wheel Pros' trade secrets are safeguarded and not available for others to use through any legitimate means.

164.    Wheel Pros' trade secrets derive independent value from not being generally known to, and not being readily ascertainable to, another person who can obtain economic value from the disclosure or use of the information.

165.    Defendants improperly and unlawfully misappropriated Wheel Pros' trade secret information, including through Lanzello's exfiltration of electronic files containing Wheel Pros' trade secret information, and Defendants' use of such information to set up and operate a directly competing entity targeting Wheel Pros' customers.

166.    During their employment with Wheel Pros, the Individual Defendants had access to and misappropriated Wheel Pros' trade secret information.

167.    Defendants accessed Wheel Pros' systems for the purpose of misappropriating Wheel Pros' trade secrets for Defendants to use in direct competition with Wheel Pros and for Defendants to avoid incurring the expense and time necessary to independently develop products, processes, strategies, plans, and customer relationships, among other things.

168.    Defendants' misappropriation of Wheel Pros' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

169.    If Defendants are not enjoined, they will continue to have access to and use Wheel Pros' misappropriated trade secret information for their own benefit and to Wheel Pros' detriment.

170.    As the direct and proximate result of Defendants' conduct, Wheel Pros has suffered and will continue to suffer immediate and irreparable competitive harm and injury.

171.    By reason of the foregoing, and because Wheel Pros' remedy at law is in and of itself inadequate, Wheel Pros is entitled to temporary, preliminary and permanent injunctive relief to recover and protect its confidential and trade secret information from further use or disclosure.

### COUNT IV
### <u>TORTIOUS INTERFENCE WITH CONTRACT</u>

(Against ASR Motorsport)

172.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 171 of this Verified First Amended Complaint.

173.    The Employment Agreements are valid and enforceable contracts between Wheel Pros and Lanzello.

174.    Upon information and belief, ASR Motorsport had full knowledge of the Employment Agreements and the restrictions contained therein prohibiting the Individual Defendants from disclosing or using Wheel Pros' confidential information or trade secrets, engaging in certain competitive activities, and soliciting Wheel Pros' employees.

175.    ASR Motorsport intentionally and unjustifiably induced Lanzello to breach the Employment Agreements by encouraging him to, among other things, (i) improperly commence competitive employment with ASR Motorsport, (ii) improperly solicit Wheel Pros' employees and customers on behalf of ASR Motorsport, and (iii) improperly use and/or disclose Wheel Pros' confidential information and trade secrets.

176.    As a direct and proximate result of ASR Motorsport's actions, Lanzello breached the Employment Agreements, thereby damaging Wheel Pros' business, competitive advantage in the marketplace, and customer relationships.

177.    By reason of the foregoing knowing, willful and intentional tortious interference with Wheel Pros' contractual agreements, Wheel Pros is entitled to a judgment against ASR Motorsport.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**

(Against Lanzello)

178.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 177 of this Amended Complaint.

179.    At all relevant times, Lanzello held a position of trust, confidence and responsibility with Wheel Pros.

180.    As a consequence, Lanzello owed and continues to owe fiduciary duties to Wheel Pros and was required to act with the highest degree of loyalty and good faith toward Wheel Pros in all manners affecting its business, and to not take any actions that are or may be harmful to Wheel Pros' business.

181.    By engaging in the conduct alleged herein and acting to advance Defendants' interests at Wheel Pros' expense, including, but not limited to, actively setting up and operating

a competing business, misappropriating Wheel Pros' confidential, proprietary and trade secret information, and soliciting Wheel Pros customers on behalf of ASR Motorsport, all while employed by Wheel Pros as its Regional Vice President, and using Wheel Pros' resources and during working hours, Lanzello breached his fiduciary duties owed to Wheel Pros.

182.    Lanzello undertook these actions to the detriment of Wheel Pros and to benefit himself, ASR Motorsport and the Individual Defendants who are now employed by ASR Motorsport.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

(Against Lanzello and ASR Motorsport)

183.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 182 of this Verified First Amended Complaint.

184.    Wheel Pros has business relationships with customers Lanzello solicited and diverted to ASR Motorsport, including during his employment with Wheel Pros.

185.    Wheel Pros developed those relationships at substantial cost and over several years, including through years of business dealings with those customers, investment in Wheel Pros' employees and operations, and execution of strategic acquisitions and business plans.

186.    Defendants were aware of the relationships between Wheel Pros and those customers and acted with malice and used dishonest and improper means to divert Wheel Pros' expected economic advantage from such customers to ASR Motorsport, including by misappropriating Wheel Pros' confidential, proprietary and trade secret information, and by Lanzello actively competing against Wheel Pros during his employment for Defendants' benefit.

187.    As a direct and proximate result of result of Defendants' tortious interference, Wheel Pros has suffered and will continue to suffer irreparable harm and substantial damages.

## COUNT VII
## BREACH OF DUTY OF LOYALTY/FORFEITURE UNDER THE FAITHLESS SERVANT DOCTRINE

(Against Individual Defendants)

188.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 187 of this First Amended Complaint.

189.    As employees of Wheel Pros, the Individual Defendants each owed Wheel Pros a duty of loyalty, including the obligation to act in the best interests of the Company, avoid conflicts of interest, and refrain from engaging in conduct that would harm or undermine Wheel Pros' business operations or competitive standing.

190.    While still employed by Wheel Pros, the Individual Defendants breached their duty of loyalty by actively assisting in the planning, formation, and development of a directly competing business, ASR Motorsport.

191.    Defendants used Wheel Pros' time, resources, and confidential information to support ASR Motorsport's launch, and coordinated to solicit Wheel Pros employees and divert business opportunities.

192.    Defendants also participated in efforts to undermine Wheel Pros' operations from within, including sharing proprietary information and preparing to resign en masse to join ASR Motorsport — all while collecting salaries and using Wheel Pros' resources to engage in competitive activity.

193.    These actions were intentional, continuous, disloyal, and undertaken in direct conflict with the Individual Defendants' duties and obligations to Wheel Pros.

194.    As a result of these breaches, Wheel Pros has suffered and continues to suffer significant harm, including loss of confidential business information, disruption of operations, loss of valuable personnel, and diminished goodwill and customer relationships.

195.    As a result of this disloyal conduct, each of these Defendants is subject to forfeiture of compensation received during the period of disloyalty.

## COUNT VIII
## <u>UNFAIR COMPETITION</u>

(Against ASR Motorsport)

196.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 195 of this First Amended Complaint.

197.    ASR Motorsport knowingly and improperly misappropriated Wheel Pros' confidential and proprietary business information in bad faith, including sales data, customer relationships, product designs, pricing information, marketing plans, and other trade secrets, in order to gain an unfair competitive advantage in the marketplace.

198.    ASR Motorsport's conduct was not the result of legitimate competition, but rather the product of a coordinated effort by former Wheel Pros' executives and employees—including Lanzello, the Individual Defendants and others acting on ASR Motorsport's behalf—who exploited their positions at Wheel Pros to secretly develop, plan, and launch ASR Motorsport while still employed by Wheel Pros.

199.    ASR Motorsport knowingly accepted and benefited from this wrongful conduct, including through its unauthorized use of Wheel Pros' confidential information and targeted solicitation of Wheel Pros' employees and customers.

200.    ASR Motorsport misappropriated and misused Wheel Pros' confidential and proprietary information to improperly compete, cause customer confusion, divert business opportunities, and erode Wheel Pros' competitive standing.

201.    As a direct and proximate result of ASR Motorsport's unfair competition, Wheel Pros has suffered and will continue to suffer irreparable harm, including loss of customer

relationships, loss of goodwill, diversion of revenue, and the unauthorized use of proprietary information by a direct competitor that did not invest the time, resources, or capital to develop such assets on its own.

**COUNT IX**
**CONVERSION**

(Against Lanzello)

202.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 201 of this Verified First Amended Complaint.

203.    The Misappropriated Funds belonged to Wheel Pros and were collected from Wheel Pros' customers on behalf of Wheel Pros as payment for Wheel Pros' products. The Misappropriated Funds were supposed to be deposited into Wheel Pros' accounts. Instead, Lanzello retained the Misappropriated Funds for months without disclosing this to Wheel Pros even after Wheel Pros terminated his employment for cause.

204.    It was only upon Wheel Pros' inquiry into the Misappropriated Funds that Lanzello returned hundreds of thousands of dollars in cash and checks to Wheel Pros, admitting that he would return it all eventually. Lanzello, or Marlene Lanzello at Lanzello's direction, retained dominion and possession over the Misappropriated Funds without authorization, thereby assuming and excising the right of ownership over goods that belonged to Wheel Pros.

205.    Wheel Pros did not have access to, or possession over, the Misappropriated Funds. Moreover, Lanzello was unable to return the Misappropriated Funds to Wheel Pros in full upon request, instead returning large sums in three different tranches. To date, although Wheel Pros' investigation is continuing, Wheel Pros has yet to reconcile all missing funds under Lanzello's supervision.

206.    "[R]eturning property to the rightful owner does not absolve defendants of all liability from the alleged conversion" and a claim exists "even when the deprivation is partial or temporary." *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013).

207.    In addition to the Misappropriated Funds, Lanzello continues to retain electronic records belonging to Wheel Pros that remain on his electronic devices. *See Thyroff v. Nationwide Mut. Ins.*, 8 N.Y.3d 283, 292-93 (2007).

**COUNT X**
**UNJUST ENRICHMENT**

(Against Lanzello and ASR Motorsport)

208.    Wheel Pros incorporates by reference the allegations set forth in Paragraphs 1 to 207 of this Verified First Amended Complaint.

209.    Lanzello and ASR Motorsport were unjustly enriched by utilizing Wheel Pros' trade secret and confidential information to unlawfully compete against Wheel Pros , including other Wheel Pros' employees to misappropriate such information and breach their statutory, contractual and common law obligations.

210.    Lanzello was further unjustly enriched by retaining and not returning the Misappropriated Funds.

211.    Lanzello and ASR Motorsport's knowing and intentionally deceptive and unlawful conduct has been and remains at Wheel Pros' expense.

**PRAYER FOR RELIEF**

WHEREFORE, Wheel Pros, LLC respectfully requests the Court enter judgment in its favor against Defendants as follows:

A.    Preliminarily and permanently enjoining Defendants, and anyone acting in concert with them, from using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business;

B.    Preliminarily and permanently enjoining Lanzello from working for ASR Motorsport or engaging in any other competitive activities in accordance with the terms of his contractual agreements with Wheel Pros;

C.    Preliminarily and permanently enjoining Lanzello, and anyone working in concert with him, from soliciting or hiring Wheel Pros employees or engaging in any other solicitation in violation of the Unit Grant Agreement;

D.    Requiring Defendants to destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information which they still possess or control, subject to supervision and verification by a neutral third party;

E.    Requiring Lanzello to return all Misappropriated Funds and any other missing cash funds belonging to Wheel Pros that were misdirected or mismanaged by or under the supervision of Lanzello;

F.    Order the transfer to Wheel Pros of all "Developments" as defined in the respective Non-Disclosure Agreements, including, but not limited to, patents, designs and profits related thereto, made, created or contributed to, in part or whole, by the Individual Defendants during their Wheel Pros' employment or which can be traced back to the Individual Defendants' improper use of Wheel Pros' confidential or trade secret information;

G.    Awarding Wheel Pros compensatory damages for any loss occasioned by Defendants' unlawful conduct;

H.      Awarding Wheel Pros punitive and exemplary damages for Defendants' willful and malicious misappropriation of trade secrets;

I.      Awarding punitive damages and the disgorgement of all amounts earned by the Individual Defendants during periods of disloyalty, as a result of their breach of their duty of loyalty owed to Wheel Pros;

J.      Awarding Wheel Pros its attorneys' fees and costs; and

K.      Granting all other further injunctive relief to which Wheel Pros is entitled or which the Court deems equitable and just.


Dated:  May 16, 2025                    Respectfully submitted,


                                        By: */s/ Katharine Liao*
                                        Katharine J. Liao
                                        New York Bar No. 5625900
                                        katharine.liao@squirepb.com
                                        Paul D. Erian
                                        New York Bar No. 5191069
                                        Paul.erian@squirepb.com
                                        Lauren A. Herz-DerKrikorian
                                        New York Bar No. 5622907
                                        Lauren.herz@squirepb.com

                                        SQUIRE PATTON BOGGS (US) LLP
                                        1120 Avenue of the Americas, 13th Floor
                                        New York, NY 10036
                                        Telephone:  (212) 872-9800
                                        Facsimile: (212) 872-9815

                                        *Counsel for Plaintiff Wheel Pros, LLC.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHEEL PROS, LLC | Civil Action No. 2:25-cv-00929-NJC-ARL |
| Plaintiff, | |
| -against- | |
| ASR MOTORSPORT, LLC,<br>NICHOLAS LANZELLO,<br>REZA NOORI,<br>JOSEPH LEAHY,<br>DAVID PALACIOS,<br>JOHN THOMPSON III and<br>DANNY HUALLANCA | |
| Defendants. | |

## **VERIFICATION**

I, Brian Clark, being of full age, hereby certify as follows:

I am authorized on behalf of Plaintiff Wheel Pros, LLC ("Wheel Pros") to make this verification. I have read the foregoing Verified First Amended Complaint, and the facts stated in the foregoing Verified First Amended Complaint are true and correct to the best of my knowledge. This verification is based on my personal knowledge, as well as knowledge and information provided to and obtained by me in my capacity as the Chief Human Resources Officer for Wheel Pros.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 16, 2025.

Brian Clark
Chief Human Resources Officer
Wheel Pros, LLC

1104421059\1\AMERICAS