# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Wheel Pros, LLC,<br><br><div align="center">Plaintiff,</div><br><div align="center">-v-</div><br>ASR Motorsport, LLC, Nicholas Lanzello, Reza Noori, Joseph Leahy, David Palacios, John Thompson, III, and Danny Huallanca,<br><br><div align="center">Defendants.</div> | <div align="center">2:25-cv-929<br>(NJC) (ARL)<br><br>SEALED</div> |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Wheel Pros, LLC ("Wheel Pros") brings this action for damages and injunctive relief against Defendants ASR Motorsport, LLC ("ASR Motorsport"), Nicholas Lanzello ("Lanzello"), Reza Noori ("Noori"), Joseph Leahy ("Leahy"), David Palacios ("Palacios"), John Thompson III ("Thompson"), and Danny Huallanca ("Huallanca") (collectively, "Defendants")[1] to stop them from allegedly stealing and misappropriating confidential, proprietary, and trade secret information from Wheel Pros, as well as engaging in employee and client solicitation in violation of various agreements between the parties. The Amended Complaint brings the following claims: (1) breach of contract for alleged violation of the Individual Defendants' Non-Disclosure Agreements with Wheel Pros (against the Individual Defendants); (2) breach of contract for Lanzello's alleged violation of the "Unit Grant Agreement," the agreement granting him equity in Wheel Pros (against Lanzello only); (3) violation of the Defend Trade Secrets Act,

---

[1] Lanzello, Noori, Leahy, Palacios, Thompson and Huallanca are also referred to as the "Individual Defendants."

18 U.S.C. §§ 1832, 1836 (against all Defendants); (4) tortious interference with contract (against ASR Motorsport only); (5) breach of fiduciary duty (against Lanzello only); (6) tortious interference with prospective economic advantage (against ASR Motorsport and Lanzello); (7) breach of duty of loyalty/forfeiture under the faithless servant doctrine (against the Individual Defendants); (8) unfair competition (against ASR Motorsport only); (9) conversion (against Lanzello only); and (10) unjust enrichment (against ASR Motorsport and Lanzello). (Am Compl. ¶¶ 146–211, ECF No. 23.)

Before the Court is Wheel Pros' Motion for a Preliminary Injunction ("PI Motion"), in which Wheel Pros asks me to issue a preliminary order:

(1) enjoining Defendants from "using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information as defined in any written agreement between Wheel Pros and any Defendant, including without limitation," the Non-Disclosure Agreements executed by Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca;

(2) enjoining Lanzello from "owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity which directly or indirectly engages in the Business (as defined in the Unit Grant Agreement), including ASR Motorsport, in accordance with the terms set forth in the Unit Grant Agreement";

(3) enjoining Lanzello from "directly or indirectly soliciting, hiring, retaining or engaging any Company Employees (as defined in the Unit Grant Agreement) in accordance with the terms of the Unit Grant Agreement, or engaging in any solicitation in violation of the Unit Grant Agreement, until further Order";

(4) enjoining ASR Motorsport from "employing Lanzello for the duration of the applicable restrictions set forth in Lanzello's Unit Grant Agreement or until further Order of the Court";

(5) requiring Defendants to "provide a full accounting of all Wheel Pros customers that any Individual Defendant (i) had material dealings with during his or her last twelve (12) months of employment with Wheel Pros, or about whom any Individual Defendant acquired confidential information, and (ii) solicited on behalf of or for the benefit of ASR Motorsport while employed by Wheel Pros ('Restricted Customers')";

(6) enjoining Defendants from "soliciting or engaging in business dealings with any Restricted Customer until further Order of the Court";

(7) requiring Defendants to "destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information, or other Wheel Pros' Confidential Information, or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party";

(8) enjoining Lanzello from "continuing to improperly retain, possess or control" and requiring Lanzello to "return to Wheel Pros" "any Misappropriated Funds and any other missing cash funds belonging to Wheel Pros that were misdirected or mismanaged by or under the supervision of Lanzello"; and

(9) enjoining Defendants from "marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to all 'Developments,' as defined in the respective Individual Defendants' Non-Disclosure Agreements, including, but not limited to, aftermarket wheels and automotive accessories, created or contributed to, in whole or in part, by any Individual Defendant while employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros."

(Proposed Order, ECF No. 35-5.) Wheel Pros also seeks preliminary relief in the form of disgorgement of Defendants' "revenue or profits that have been realized as a result of Defendants' unlawful activities," attorneys' fees and costs, damages for losses caused by Defendants' unlawful conduct, and punitive and exemplary damages. (*Id.* at 3.)

The PI Motion is fully briefed, and this Court held a two-day hearing on the PI Motion on July 10 and 11, 2025. (*See* July 10, 2025 Hr'g Tr., ECF No. 52; July 11, 2025 Hr'g Tr., ECF No. 51.)

For the reasons explained below, I grant the PI Motion in part, as follows:

(1) Defendants are enjoined from using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information as defined in any written agreement between Wheel Pros and any Individual Defendant, including without limitation, the Non-Disclosure Agreements executed by Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca.

(2) Lanzello is enjoined from owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity which directly or indirectly engages in the Business (as defined in the Unit Grant Agreement), including ASR Motorsport, in accordance with the terms set forth in the Unit Grant Agreement.

(3) Lanzello is enjoined from directly or indirectly soliciting, hiring, retaining or engaging any Company Employees (as defined in the Unit Grant Agreement) in accordance with the terms of the Unit Grant Agreement, or engaging in any solicitation in violation of the Unit Grant Agreement, for the duration of the applicable restrictions set forth in Lanzello's Unit Grant Agreement.

(4) Defendants shall destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information, or other Wheel Pros' Confidential Information (as defined in the Individual Defendants' Non-Disclosure Agreements), or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party.

(5) Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to all "Developments," as defined in the respective Individual Defendants' Non-Disclosure Agreements, including, but not limited to, aftermarket wheels and automotive accessories, created or contributed to, in whole or in part, by any Individual Defendant while employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.

## BACKGROUND

The following facts are taken from: (1) the Amended Complaint (Am. Compl.) and the documents attached to the Amended Complaint; (2) the declarations, factual exhibits, and testimony proffered in connection with the PI Motion; and (3) the testimony proffered at the PI Motion hearing. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (holding that a court "need not accept as true the well-pleaded allegations in [the plaintiff's] complaint" on a motion for a preliminary injunction).

### I.    The Parties

Wheel Pros is a leader in the aftermarket tire industry, designing, marketing, and distributing "branded automotive aftermarket wheels, performance tires, and accessories." (Am. Compl. ¶ 24.) Wheel Pros' clients include "over 10,000 retailers" and a network of distribution centers across North America and Australia. (*Id.*)

ASR Motorsport was formed on September 19, 2024 as a competitor to Wheel Pros. (*Id.* ¶ 71.) Lanzello is a former Wheel Pros employee and currently the President of ASR Motorsport.

(*Id.* ¶ 31.) Noori, Palacios, Leahy, Thomspon, and Huallanca are former Wheel Pros employees who resigned shortly following Lanzello's termination; all of them now work at ASR Motorsport. (*Id.* ¶ 52.)

## II.    Individual Defendants' Employment Agreements with Wheel Pros

In 2004, Lanzello began working at Wheel Pros' predecessor entity MHT Luxury Wheels, Inc. ("MHT"). (*Id.* ¶ 30.) Following Wheel Pros' acquisition of MHT in 2019, Lanzello became Wheel Pros' "Regional Vice President – Northeast," and he retained this position until his termination. (*Id.* ¶ 31; July 11, 2025 Hr'g Tr. 344:5–8.)

As a condition of his employment with Wheel Pros, on November 14, 2019, Lanzello entered into a non-disclosure agreement with Wheel Pros ("Lanzello Non-Disclosure Agreement"). (Lanzello NDA, Stip. Ex. 1, ECF No. 47-1 at 1–3.) The Lanzello Non-Disclosure Agreement is governed by New York law. (*Id.* ¶ 7.) Paragraphs 1.a, 2, 5, and 6 of the agreement are relevant to this action.

Paragraph 1.a defines "Confidential Information" as:

[I]nformation that is not generally known in the industry in which Wheel Pros is engaged, in the possession, ownership or control of Wheel Pros or its employees. Confidential Information includes, but is not limited to, information related to wheel and cap designs (whether patentable, patented or not), trade secrets, programs, business plans, inventions (whether patentable, patented or not), processes, formulas, existing or contemplated products, technical data, services, technology, concepts, computer programs, plans, studies, techniques, designs, specifications, patterns, contracts, presentations, and business information, and including information related to any research, development, manufacture, purchasing, engineering, know-how, sales or marketing methods, competitive analyses, methods of doing business, customer lists, or customer usages or requirements.

(Lanzello NDA ¶ 1.a.) Paragraph 2, in turn, provides that Lanzello will "hold all Confidential Information that has been, or may be obtained, in trust and confidence" and "not use for [Lanzello's] own purposes, nor disclose to others, either during or after employment, except as

required by Wheel Pros, any Confidential Information." (*Id.* ¶ 2.) Likewise, Paragraph 6, concerning company documents and records, requires that "[a]ll written materials and other tangible objects . . . shall be the property of Wheel Pros and shall be delivered to Wheel Pros upon termination of employment or at any other time upon request." (*Id.* ¶ 6.)

Additionally, Paragraph 5 of the Lanzello Non-Disclosure Agreement prohibits Lanzello from competing with Wheel Pros while employed at the company:

> [D]uring employment with Wheel Pros, [Lanzello] agrees that [Lanzello] will not compete, or without the advance written approval of Wheel Pros, engage in any activity that may constitute a conflict with Wheel Pros' interests regarding Confidential Information or Developments. Any question whether a particular activity may constitute a conflict of interest shall be resolved by obtaining Wheel Pros' written approval before engaging in that activity.

(*Id.* ¶ 5.)[2]

On June 6, 2021, Lanzello entered into an agreement with Wheel Pros governing his receipt of equity in the company—the Unit Grant Agreement. (Unit Grant Agreement, Stip. Ex. 2, ECF No. 47-1 at 4–35.) According to Lanzello, he did not have the opportunity to read the Unit Grant Agreement in its entirety before signing it. (Lanzello Dep. Tr. 402:18–403:2, Krezalek Decl. Ex. O, ECF No. 29-16.) However, Lanzello acknowledged that he paid taxes on Wheel Pros shares received pursuant to the Unit Grant Agreement and that he was told that his shares would be worth "a few million dollars." (July 11, 2025 Hr'g Tr. at 350:10–13 ("[LANZELLO]: I mean, I was told it was going to be worth a few million dollars."); *id.* at 352:7–8 ("[LANZELLO]: I normally was getting a refund in my taxes and I had to owe, like, $100,000.").)

---

[2] Paragraph 1(b) defines "Developments" as "inventions (whether or not patentable), product designs (whether or not patentable), new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property created during [Lanzello's] employment." (Lanzello NDA ¶ 1.b.)

The Unit Grant Agreement contains additional restrictive covenants, as set forth below.

First, Paragraph 9(a), concerning non-competition, provides:

> During the period of Executive's employment with the Partnership, Employer or any of their respective Subsidiaries and **for five (5) years following any Separation**, Executive **shall not**, directly or indirectly, own any interest in, **manage**, control, **participate in** (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), **consult with, render services for or otherwise engage in any business or entity which directly or indirectly competes with the business** of supplying manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories for vehicle models or brands currently or planned to be supplied, manufactured and/or distributed by [Wheel Pros].

(Unit Grant Agreement ¶ 9(a) (emphasis added).) Second, Paragraph 9(b), concerning non-solicitation, provides:

> During the period of Executive's employment with the Partnership, Employer or any of their respective Subsidiaries and **for five (5) years following any Separation, Executive shall not, and shall not cause any of his or her Affiliates to, directly or indirectly, solicit** (except pursuant to a general solicitation which is not directed specifically to any officer, manager or employee of the Partnership or any of its Subsidiaries) **or hire, retain or engage any officer, manager or employee** of the Partnership or any of its Subsidiaries (collectively, the "Company Employees"), **or encourage any such Company Employee to leave his or her employment or hire any such Company Employee who has left such employment**; provided, however, that nothing in this Section 9(b) shall prevent Executive or any of his or her Affiliates from soliciting or hiring any former Company Employee whom has not been employed by the Partnership or any of its subsidiaries for the twelve (12) month period preceding such solicitation or hiring.

(*Id.* ¶ 9(b) (emphasis added).)

Noori, Palacios, Leahy, Thompson, and Huallanca were all formerly employed by Wheel Pros in managerial or sales positions. (Am. Compl. ¶¶ 52, 54.) Specifically: (1) Noori was the General Manager of Wheel Pros New York and New Jersey (*id.* ¶ 54.a); (2) Palacios was the General Manager of Wheel Pros Riverside, California (*id.* ¶ 54.b); (3) Leahy was a Sales Manager at Wheel Pros Los Angeles (*id.* ¶ 54.c); (4) Thompson was a Sales Manager at Wheel Pros Atlanta (*id.* ¶ 54.e); and Huallanca was a Sales Manager at Wheel Pros New York (*id.*

¶ 54.d). Noori, Palacios, Leahy, Thompson, and Huallanca all resigned from Wheel Pros shortly after Lanzello's termination and now work at ASR Motorsport. (*Id.* ¶ 52.)

As part of their employment with Wheel Pros, Noori, Palacios, Leahy, Thompson, and Huallanca all signed the same form non-disclosure agreement as the Lanzello Non-Disclosure Agreement, with the law of their respective states of residence applying to each agreement.[3]

### III.  Defendants' Misappropriation of Trade Secrets, Use of Confidential and/or Proprietary Information, and Unlawful Competitive Activities

As Regional Vice President, "Lanzello was granted unfettered access" to Wheel Pros' "proprietary wheel design program that utilizes segmented design teams, aggregation and analysis of market and sales research, and review and refinement by dedicated design committees," as well as other proprietary information, including:

> pricing methodologies, costs, sales and other financial information; distribution methods and operations; product design processes and planned designs; marketing and branding strategies; strategic business plans; customer identities; preferences and histories; target and prospective customers; and terms of agreements with vendors, suppliers, and other third-party business partners.

(Am. Compl. ¶ 33.)

The record includes evidence demonstrating that as early as February 2024, nine months before Lanzello's departure from Wheel Pros, Lanzello and the other Individual Defendants began engaging in activities to found ASR Motorsport—including by disseminating Wheel Pros' proprietary materials outside of Wheel Pros, soliciting Wheel Pros' employees to work at the

---

[3] Noori Non-Disclosure Agreement, Am. Compl. Ex. C, ECF No. 23-1 at 36–38 (applying New York law); Palacios Non-Disclosure Agreement, Am. Compl. Ex. D, ECF No. 23-1 at 39–41 (applying California law); Leahy Non-Disclosure Agreement, Am. Compl. Ex. E, ECF No. 23-1 at 42–44 (applying California law); Huallanca Non-Disclosure Agreement, Am. Compl. Ex. F, ECF No. 23-1 at 45–47 (applying New York law); Thompson Non-Disclosure Agreement, Am. Compl. Ex. G, ECF No. 23-1 at 48–50 (applying Florida law). I refer to the Individual Defendants' respective non-disclosure agreements collectively as the "Non-Disclosure Agreements" or the "NDAs."

forthcoming company, and encouraging customers to do business with the forthcoming company. The extensive factual record contains numerous examples of Defendants engaging in competition with Wheel Pros—including through the use of Wheel Pros' confidential information, solicitation of employees, and solicitation of customers—even while the Individual Defendants were employed by Wheel Pros. The following summary highlights the key facts.

On February 4, 2024, non-party Art Hale, Jr. ("Hale")—the former CEO of MHT, who at the time was subject to a non-compete agreement with Wheel Pros[4]—texted Lanzello images of wheels, to which Lanzello responded, "Winner, winner, chicken dinner." (First Liao Decl. Ex. D, ECF No. 26-2 at 43–45.) Hale also texted Lanzello, "I've been drawing for three weeks," to which Lanzello responded, "Can't wait." (*Id.*) Shortly after those exchanges, on February 14, 2024, Lanzello emailed Hale a summary of Wheel Pros' February 2024 sales to-date, stating that "February is starting ██████." (Pl.'s Rebuttal Ex. E, ECF No. 47-4 at 14–16.)

In the following months, Hale and Lanzello frequently texted, even before Hale's non-compete with Wheel Pros expired in mid-May 2024, discussing wheel designs and Hale's plans to (in Lanzello's words) "crush the wheel game again." (First Liao Decl. Ex. G, ECF No. 26-2 at 52–54.) In one instance, on April 30, 2024, Lanzello texted two screenshots to Hale, showing Wheel Pros' month-to-date and total daily sales revenue by region. (Stip. Ex. 4, ECF No. 47-1 at 42–46; *see also* July 10, 2025 Hr'g Tr. 86:15–17 (Wheel Pros employee Eric Tiffin's testimony as to the contents of the screenshots).) Also in April 2024, Lanzello informed Hale via text that he believed "[t]he timing is right to launch." (Stip. Ex. 4.)

---

[4] Hale's non-compete agreement with Wheel Pros expired on "approximately" May 15, 2024. (July 11, 2024 Hr'g Tr. 299:9.)

On May 16, 2024, almost immediately after Hale's non-compete agreement with Wheel Pros expired, Hale informed Lanzello that Junjie Chen ("Chen"), a former Wheel Pros employee, "has factories lined up" to produce wheels for ASR Motorsport. (Stip. Ex. 5, ECF No. 47-1 at 47–54.) Then, on June 7 and 8, 2024, Lanzello, Leahy, Hale, Chen, and others held another strategy meeting in Los Angeles, at which they discussed product designs and business plans. (*See* First Liao Decl. Ex. M, ECF No. 26-2 at 80–83 (June 7, 2024 text chain in which Hale, A.D. Hale, and Lanzello discuss meeting logistics and invitees); Stip. Ex. 6, ECF No. 47-1 at 55–59 (May 21, 2024 text chain between Hale and Lanzello, discussing strategy meeting planning); Stip. Ex. 7, ECF No. 47-1 at 60–62 (June 8, 2024 text chain between A.D. Hale, Hale, Leahy, Chen, Lanzello, and an unidentified individual listed as "Craig Atlanta" discussing strategy meeting logistics).)

On July 16, 2024, Lanzello texted Hale Wheel Pros' spreadsheets showing the company's 100 top-selling SKUs of 2023 and year-to-date 100 top-selling SKUs of 2024, including the average selling price of those SKUs and the corresponding gross profit margin. (Stip. Ex. 8, ECF No. 47-1 at 63–76; *see also* July 10, 2025 Hr'g Tr. 124:23–125:1 ("[TIFFIN]: This appears to be our SKUs, looks like our top selling SKUs in order of volume, it looks like, with . . . average selling price and gross margin.").) As explained at the PI Motion hearing, a SKU (short for "stock keeping unit") refers to the numerical code used by a manufacturer to categorize and track its products. The SKU numbers used by Wheel Pros to identify its approximately 12,000 wheel products contain five data points: (1) the wheel's style or design; (2) the wheel's size; (3) the wheel's bolt pattern; (4) the wheel's finish; and (5) the wheel's offset. (July 10, 2025 Hr'g Tr. 84:3–8; 91:4–8.) Collectively, this information provides a given wheel's "fitment"—that is, what types of vehicles a particular wheel will fit. (*Id.* 178:16–23.) As Wheel Pros' Product Director

Eric Greiving ("Greiving") testified, fitment is "a very specific knowledge that requires a lot of work to understand what goes on what vehicle, and those are sometimes specific to vehicles and other times, it's specific to a trend relating to a vehicle." (*Id.*) While the SKU numbers corresponding to each of Wheel Pros' products appear on Wheel Pros' website in piecemeal form, aggregated information regarding Wheel Pros' 12,000 SKUs and which SKUs sell best is not public information. (*Id.* 84:3–8; *see also id.* 83:10–21 ("TIFFIN: [H]ow much of that particular SKU you are selling, now you have five different data points that can easily help you determine what's actually happening in the market, what fitments are selling well . . . It's critical information.").)

Throughout this period, the Individual Defendants made plans for ASR Motorsport during their work hours at Wheel Pros and using Wheel Pros resources. For example, on July 22, 2024, Lanzello stated in a text message that he had completed work for ASR Motorsport at the Wheel Pros office but waited until he was back home to email his work product because he "didn't want to sign on to the internet at the office." (Am. Compl. ¶ 98.) In another text exchange, Noori texted Lanzello that he was "sending Arena texts while on WP calls LOL." (Second Liao Decl. Ex. M, ECF No. 36 at 100–03.) On August 4, 2024, Lanzello, Leahy, Palacios, Thompson, and Noori discussed brand names and purchased the domain name for "Arena Wheel." (Am. Compl. ¶ 88.)

On August 9, 2024, Chen, acting on behalf of ASR Motorsport, emailed confidential drawings corresponding to two Wheel Pros wheel designs to Hale, Lanzello, Jeff Claunch (who, at the time, was Director of Engineering at Wheel Pros), and Jose Valenzuela (a "third party contractor" who Wheel Pros would "use from time to time"), one of which was "still in sample stage in May." (Stip. Ex. 11, ECF No. 47-1 at 89–102; *see also* July 10, 2025 Hr'g Tr. 244:7–11,

246:21–23.) At the PI Motion hearing, Greiving testified that some of the drawings sent by Chen were "like a schematic for how to build the wheels." (*Id.* 201:5–6.) On August 10, 2024, Chen emailed the same group of individuals—Hale, Lanzello, Claunch, and Valenzuela—a photograph of a Wheel Pros spreadsheet showing "about . . . half year's worth of purchasing" of specific SKUs, including "sales quantity" and "how many of those SKUs [Wheel Pros had] sold." (Stip. Ex. 13, ECF No. 47-1 at 129–33.) That same day, Chen emailed the same group a spreadsheet showing Wheel Pros' "actively purchased SKUs as of today" and requested that Valenzuela "use the corresponding inner part when designing the rear wheels." (Stip. Ex. 14, ECF No. 47-1 at 134–38.) Two days later, Chen emailed the same group additional wheel drawings. (Stip. Ex. 12, ECF No. 47-1 at 104–28.)

Then, on August 16, 2024, Lanzello replied to the August 10, 2024 email thread, copying Hale's son A.D. Hale—a third party who is not affiliated with Wheel Pros or ASR Motorsport. (Stip. Ex. 15, ECF No. 47-1 at 139–44; July 11, 2025 Hr'g Tr. 330:24–25 (Hale testifying that A.D. Hale is "not involved with ASR [Motorsport] at all").) It is unclear from the face of Stipulated Exhibit 15 whether A.D. Hale received the underlying drawing attached to Chen's August 10, 2025 email, or just the text of the email chain. Regardless, the text of the email chain alone includes Wheel Pros' confidential and proprietary information—including descriptions of the specifications set forth in the confidential drawings that were attached to the August 10, 2024 email. (Stip Ex. 15.) The email chain also includes discussions about (1) "brand new" Wheel Pros wheel styles, including one that was not yet in production as of May 2024, and (2) the fact that Wheel Pros "started to use just ███████████████████████████." (*Id.*) Finally, the email chain includes a link to download a zip file, apparently containing the attached wheel drawings. (*Id.*)

Defendants also began taking actions to solicit Wheel Pros' clients. For example, on or around August 15, 2024, Lanzello had dinner with the owner of what Lanzello referred to as his "big customer" at Wheel Pros. (First Liao Decl. Ex. BB, ECF No. 26-2 at 183–87.) Following the dinner, Lanzello texted Hale to inform him that the customer at issue does "████████ a year" and would follow Lanzello to ASR Motorsport. (*Id.*)

ASR Motorsport was formed on September 19, 2024 and was formally registered to conduct business on October 11, 2024. (Am. Compl. ¶ 71.) According to its website, ASR Motorsport provides "the most incredible, high-quality and beautiful after-market wheels and products to millions of people who love enhancing the look of their vehicles." (Am. Compl. Ex. H, ECF No. 23-1 at 51–52.) On his LinkedIn profile, Lanzello holds himself out as the President of ASR Motorsport and indicates that he left Wheel Pros in October 2024. (Am. Compl. Ex. O, ECF No. 23-1 at 88; *see also* July 11, 2025 Hr'g Tr. 342:7–8 (Lanzello testifying that he is "President/CEO" of ASR Motorsport).) In October 2024, Lanzello also signed a power of attorney as President of ASR Motorsport to authorize shipping services, opened ASR Motorsport's bank account and accounts with FedEx and UPS, and negotiated warehouse leases. (Am. Compl. ¶ 90.)

Following the founding of ASR Motorsport, Defendants continued their efforts to solicit Wheel Pros' customers, which resulted in some customers moving their business over to ASR Motorsport entirely. According to Wheel Pros employee Jared Greenlese, in September 2024, a representative from ██████████—a client managed by Lanzello—informed Greenlese that ██████████ intended to stop doing business with Wheel Pros. (Greenlese Decl. ¶¶ 10–11.) Six months later, an ██████████ employee texted Greenlese a video in which the employee threw a Wheel Pros catalog in the trash. (*Id.*)

On October 23, 2024, Lanzello emailed a significant Wheel Pros customer about carrying ASR Motorsport products, stating, "We are go to onboard ASAP." (Am. Compl. ¶ 95.) On October 27, 2024, Lanzello emailed a Wheel Pros 2025 budget template from his Wheel Pros email address to his personal email address. (Stip. Ex. 23, ECF No. 47-2 at 41–62.)[5] On October 29, 2024, Lanzello sent an email from the account "NickL@asrmotorsport.com" to the "big customer" with whom he had dinner back in August 2024, providing an ASR Motorsport product sheet and stating, "[T]his should be what you need to get started. Take a look and let me know if any is missing to launch on your site." (Am. Compl. ¶ 93.) Also on October 29, 2024, Lanzello emailed ███, another Wheel Pros customer, indicating that he had previously sent ███ ASR Motorsport's product sheet. (First Liao Decl. Ex. CC, ECF No. 26-2 at 188–89.)

In early-to-mid November 2024, Wheel Pros' Global Vice President of Sales Eric Tiffin had a conversation with Lanzello, in which Lanzello denied that there was any truth to the rumor than he intended to leave Wheel Pros and work for a new company being founded by Hale; Tiffin memorialized the conversation in a November 12, 2024 email to Tiffin's superior, John Vang, and head of Wheel Pros HR, Brian Clark. (Pl.s' Rebuttal Ex. A, ECF No. 47-4 at 1–2; *see also* July 10, 2024 Hr'g Tr. 69:23–72:22 (Tiffin testimony regarding his conversation with Lanzello).) Subsequently, Tiffin discovered a website listing Lanzello as the founder of a wheel company in the northeast region. (July 10, 2025 Hr'g Tr. 69:13–19.) Upon receiving this

---

[5] During the PI Motion hearing, Lanzello testified that he sent this budget template to his personal email account because he "had a deadline to in [his] budget plan to [his] boss" and would need to continue working on the document on his personal desktop computer, which has external monitors, as opposed to his work laptop. (July 11, 2025 Hr'g Tr. 368:16–21 ("[I]f you could see how big this document is it's virtually impossible to do this on a laptop. So I emailed it so I could put it up on my screens at home and work.").) Based on Lanzello's tone and demeanor, as well as his demonstrably untrue answers to other questions during the PI Motion hearing, I do not find this testimony to be credible. *See infra*, Discussion Section II.C.

information, Tiffin flew to New York unannounced to speak to Lanzello in-person; however, when Tiffin arrived, he discovered that Lanzello was in Los Angeles attending a meeting related to ASR Motorsport. (July 10, 2025 Hr'g Tr. 74:16–75:8.) At this point, Tiffin conducted an investigation, during which he found a note titled "ASR To Do!!" in Lanzello's office at Wheel Pros. (Am. Compl. Ex. I, ECF No. 23-1 at 53–54.) Based on the findings of the investigation, Tiffin recommended that Wheel Pros terminate Lanzello immediately, which it did on November 20, 2024. (July 10, 2024 Hr'g Tr. 76:7–10.)

On November 26, 2024, Shahin Zamanian Rad, the owner of Wheel Pros client Rayco II, World of Spoilers, Inc. ("Rayco"), texted Lanzello, "My floor. All yours[.] Warehouse. All yours . . . Told my guys to remove Wpro glass display." (Pl.'s Rebuttal Ex. B, ECF No. 47-4 at 3–4; *see also* July 10, 2025 Hr'g Tr. 269:4–12 ([Rad] testifying that "Wpro" refers to "Wheel Pros").)

In their effort to solicit customers for ASR Motorsport, Defendants also shared with Wheel Pros' customers information derived from ASR Motorsport's use of Wheel Pros' internal pricing information. On December 6, 2024, Noori emailed a representative at Tire Agent, informing the representative that he was leaving Wheel Pros and sharing a "link to all the part numbers." (Stip. Ex. 29, ECF No. 47-2 at 83–84.) Later, the Tire Agent representative emailed Noori, suggesting that Noori "replace the [Wheel Pros] part numbers" with ASR Motorsport part numbers. (Stip. Ex. 31, ECF No. 47-2 at 88–93.) On December 10, 2024, Lanzello emailed a representative at ████, sharing ASR Motorsport's "current sku list" and stating that the items were priced at 40% off wheel brands and 35% off suspension, compared to Wheel Pros' prices. (Stip. Ex. 27, ECF No. 27-2 at 78–79.) Likewise, on December 24, 2024, Huallanca emailed ████████ with an ASR Motorsport inventory list and stated that a discount had been "set at 35%

15

off and that allows you to make an incredible margin with a product much more superior and at a better price than [Wheel Pros brands] ███████████████ ." (Stip. Ex. 30, ECF No. 47-2 at 85– 87.)

Following Lanzello's termination, ASR Motorsport hired at least seven former Wheel Pros employees, including three sales representatives, two general managers, an accountant, and a warehouse associate. (Am. Compl. ¶ 113.)

## PROCEDURAL HISTORY

Wheel Pros filed the initial Complaint in this action on February 18, 2025 (Compl., ECF No. 2), along with a motion for a temporary restraining order (TRO Mot., ECF No. 1). I held a hearing on February 20, 2025. (Min. Entry, Feb. 20, 2025.) During that hearing, the parties reached agreement on numerous issues pending the resolution of Wheel Pros' anticipated motion for a preliminary injunction; accordingly, I dismissed the motion for a temporary restraining order as moot. (Min. Entry, Feb. 20, 2025; Elec. Order, Feb. 20, 2025.) On the same day, I set a schedule for expedited discovery, amendment of the pleadings, and briefing concerning the anticipated motion for a preliminary injunction, which I subsequently modified pursuant to the parties' stipulation on April 15, 2025. (Min. Entry, Feb. 20, 2025; Elec. Order, Apr. 15, 2025.) I also directed the parties to participate in a settlement conference before Magistrate Judge Arlene R. Lindsay, which did not result in a settlement. (Elec. Order, Feb. 20, 2025; Min. Entry, Mar. 13, 2025.)

On May 16, 2025, pursuant to the parties' stipulated briefing schedule, Wheel Pros filed the Amended Complaint and attached exhibits. (Am. Compl.) On the same day, Wheel Pros also filed the PI Motion (Mot.), a supporting memorandum (Mem., ECF No. 25-2), and a declaration by Wheel Pros' counsel Katharine Liao (First Liao Decl., ECF No. 26-1) with numerous

16

supporting exhibits (ECF No. 26-2). On June 6, 2025, Defendants filed a memorandum in opposition to the PI Motion (Opp'n, ECF No. 28-1) and a declaration by Defendants' counsel Martin S. Krezalek (Krezalek Decl., ECF No. 29-1) attaching numerous exhibits (ECF Nos. 29-2–29-73). On June 20, 2025, Wheel Pros filed a reply memorandum (Reply, ECF No. 35) along with declarations by Clark (Clark Decl., ECF No. 35-1), Vang (Vang Decl., ECF No. 35-2), Tiffin (Tiffin Decl., ECF No. 35-3), and Greiving (Greiving Decl., ECF No. 35-4), as well as a declaration by Katharine Liao attaching additional exhibits (Second Liao Decl., ECF No. 36).

On July 2, 2025, the parties filed a joint letter outlining disputes concerning the remote testimony of witnesses and the admission of certain exhibits at the upcoming hearing. (ECF No. 39.) I denied the parties' request to have certain witnesses testify remotely and ordered the parties to file by July 7, 2025, a joint submission identifying their anticipated witnesses and exhibits, as well as any disputes over the admission of exhibits. (Elec. Order, July 3, 2025.) On July 7, 2025, the parties timely filed their joint submission. (ECF No. 40.)

On July 10 and 11, 2025, the Court held an evidentiary hearing on the PI Motion. (July 10, 2025 Hr'g Tr.; July 11, 2025 Hr'g Tr.) At the hearing, the parties jointly introduced numerous stipulated exhibits, as well as additional exhibits to which the parties did not stipulate. (ECF No. 47.) Following the hearing, on August 1, 2025, the parties filed supplemental briefing. (Defs.' Suppl. Br., ECF No. 48; Pl.'s Suppl. Br., ECF No. 50.)[6]

As a result of the parties' numerous submissions, the large volume of documentary exhibits I have reviewed in connection with the PI Motion is spread throughout the docket in multiple locations, as follows:

(1) The exhibits attached to the Amended Complaint are docketed at ECF No. 23-1.

---

[6] Defendants have not moved to dismiss the Amended Complaint, but rather filed an answer to the Amended Complaint along with counterclaims. (Am. Answer, ECF No. 49.)

(2) The exhibits submitted along with Wheel Pros' opening brief on the PI Motion are attached to the First Declaration of Katharine Liao and are docketed at ECF No. 26-2.

(3) The exhibits submitted along with Defendants' opposition brief on the PI Motion are attached to the Declaration of Martin Krezalek and are docketed at ECF Nos. 29-2 to 29-73.

(4) The exhibits submitted along with Wheel Pros' reply brief in further support of the PI Motion are attached to the Second Declaration of Katharine Liao and are docketed at ECF No. 36.

(5) The exhibits introduced at the PI Motion hearing are docketed at ECF Nos. 47-1 (Stip. Exs. 1–15), ECF No. 47-2 (Stip. Exs. 16–35), ECF No. 47-3 (Stip. Exs. 36–53), ECF No. 47-4 (Pl.s' Rebuttal Exs. A–H), and ECF No. 47-5 (Defs.' Exs. C and I).[7]

Many of the relevant documents appear multiple times on the docket: (1) attached to the Amended Complaint; (2) attached to declarations in support of, or in opposition to, the PI Motion, and (3) included in the parties' exhibits introduced into evidence at the PI Motion hearing.[8]

---

[7] At the PI Motion hearing, Defendants objected to the admission of Wheel Pros' Exhibit A, and Wheel Pros objected to the admission of Defendants' Exhibits A through J. (ECF No. 40 at 6–12 (outlining the parties' objections).) Of these exhibits, the only ones shown to witnesses at the hearing were Defendants' Exhibits C and I, although Wheel Pros additionally introduced Rebuttal Exhibits A through H. (*See generally*, July 10, 2025 Hr'g Tr.; July 11, 2025 Hr'g Tr.) In their joint filing of the PI Motion hearing exhibits on the docket, the parties dropped Wheel Pros' Exhibit A and all of Defendants' Exhibits *except* Defendants' Exhibits C and I. (ECF No. 47.)

Concerning Defendants' Exhibits C and I—images of non-party manufacturers' wheels that Defendants contend look similar to both Wheel Pros and ASR Motorsport wheels—Wheel Pros objects to the relevance of these exhibits under Federal Rules of Evidence 401 and 402. (ECF No. 47 at 2.) I overrule Wheel Pros' objections and do consider Defendants' Exhibits C and I in resolving the motion for preliminary injunction. *See Gov't Employees Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 455 (E.D.N.Y. 2020) ("[I]t is well established that the strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction."). Nevertheless, even considering these exhibits, as discussed below, Wheel Pros has met the requirements for the issuance of the limited preliminary injunction fashioned by the Court in this Opinion and Order.

[8] For ease of reference, I cite to these documents by reference to where they appear in the exhibits introduced into evidence at the PI Motion hearing, unless the relevant document was not

**JURISDICTION**

As set forth in my February 19, 2025 Order to Show Cause, this Court has subject matter jurisdiction over Wheel Pros' federal Defend Trade Secrets Act claims under 28 U.S.C. § 1331. (Elec. Order, Feb. 19, 2025.) Further, as set forth on the record in the February 20, 2025 hearing on Wheel Pros' motion for a temporary restraining order, this Court has supplemental jurisdiction over Wheel Pros' state law claims under 28 U.S.C. § 1367(a) because those claims are "so related to" Wheel Pros' Defend Trade Secrets Act claims "that they form part of the same case or controversy under Article III of the United States Constitution." (Min. Entry, Feb. 20, 2025.)

Defendants do not raise personal jurisdiction or insufficient service of process defenses under Rule 12(b)(2) and (b)(5), and such defenses are therefore waived. *See* Fed. R. Civ. P. 12(b) ("A motion asserting [a Rule 12(b)(2) or (b)(5) defense] must be made before pleading if a responsive pleading is allowed."); Fed. R. Civ. P. 12(h)(1)(B) ("A party waives any defense listed in Rule 12(b)(2)–(5) by . . . failing to . . . make it by motion under this rule.").

Venue is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events . . . giving rise to the claim occurred" in this judicial district. (*See, e.g.*, Am. Compl. ¶ 23 ("Lanzello is located in this Court's jurisdiction and exfiltrated Wheel Pros' trade secrets and confidential information while working out of Wheel Pros' New York office.").)

**LEGAL STANDARDS**

The Second Circuit has long held that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action,

---

introduced at the hearing, in which case I cite to that document as it appears elsewhere on the docket.

(2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. It has made clear that when a party seeks "mandatory" rather than "prohibitory" preliminary relief, "the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. Mar. 18, 2024) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)) (emphasis in original).[9]

A mandatory preliminary injunction typically requires the non-movant to affirmatively take some action to change the status quo, whereas a prohibitory preliminary injunction typically requires the non-movant to either refrain from taking action to preserve the status quo or take action to return to the status quo prior to the dispute. *Id.* Determining whether the requested preliminary relief is mandatory or prohibitory "is sometimes unclear":

> In borderline cases, essentially identical injunctions can be phrased either in mandatory or prohibitory terms. We have therefore explained that prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it. In this context, the status quo is really the status quo *ante*— that is, the last actual, peaceable[,] uncontested status which preceded the pending controversy.

*Id.* (citing *N. Am. Soccer League*, 883 F.3d at 36 n.4, 37 n.5).

Here, although the parties' submissions on Wheel Pros' PI Motion do not directly address whether Wheel Pros seeks a mandatory or prohibitory preliminary injunction, the parties both

---

[9] Unless otherwise indicated, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

apply the lower legal standard associated with a request for a prohibitory preliminary injunction. (Mem. at 15; Opp'n at 8.) At the PI Motion hearing, counsel for Defendants argued for the first time that the higher standard for preliminary relief should apply because Plaintiffs seek a preliminary injunction that would require ASR Motorsport to "cease selling wheels that should be assigned to [Wheel Pros]." (July 10, 2025 Hr'g Tr. 36:6-15.) In their supplemental brief, Defendants also argue that the higher standard should apply because the preliminary relief sought here would "essentially foreclose a trial on the merits" by potentially putting ASR Motorsport out of business. (Defs.' Suppl. Br. at 1, 4–5 (citing *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d at 238 (holding that "a plaintiff must meet [the higher] standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits").)

As a threshold matter, Wheel Pros seeks numerous forms of relief that are inappropriate on a preliminary injunction, including disgorgement of revenue and profits realized by Defendants as a result of their alleged unlawful activities, attorneys' fees and costs, and compensatory, punitive, and exemplary damages. (*See* Proposed Order.) None of these forms of relief are appropriate preliminary relief. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that district courts have "no authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication of [the plaintiff's] contract claim for money damages" because "such a remedy was historically unavailable from a court of equity"); *U.S. Securities and Exchange Comm'n v. Kontilai*, No. 23-7537-cv, 2025 WL 615190, at *3 n.4 (2d Cir. Feb. 26, 2025) (holding that disgorgement is not an available form of relief on a motion for a preliminary injunction).

However, under the Second Circuit's guidance, much of Wheel Pros' requested preliminary relief is clearly prohibitory. For example, Wheel Pros' request for an order that would preliminarily enjoin Defendants from using and disseminating trade secrets and confidential information and from directly or indirectly soliciting Wheel Pros' employees and clients is a prohibitory injunction that would preserve the status quo that was in place before the parties' dispute arose.

Similarly, Wheel Pros' request for an order that would preliminarily enjoin Lanzello from working as a manager or employee of ASR Motorsport and that would enjoin ASR Motorsport from employing Lanzello, both in accordance with the terms of the Unit Grant Agreement, is also a prohibitory injunction. The last actual, peaceable, uncontested status between the parties was when Lanzello was working for Wheel Pros and had not begun disseminating Wheel Pros' confidential and proprietary information outside of the company, working to form ASR, soliciting Wheel Pros employees and customers, or serving as ASR's president while employed by Wheel Pros.

By contrast, Wheel Pros' request for an order preliminarily enjoining Defendants from soliciting or engaging in business dealings with "Restricted Customers"—defined to include Wheel Pros customers whom Individual Defendants' solicited for ASR Motorsport while working for Wheel Pros, Wheel Pros customers with whom any Individual Defendants had material dealings during their last twelve months at Wheel Pros, and Wheel Pros customers about whom any Individual Defendant acquired confidential information—is a closer question. Insofar as this relief seeks to preserve the status quo ante by returning the parties to their positions before Defendants had begun soliciting Restricted Customers while still employed at Wheel Pros, it is prohibitory relief. However, insofar as this relief seeks to alter the status quo

ante by limiting Individual Defendants Noori, Leahy, Palacios, Thompson, and Huallanca—who, unlike Lanzello, ceased to be bound by their non-solicitation agreements upon leaving Wheel Pros—from soliciting prospective customers merely because these Individual Defendants previously solicited those customers in violation of their then in-force non-solicitation agreements, it is closer to mandatory relief.[10]

Nevertheless, as set forth below, the preliminary relief I order today—which does not grant the full scope of the preliminary injunction Wheel Pros requests—is limited, clearly prohibitory, and tailored to the specific forms of irreparable harm recognized by the Second Circuit: the dissemination of trade secrets and confidential information and the violation of Lanzello's ongoing obligations not to compete, both of which result in the loss of customer goodwill and other irreparable harm. *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 673 (2d Cir. 2023) (observing that a "loss of goodwill supports a finding of irreparable injury in cases in which employers seek to enforce restrictive covenants against their former employees to prevent them from contacting their customers"). I do not award Wheel Pros "substantially all the relief" sought, nor does the limited injunction issued today foreclose a trial on the merits. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 238.

---

[10] The Non-Disclsoure Agreements signed by the Individual Defendants only limit client solicitation while the Individual Defendants were still employed by Wheel Pros. (*See* NDAs ¶ 5 ("For good consideration, *during employment with Wheel Pros*, Employee agrees that Employee will not compete . . ." (emphasis added)).) By contrast, Lanzello is bound by the Unit Grant Agreement's requirement that he not compete with Wheel Pros for five years following his departure from the company. (*See* UGA ¶¶ 9(a)–(b).)

Thus, the lower "prohibitory injunction" standard applies.[11] Accordingly, Wheel Pros must demonstrate irreparable harm and either a likelihood of success on the merits, or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, in order to secure a preliminary injunction.

## DISCUSSION

In their opening brief, Wheel Pros argues that the requirements are met for this Court to issue a preliminary injunction. As to irreparable harm, Wheel Pros points to evidence that it contends shows the loss of customer relationships and goodwill caused by Defendants' unlawful actions. Wheel Pros also argues that its trade secrets will "inevitably be disclosed" because "[i]t will be impossible for . . . Defendants to wall off their knowledge of Wheel Pros' trade secrets while working substantially similar positions" at ASR and thus the Court should conclude that these trade secrets will inevitably be disseminated. (Mem. at 17.) Finally, Wheel Pros argues that, in signing the Unit Grant Agreement, Lanzello agreed that any breach of that agreement would cause irreparable harm to Wheel Pros. (*Id.* at 18; UGA ¶ 9(e) ("[T]he parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.").) As to likelihood of success on the merits, Wheel Pros argues that it is likely to succeed on its breach of contract, trade secret misappropriation, and breach of duty of loyalty claims, citing provisions of the Unit Grant Agreement signed by Lanzello and the non-disclosure agreements signed by the other Individual Defendants, as well as allegedly stolen confidential information. (*Id.* at 19–24.)

---

[11] The following analysis addresses Wheel Pros' PI Motion under the lower prohibitory injunction standard, which I find to be the appropriate standard here. Nevertheless, I also find that, at a minimum, Wheel Pros has shown a clear likelihood of success on the merits of its Defendant Trade Secrets Act and breach of contract claims and has made a strong showing of irreparable harm with respect to lost goodwill as a result of Defendants' customer poaching activities.

As to the balance of the equities, Wheel Pros argues that "any harm [Lanzello] faces from enforcement of the Unit Grant Agreement's restrictive covenants are the result of his own decisions to violate his contractual obligations," while "without injunctive relief, Wheel Pros will face substantial and irreparable damage to its aftermarket wheel business." (*Id.* at 24.) Finally, as to the public interest, Wheel Pros states in conclusory fashion, and without any citation, that "the public has a clear interest in ensuring contracting parties satisfy their agreed-to obligations." (*Id.* at 25.)

In opposition, Defendants claim that Wheel Pros cannot show irreparable harm, pointing to testimony by Wheel Pros' 30(b)(6) witness and other evidence that several of the customers alleged to have been solicited by Defendants still do a substantial amount of business with Wheel Pros and that the 30(b)(6) witness could not identify any specific lost revenues or business. (Opp'n at 3–10.) Concerning the alleged dissemination of trade secrets and confidential information, Defendants argue that there is no irreparable harm because Wheel Pros has not shown lost customer relationships or goodwill, and the alleged trade secrets and confidential information are not sufficiently technical to invoke what they refer to as the "inevitable disclosure" doctrine. (Opp'n at 11–15.) Defendants also raise multiple arguments purporting to rebut Wheel Pros' claims concerning their likelihood of success on the merits of the various claims. (*Id.* at 17–29.) Further, Defendants argue that the balance of the equities favors them because "Wheel Pros is a leader in the aftermarket wheel industry serving over 10,000 retailers with distribution centers spanning North America and Australia" while, according to testimony by Hale, ASR Motorsport is much smaller. (*Id.* at 29; *see also* Am. Compl. ¶¶ 24–25; Hale Tr. 67:6–69:19, ECF No. 29-3.) Finally, Defendants argue that the public interest weighs in favor of

denying an injunction because "there is no longer any risk that Plaintiff's alleged trade secrets will be further disseminated." (Opp'n at 30.)

On reply, Wheel Pros raises additional examples of alleged lost customer relationships and goodwill. (Reply at 4–5.) It also reiterates arguments with respect to the likelihood of success on the merits, emphasizing that Defendants do not contest in their opposition that they violated their Non-Disclosure Agreements by disclosing Wheel Pros' confidential information without authorization, competing with Wheel Pros while employed by the company, and engaging in activities that would create a conflict of interest with Wheel Pros. (*Id.* at 6–15.)

In its supplemental briefing, Wheel Pros cites to record evidence supporting a finding that Defendants disseminated Wheel Pros' trade secrets beyond ASR Motorsport to a freelancer, customers, Hale, and Hale's son A.D Hale. (Pl.'s Suppl. Br. at 4–8.) Defendants argue that their sharing of Wheel Pros' confidential information does not meet the standard for wider "dissemination" under the Second Circuit's holding in *Faiveley Transport Malmo AB v. Wabtec Corporation*, 559 F.3d 110, 118 (2d Cir. 2009). (Defs.' Suppl. Br. at 5–13.) Defendants also largely reiterate their arguments raised in their opposition brief concerning Wheel Pros' likelihood of success on the merits of the various claims. (*Id.* at 13–19.)

For the reasons explained below, Wheel Pros has met the standards required for some, but not all, of the preliminary relief requested.

## I.    Irreparable Harm

Demonstrating irreparable harm is "the single most important prerequisite for the issuance of" a preliminary injunction. *Faiveley*, 559 F.3d at 118. The showing of irreparable harm must be "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except

26

in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).

With respect to the misappropriation of trade secrets or other proprietary information, the Second Circuit has made clear that it is incorrect to automatically apply "a presumption of irreparable harm . . . upon the determination that a that a trade secret has been misappropriated," notwithstanding its earlier recognition that "the loss of trade secrets cannot be measured in money damages where that secret once lost, is lost forever." *Faiveley*, 559 F.3d at 118–19. The Second Circuit explained, however, that a presumption of irreparable harm might apply in a trade secrets action in certain circumstances:

> *A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets.* Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. . . . [W]here there is no danger that a misappropriator will disseminate proprietary information, the only possible injury that the plaintiff may suffer is loss of sales to a competing product which should be fully compensable by money damages.

*Faiveley*, 559 F.3d at 118–19 (emphasis added). Therefore, in order for the Court to presume irreparable harm resulting from Defendants' alleged misappropriation of trade secrets, Wheel Pros must, at a minimum, show a risk that either (1) Defendants will disseminate those secrets to others or (2) Defendants will otherwise irreparably impair the value of those secrets.

With respect to other unlawful competitive activities—such as the violation of non-solicitation or non-compete agreements—the Second Circuit has held that, while a business's mere loss of sales is compensable by money damages, a business's "loss of reputation and

goodwill constitutes irreparable harm" sufficient to warrant a preliminary injunction. *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)); *see also JTH Tax*, 62 F.4th at 673 ("[A] loss of prospective goodwill that is both imminent and non-quantifiable can constitute irreparable injury."). "Goodwill" refers to a business's expectation "of continued patronage" by its customers. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993). In other words, Wheel Pros cannot establish irreparable harm arising from Defendants' solicitation of Wheel Pros employees and customers based solely on the fact that its customers are also doing business with ASR Motorsport. Rather, Wheel Pros must show that Defendants' conduct of soliciting Wheel Pros employees and customers risks damaging Wheel Pros' reputation or goodwill such that Wheel Pros may no longer have an expectation of continued patronage by certain customers.

Wheel Pros argues that it will experience irreparable harm absent a preliminary injunction because: (1) Defendants will "use and disclose" Wheel Pros' trade secrets; (2) Defendants' conduct is causing, and will continue to cause, Wheel Pros to lose customer relationships and goodwill; and (3), in signing the Unit Grant Agreement, Lanzello agreed that violation of the agreement's restrictive covenants would result in irreparable harm.

As set forth below, Wheel Pros has sufficiently shown irreparable harm in the form of substantial, ongoing risks: (1) that Defendants will continue to disseminate Wheel Pros' trade secret information beyond Defendants to a wider audience and will otherwise irreparably impair the value of those secrets; and (2) that Wheel Pros will experience a loss of customer goodwill due to Defendants' use of Wheel Pros' trade secrets, solicitation of customers, and other competitive activities undertaken in violation of the Non-Disclosure Agreements and the Unit

28

Grant Agreement. Because I find irreparable harm on these bases, I do not reach the question of whether irreparable harm is shown because Lanzello stipulated to a finding of irreparable harm by signing the Unit Grant Agreement.

a. Dissemination of Trade Secrets & Related Impairment of Value

Wheel Pros has shown that there is an actual and imminent risk that Defendants will disseminate its trade secrets to a wider audience beyond ASR Motorsport. Accordingly, under *Faiveley*, there is a presumption of irreparable harm. Based on the record on the PI Motion, Defendants have not sufficiently rebutted that presumption, and Wheel Pros has therefore established that it is experiencing irreparable harm from Defendants' challenged conduct. Indeed, the record shows that Defendants *already have* disseminated trade secrets beyond ASR Motorsport—including to at least one freelancer, to customers, and to Hale's son, who is unaffiliated with ASR Motorsport—and that such dissemination risks irreparably impairing the value of Wheel Pros' trade secrets.

First, on August 9 and 10, 2024, Chen sent, by email, Wheel Pros' proprietary wheel designs to Hale, Valenzuela, Lanzello, and former Wheel Pros employee Jeff Claunch. (Stip. Exs. 11, 13.) Valenzuela was never an employee of Wheel Pros or ASR Motorsport, but rather is a private contractor who was engaged by Wheel Pros on a periodic basis and who now is also engaged by ASR Motorsport. (July 10, 2025 Hr'g Tr. 244:7–17, 250:18–22.) Chen's August 10, 2024 email to Hale, Lanzello, Valenzuela, and Claunch makes clear that the purpose of sharing Wheel Pros' proprietary wheel designs was to assist the development of wheels for a new endeavor involving others on the email thread. (Stip. Ex. 13 ("WP started to use ██████ ██████████ . . . . ████████████████████████████████ ████████████████ .").) Although Chen is not a Defendant in this action, the context of his August 9 and 10, 2025 emails make clear that Chen was acting as an agent of ASR

Motorsport and/or Hale in disseminating Wheel Pros' proprietary wheel designs to the email recipients.

Second, on August 16, 2024, Lanzello replied to the August 10, 2024 email message thread in which Chen shared Wheel Pros' proprietary wheel designs, copying Hale's son, A.D. Hale. (Stip. Ex. 15.) By including A.D. Hale on the email chain, Lanzello gave him access to Wheel Pros' confidential and proprietary information, including: (1) descriptions of the specifications set forth in the confidential drawings attached to the August 10, 2024 email, (2) discussions about "brand new" Wheel Pros wheel styles, including one not yet in production as of May 2024, (3) the fact that Wheel Pros had "started to use ████████████████████ ████████████" as of the date of the email thread, and (4) a link to download a zip file, apparently containing the attached confidential and proprietary Wheel Pros wheel drawings. (*Id.*) A.D. Hale was also included in various email and text threads in which Lanzello provided Wheel Pros' confidential and proprietary information for the purpose of launching ASR Motorsport, despite the fact that, according to Hale, A.D. Hale "is not involved with ASR at all." (July 11, 2025 Hr'g Tr. 330:24–25; *see, e.g.*, Stip. Ex. 4 (April 30, 2024 text chain between Lanzello and Hale, in which Hale states that it was A.D. Hale's idea to schedule an ASR Motorsport strategy meeting for the weekend after Labor Day 2024); Stip. Ex. 10 (late-July 2024 email chain in which A.D. Hale asks whether Wheel Pros brand "███████ still sells and Lanzello responds, "██████ still sells . . . My thinking was [Wheel Pros] is ████████████████ and if we had we could gain market share").)

Third, the record shows that, at a minimum, Defendants sent confidential Wheel Pros information to customers in an attempt to poach their business from Wheel Pros. For example, on December 16, 2024, Noori (from his ASR Motorsport email) sent a representative at Tire

Agent (a Wheel Pros customer) a link to a drive containing "all the part [or SKU] numbers" to certain ASR Motorsport products. (Stip. Ex. 29.)[12] Later, on January 31, 2025, Noori discussed with the same Tire Agent representative how to match Wheel Pros' SKU numbers and prices with those of analog products from ASR Motorsport so that Tire Agent could seamlessly replace its Wheel Pros stock with ASR Motorsport stock. (Stip. Ex. 31.)[13]

Taken together, these examples show that Defendants have already gone beyond mere use of Wheel Pros trade secret information to disseminate that confidential and proprietary information to people and entities who are neither part of Wheel Pros nor ASR Motorsport. They also show that through this wider dissemination, Defendants have already engaged in conduct that threatens to compromise the value of those trade secrets, which include proprietary wheel designs, SKU inventory system data, and pricing information. The record thus demonstrates a

---

[12] July 10, 2025 Hr'g Tr. 204:6–8 ("[PLAINTIFF'S COUNSEL]: And just to be clear, SKUs and part numbers are the same? [GREIVING]: Correct.").

[13] In its supplemental briefing, Wheel Pros also argues that Defendant disseminated trade secret information to customers by representing to customers that they could provide similar products at certain percentages lower than Wheel Pros' prices. (Pl.'s Suppl. Br. at 7–8.) Specifically, Wheel Pros argues that, because different customers have different pricing deals with Wheel Pros, these pricing deals are trade secrets and, accordingly, Defendants' representation to a Wheel Pros customer that ASR Motorsport can offer a discount of a specific percentage constitutes dissemination of the underlying pricing deal with Wheel Pros. (Id.)

Wheel Pros is correct that specific, confidential pricing deals with customers—especially when aggregated together as a tool that ASR Motorsport can use to undercut Wheel Pros' pricing strategy—may very well be a trade secret. See N.Y. Packaging II LLC v. Mustang Mkt'g Grp. LLC, No. 21-cv-1629, 2022 WL 604136, at *5 (E.D.N.Y. Mar. 1, 2022) (holding that "confidential pricing, sales, and product information" is a trade secret); see also TransPerfect Glob., Inc. v. Lionbridge Tech., Inc., No. 22-1348-cv, 2024 WL 177726, at *2 (2d Cir. Jan. 17, 2024) (accepting plaintiff's uncontested claim that its "customer revenue and pricing information" is a trade secret). However, an email offering a customer a certain percentage discount does not constitute dissemination of that trade secret, as opposed to the use of the trade secret for ASR Motorsport's own competitive advantage. Nevertheless, there is ample evidence in the record showing that Defendants have disseminated Wheel Pros' trade secret information in other ways, giving rise to a real risk of continued wider dissemination.

real risk the Defendants will continue to disseminate Wheel Pros' trade secret information beyond ASR Motorsport to a wider audience *and* will otherwise irreparably impair the value of those secrets by, among other things: (1) copying Wheel Pros' proprietary designs for wheels, including wheels that have not yet entered the market; and (2) using Wheel Pros' SKU inventory system and confidential pricing and sales data to offer customers essentially a product-for-product matching of Wheel Pros and ASR Motorsport products at a better price, thus undercutting Wheel Pros' entire pricing strategy.

Defendants argue—unconvincingly—that the *Faiveley* standard for irreparable harm in a trade secret case is not met because Defendants have no intention to use Wheel Pros' trade secrets for anything other than ASR Motorsport's own ability to gain a competitive advantage in the market. But that the demonstration of irreparable harm does not hinge on any contention that Defendants are, for example, *selling* Wheel Pros' trade secrets to Wheel Pros' competitors. Moreover, although the record suggests that Defendants intend to use Wheel Pros' trade secrets *primarily* for ASR Motorsport's competitive advantage, the risk of broader dissemination beyond ASR Motorsport remains great given Defendants' documented lack of regard for ensuring that Wheel Pros' trade secrets remain confidential even as Defendants used them. This is amply illustrated by numerous instances in which Defendants have shared Wheel Pros' secrets openly with, at a minimum, a freelance contractor, Hale's son, and certain customers.

Accordingly, the cases on which Defendants rely to argue that they have no incentive to further disseminate Wheel Pros' trade secrets are distinguishable from this action. For example, in *Passlogix, Inc. v. 2FA Tech., LLC*, the district court held that the plaintiff "provided no reason . . . to believe that [the defendant] is likely to undermine its own business opportunities by disclosing [the plaintiff's] source code to third parties." No. 08-cv-10986, 2010 WL 2505628, at

*10 (S.D.N.Y. June 21, 2010). Here, by contrast, the record shows that, whatever their intentions may be, Defendants already have disclosed Wheel Pros' trade secret information to third parties.

Defendants' remaining arguments, addressed below, likewise do not rebut the finding of irreparable harm here.

First, Defendants argue that Hale cannot be considered a third party to whom Defendants disseminated trade secrets because Hale, although not an employee or owner of ASR Motorsport, is its "sole beneficial owner" through a parent company. (Defs.' Suppl. Br. at 6; *see also* July 10, 2025 Hr'g Tr. 45:6–8 ("[DEFENDANTS' COUNSEL]: With Mr. Hale it's not wider dissemination because, as [Wheel Pros'] argument would have it, Mr. Hale is effectively ASR.").) Even if Hale is not a third party, however, there is ample evidence in the record showing that Defendants *did* disseminate Wheel Pros' trade secrets to third parties—Hale's son, a contractor, and customers. (*See* Stip. Exs. 4, 10, 11, 13, 15, 29, 31.)

Second, Defendants argue that Hale's son, A.D. Hale, is not a third party because "at the time when A.D. Hale was included on these communications, it was anticipated that he would be actively involved in ASR's operations." (Defs.' Suppl. Br. at 7.) Nevertheless, in light of Hale's testimony that A.D. Hale is "not involved" with ASR Motorsport, such vague claims regarding what A.D. Hale's "anticipated" role with ASR Motorsport may have been from May 2024 through August 2024 are not sufficient to establish that A.D. Hale is, or ever was, an employee of ASR Motorsport. To the extent that Defendants vaguely "anticipated" that A.D. Hale "would be actively involved" in ASR Motorsport in some general way at the time during which he received the trade secrets, this is further evidence of Defendants' willingness to disseminate Wheel Pros' confidential information to people who have no formal relationship with ASR Motorsport. In the voluminous records submitted in connection with the PI Motion, Defendants

cite no employment agreement or other document outlining what, if anything, A.D. Hale's "anticipated" role was, why such a role never came to fruition, or what, if any, measures A.D. Hale will take to protect the Wheel Pros' trade secrets that were shared with him.

Third, Defendants argue that the inclusion of A.D. Hale on "a single message concerning planning for ASR does not provide evidence of planned dissemination of Wheel Pros sales information beyond ASR or for any purpose beyond ASR's pecuniary gain." (Defs.' Suppl. Br. at 7.) This argument, however, ignores that A.D. Hale appears on numerous communications in the record, including on the August 2024 email thread in which Lanzello provided A.D. Hale access to (1) descriptions of the specifications set forth in Wheel Pros' confidential drawings, (2) discussions about "brand new" Wheel Pros wheel styles, including one not yet in production, (3) information concerning the fact that Wheel Pros had "started to use ███████████████ █████████" as of the date of the email thread, and (4) a link to download a zip file apparently containing confidential and proprietary Wheel Pros wheel drawings. (Stip. Exs. 11, 13.)

Fourth, Defendants argue that the only identified "proprietary pricing information" is a planning template that Lanzello emailed to himself—not to others. (Defs.' Suppl. Br. at 8–9 (citing Stip. Ex. 23).) But, as discussed below, *infra* at Discussion Section II.a, some of the Wheel Pros pricing information that was disseminated constitute protectible trade secrets. Regardless, Defendants disseminated other trade secrets—most notably, proprietary wheel drawings.

Fifth, Defendants argue that there is no evidence that they disseminated Wheel Pros' customer lists to a "broader audience." (Defs.' Suppl. Br. at 9–10.) Wheel Pros does not appear to dispute this claim, and the record does not show that Defendants engaged in the wider

dissemination of customer lists in particular. Further, given Tiffin's testimony at the evidentiary hearing that Wheel Pros' website publicly lists all active customers that purchase more than a "de minimis" amount of products, there are questions as to whether Wheel Pros' customer list alone (when *not* paired with sales data) is a trade secret. (*See* July 10, 2025 Hr'g Tr. 157:18–21.) Nevertheless, this does not negate the fact that Defendants disseminated *other* Wheel Pros trade secrets.

Sixth, Defendants argue that there is no evidence that Defendants disseminated Wheel Pros' product designs. (Defs.' Suppl. Br. at 10–12.) This argument is squarely contradicted by ample evidence in the record—for example, the emails from August 9, 10, and 15, 2025 showing that Chen, acting on behalf of ASR Motorsport and copying Lanzello, disseminated Wheel Pros' drawings to a third-party contractor and that Lanzello subsequently copied in A.D. Hale. (Stip. Exs. 11, 13.)

Seventh, Defendants argue that there is no risk of *future* harm from the misappropriation of the trade secrets at issue that a forward-looking preliminary injunction could protect against here, since Wheel Pros alleges harm in the form of ASR Motorsport's enhanced ability to expedite its entry into the market through use of Wheel Pros' trade secrets and because ASR Motorsport "has already come to market." (Defs.' Suppl. Br. at 12–13.) This argument fails for two reasons. First, for the purposes of the instant PI Motion, Defendants' argument is beside the point. As set forth in *Faiveley*, the types of harm protectible by preliminary injunctive relief are the harms resulting in the further *dissemination* of, and *impairment to the value* of, trade secrets—not just harm from use. Second, the mere fact that ASR Motorsport has already launched as a company does not contradict evidence demonstrating the substantial, ongoing risk

that Defendants will continue to disseminate trade secrets to expedite ASR Motorsport's entry into different wheel markets across the country as well as the entry of *certain products* to market.

### b. Loss of Customer Relationships and Goodwill

Wheel Pros has likewise shown that Defendants' challenged conduct has led to the actual loss of Wheel Pros' goodwill with customers and imminent additional loss of such goodwill with other customers.

For example, the record shows that on November 26, 2024, Rad, the owner of then Wheel Pros customer Rayco, texted Lanzello: "My floor. All yours[.] Warehouse. All yours[.] Let's build it right here[.] As a base[.] Told my guys to remove [Wheel Pros'] glass display." (Pl.'s Rebuttal Ex. B.) This communication took place just days after Lanzello was terminated for cause and while Lanzello was allegedly subject to both the Non-Disclosure Agreement and the five-year non-compete provision of the Unit Grant Agreement. Moreover, Rad's testimony at the PI Motion hearing underscores that Lanzello's challenged conduct—specifically, his solicitation of Wheel Pros customers during the timeframe governed by the Unit Grant Agreement—has irreparably damaged Wheel Pros' goodwill with Rayco. Rad lacked credibility when he testified that Rayco had only temporarily paused purchasing Wheel Pros products and that Rayco removed the Wheel Pros glass display from its sales floor only because Wheel Pros had temporarily locked Rayco's account for past due payments. (July 10, 2025 Hr'g Tr. 269:4–271:19.) On cross-examination, Wheel Pros' counsel elicited testimony from Rad confirming that Rayco's account was not, in fact, locked on November 26, 2024 when Rad informed Lanzello that he was removing the Wheel Pros glass display from Rayco's storefront and that Rayco's floor was "all [Lanzello's]." (*Id.* 272:17–276:22.) Not only did Rad testify falsely about the purpose underlying his text to Lanzello, but his demeanor and tone also demonstrated his

lack of credibility when he testified that Rayco would do business with Wheel Pros in the future. (*See id.* 261:15–262:3.)

For another example, Greenlese, Wheel Pros' Regional Vice President of the West and International regions, submitted an affidavit attesting that Lanzello was aware of "certain customer issues" involving Wheel Pros customer ████████, an account managed by Lanzello. (Greenlese Aff. ¶ 10.) In September 2024 (the month that ASR Motorsport officially launched), ████████ informed Greenlese that it began purchasing from ASR Motorsport. (*Id.* ¶ 11.) On March 10, 2025, an ████████ employee texted Greenlese a video in which the employee threw a Wheel Pros catalog in the trash. (*Id.*) Such conduct goes beyond the mere decision to do less business with Wheel Pros in light of the increased competition spurred by ASR Motorsport's entry into the market and suggests that Lanzello's violation of his restrictive covenants not to compete with Wheel Pros has damaged ████████' goodwill towards Wheel Pros.

In opposition to the PI Motion, Defendants, without the Court's leave, submitted a supplemental letter objecting to some of the factual characterizations by Wheel Pros in its supplemental brief and attaching a declaration by ████████, owner of ████████. (Defs.' Suppl. Ltr., ECF No. 53; ████████., ECF No. 53-1.) In his declaration, ████████ attests that "[t]he notion that ████████ intended (or intends) to stop purchasing from Wheel Pros is not true" and that "ASR's entry into the market has had zero impact on ████████ goodwill toward Wheel Pros." (████████ ¶¶ 9, 18.) Both Wheel Pros and Defendants could have called Greenlese and/or ████████ to testify at the PI Motion hearing, but they chose not to do so. Accordingly, I am not fully able to assess the credibility of these witnesses and the proper weight to give their conflicting factual declarations. However, I note that Greenlese's

declaration includes a screenshot of the video in which an ███████ ██ employee throws a Wheel Pros catalog into the trash. (Greenlese Decl. ¶ 11.) Nevertheless, even if I were to credit ████████ factual representations over Greenlese's, Wheel Pros has still made a sufficient showing of irreparable harm in the form of lost customer relationships and goodwill, for the other reasons set forth above.

Thus, these examples provide further support for the conclusion that Lanzello's competition with Wheel Pros, in violation of the restrictive covenants to which he is bound, risks resulting not only in the loss of sales to a new competitor in the market, but also the loss of entire customer relationships and goodwill.

Defendants' argument in their supplemental briefing that Wheel Pros has shown no harm beyond "the mere fact of ASR's competition in the marketplace" ignores the record. (Defs.' Suppl. Br. at 13–15.) Some of the harm alleged by Wheel Pros—for example, the fact that some customers now purchase from both Wheel Pros *and* ASR Motorsport—may be compensable by money damages at the conclusion of litigation in the event that Wheel Pros prevails. But the two examples described above suggest that the Individual Defendants' solicitation of Wheel Pros customers for ASR Motorsport—allegedly in violation of Lanzello's Unit Grant Agreement and other Individual Defendants' Non-Disclosure Agreements with Wheel Pros—has irreparably damaged Wheel Pros' relationships with certain customers far beyond the mere loss of sales. On this point, I emphasize that Rad's testimony—specifically, his testimony that Rayco would do business with Wheel Pros in the future and that his November 26, 2024 text message to Lanzello did not convey a permanent end to the business relationship between Wheel Pros and Rayco— was completely lacking in credibility. (July 10, 2025 Hr'g Tr. 269:4–271:19, 272:17–276:22.)

Accordingly, Wheel Pros has demonstrated irreparable harm in the form of loss of customer relationships and goodwill.

      c.   <u>Restrictive Covenants in the Unit Grant Agreement</u>

As explained above, Wheel Pros has made a sufficient showing of irreparable harm in the form of (1) a substantial and ongoing risk that Defendants will continue to disseminate Wheel Pros trade secrets and will otherwise irreparably impair the value of those secrets and (2) the loss of customer relationships and goodwill. Therefore, I do not reach Wheel Pros' argument that irreparable harm is established on the sole basis that Lanzello stipulated in the Unit Grant Agreement that breach of the restrictive covenant set forth in the agreement would result in irreparable harm. Nevertheless, I note that, as a general matter, the Second Circuit has not endorsed a bright-line rule finding irreparable harm simply on the basis of a contract term stipulating to such a finding. *See JTH Tax*, 62 F.4th at 674 (holding that, while clauses acknowledging that any breach of a restrictive covenant will cause "loss of . . . customer goodwill and irreparable harm" "may be entitled to weight, *they do not control the question whether preliminary injunctive relief is appropriate*, even in a case involving breach of a non-compete covenant" (emphasis added)).

## II.    Likelihood of Success on the Merits

Wheel Pros has made a strong showing that it is likely to succeed on the merits of the following claims: (1) that Defendants violated the Defend Trade Secrets Act by misappropriating Wheel Pros' trade secrets; (2) that the Individual Defendants—Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca—violated their Non-Disclosure Agreements with Wheel Pros; and (3) that Lanzello violated the restrictive covenants in the Unit Grant Agreement. I address each claim below.

      a.   <u>The Defend Trade Secrets Act</u>

To demonstrate a likelihood of success on the merits of a misappropriation claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, a plaintiff must show that the defendant disclosed a trade secret without consent where either: (1) that secret was acquired by improper means; or (2) at the time of disclosure, the defendant knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty. 18 U.S.C. § 1839(5). Under this test, "improper means" includes misrepresentation and breach or inducement of the breach of the duty to maintain secrecy; it does not include situations in which the information in question is "reverse engineer[ed]" or "independent[ly] deriv[ed]." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020).

First, Wheel Pros must show that the items at issue are protectable trade secrets. The statute defines a trade secret as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The Second Circuit has previously found that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected . . . against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999). This Court has found that a company's "master list of existing customers and qualified leads" that it developed through "paid advertising, participating in trade shows, and maintaining a website" qualifies as a trade secret. *Bullion Shark LLC v. Flip A Coin LLC*, No. 23-cv-6529, 2023 WL 8455669, at *6 (E.D.N.Y. Dec. 6, 2023). Similarly, another judge of this Court has

40

found a business's customer lists and sales reports that recorded how much customers paid to be trade secrets. *See IME Watchdog, Inc. v. Gelardi*, No. 22-cv-1032, 2022 WL 1525486, at *2, 10 (E.D.N.Y. May 13, 2022), *reconsideration denied*, 2022 WL 2316137 (E.D.N.Y. June 28, 2022); *see also Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-6545, 2021 WL 5630910, at *6 (E.D.N.Y. Dec. 1, 2021). .

Second, Wheel Pros must show that the items at issue were acquired by improper means or that Defendants knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy or derived from a person who owed such a duty. *See* 18 U.S.C. §§ 1839(5).

Here, Wheel Pros has identified numerous materials at issue that are trade secrets under the Defend Trade Secrets Act. The record shows that ASR Motorsport took and leveraged a large volume of Wheel Pros' confidential information, which possessed its own economic value by virtue of the fact that the information was not publicly disclosed. These include proprietary drawings of unreleased wheel designs (Stip. Exs. 11, 13), aggregated data regarding Wheel Pros' best-selling wheels and their associated fitments (Stip. Ex. 8), detailed information concerning sales volumes (Stip. Ex. 4), and customer lists with customer-specific pricing schemes (Stip. Exs. 29, 31). Furthermore, Wheel Pros took steps to keep this confidential information secure, including by: (1) requiring employees with access to trade secrets to sign non-disclosure agreements, (2) requiring employees to use a two-factor authentication protocol in order to access trade secret or otherwise confidential information, and (3) limiting access to trade secrets within the company. (July 10 Hr'g Tr. 81:22–82:9.)

Wheel Pros has likewise shown that Defendants improperly acquired the trade secrets. The record shows that every Individual Defendant in this action signed a Non-Disclosure

41

Agreement pursuant to which they were required to guard the secrecy of "Confidential Information"—defined to include information "*not* generally known in the industry in which Wheel Pros is engaged, [that is] in the possession, ownership or control of Wheel Pros or its employees." (NDAs ¶ 1.a (emphasis added); *see supra* at Background Section I.a.) Accordingly, Defendants had a duty to maintain the secrecy of the above-described trade secret materials.

Defendants' arguments that none of these materials constitutes a protectible trade secret are not meritorious.

First, Defendants argue that Wheel Pros' pricing information is not a protectible trade secret because Wheel Pros does not use a "complex pricing or trading algorithm" and thus "any person could simply determine the price of Wheel Pros' products from the internet." (Opp'n at 22–23.) While the sticker price of Wheel Pros' products may not be a trade secret, Defendants ignore ample evidence that they copied confidential, aggregated information regarding Wheel Pros' negotiated pricing agreements with numerous customers for various products; Defendants have used this information to "create a business that allows [ASR Motorsport] to set [prices] and the percentages off" the prices privately negotiated between Wheel Pros and its customers "and a discount structure in a way that can provide [those] customers [a] better margin" when they purchase from ASR Motorsport as opposed to Wheel Pros. (July 10, 2025 Hr'g Tr. 118:16–24; *see also* July 10, 2025 Hr'g Tr. 155:21–22 ("[DEFENDANTS' COUNSEL]: Would ASR need to have access to confidential information to offer a price that's lower than what Wheel Pros is offering? [TIFFIN]: In order to make that statement, they would have to understand and know what we're selling the product for.").)

Second, Defendants argue that Wheel Pros' customer lists are not protectible trade secrets because such lists contain "little more than publicly available information." (Opp'n at 23–24.)

Defendants are correct that Wheel Pros' customer list alone likely is not a protectible trade secret, especially in light of the fact that Wheel Pros' website lists the majority of its customers. (July 10, 2025 Hr'g Tr. 157:18–21.) However, Defendants ignore that the customer-related information they took from Wheel Pros goes far beyond a list of the names of customers to include sales volume and prices for ranges of products under private pricing arrangements. (Stip. Exs. 29, 31; July 10, 2025 Hr'g Tr. 104:8–106:4.)

Third, Defendants argue that Wheel Pros' sales data is not a trade secret because data concerning Wheel Pros' past sales to customers is "readily ascertainable through a simple inquiry with customers and retailers." (Opp'n at 24.) This argument mischaracterizes the record, which shows that the sales data Defendants took from Wheel Pros and leveraged to build ASR Motorsport goes far beyond basic past sales data to include, among other data points, aggregated monthly sales and best-selling products by volume. (*See, e.g.*, Stip. Exs. 4, 8.)[14]

Fourth, Defendants argue that the similarities between the wheel designs of ASR Motorsport and Wheel Pros are attributable to "readily ascertainable" observation rather than the improper use of trade secrets. (Opp'n at 24–26.) But evidence shows that ASR Motorsport took from Wheel Pros confidential and highly detailed product design information, including 2D and 3D wheel drawings used as blueprints to make specific wheels. (*See, e.g.*, Stip. Exs. 11, 13.)

For these reasons, Wheel Pros is likely to succeed on the merits of its Defend Trade Secrets Act claims.

---

[14] Defendants do not dispute Wheel Pros' allegation that it has more than 10,000 retailers (Am. Compl. ¶ 24; Am. Answer ¶ 24 (stating that Defendants "lack knowledge or information sufficient to form a belief about the truth of the allegations" concerning Wheel Pros' customer volume).) The sheer volume of Wheel Pro retailers alone undercuts Defendants contention that gathering even data limited to Wheel Pros' past sales could somehow be "readily ascertain[ed]" through a "simple inquiry with customers and retailers." (Opp'n at 24.)

b.  <u>Individual Defendants' Violation of their Non-Disclosure Agreements</u>

The Individual Defendants' Non-Disclosure Agreements with Wheel Pros impose a number of obligations on them. Relevant to this case, they provide:

(1) "Employee will not use for Employee's own purposes, nor disclose to others, either during or after employment, except as required by Wheel Pros, any Confidential Information" (NDAs ¶ 2), which is defined to include "information related to wheel and cap designs," "business plans," and "business information" (including "information related to . . . sales or marketing methods," "customer lists," and "customer usage requirements" (NDAs ¶ 1.a);

(2) "[D]uring employment with Wheel Pros, Employee agrees that Employee will not compete, or without the advance written approval of Wheel Pros, engage in any activity that may constitute a conflict with Wheel Pros' interests regarding Confidential Information or Developments" (NDAs ¶ 5).

Here, the record includes sufficient evidence to conclude that Wheel Pros has a likelihood of success on the merits of its breach of contract claims concerning the Individual Defendants' Non-Disclosure Agreements with Wheel Pros. The record shows at least one instance in which each of the Individual Defendants did either or both of the following in violation of these agreements: (1) took and used for the benefit of ASR Motorsport Wheel Pros' "Confidential Information," which is defined to include "information related to wheel . . . designs," "information related to . . . sales," and "customer lists" (NDAs ¶ 1.a); or (2) took actions to "compete, or without the advance written approval of Wheel Pros, engage in any activity that may constitute a conflict with Wheel Pros' interests regarding Confidential Information" while still employed by Wheel Pros (NDAs ¶ 5). The following are examples, and not an exhaustive list, of evidence supporting the conclusion that all Individual Defendants engaged in conduct in violation of their Non-Disclosure Agreements with Wheel Pros.

First, Lanzello was employed by Wheel Pros until his termination in late-November 2024. (July 10, 2024 Hr'g Tr. 76:7–10.) The record shows that, prior to his termination, Lanzello

took large amounts of Wheel Pros' proprietary information to develop ASR Motorsport while still employed at Wheel Pros. The following are just examples of Lanzello's misconduct.

- Lanzello sent Hale detailed Wheel Pros sales data for February 2024 (Pl.'s Rebuttal Ex. E);

- Lanzello sent two screenshots to Hale, showing Wheel Pros' month-to-date and total daily sales revenue by region in April 2024 (Stip. Ex. 4);

- On July 16, 2024, Lanzello texted Hale Wheel Pros' spreadsheets showing the company's 100 top-selling SKUs for 2023 and year-to-date top 100 selling SKUs for 2024, including the average selling price of those SKUs and the corresponding gross profit margin (Stip. Ex. 8);

- On August 16, 2024, Lanzello forwarded A.D. Hale an email thread containing proprietary wheel design information (Stip. Ex. 15); and

- On October 27 2024 , Lanzello emailed from his work account to his personal account a detailed Wheel Pros budget spreadsheet (Stip. Ex. 23).

Second, Noori was employed by Wheel Pros until his resignation December 16, 2024. (Kilger Tr. 138:19–139:7, First Liao Decl Ex. A, ECF No. 26-2 at 1–20.) On December 9, 2024, also while Noori was still employed by Wheel Pros, Lanzello sent Hale a text message stating that Noori "met with" a competitor and that the competitor was "full on board" and that their "support" was with ASR Motorsport. (First Liao Decl. Ex. EE, ECF No. 26-2 at 192–94.) On his last day at Wheel Pros, Noori sent an email to a representative of Tire Agent, sending the representative a link to a drive containing "all the part numbers" to certain ASR Motorsport products. (Stip. Ex. 29.) Later, on January 31, 2025, Noori discussed with the same Tire Agent representative how to match Wheel Pros' SKU numbers and prices with those if the ASR Motorsport analogs so that Tire Agent could seamlessly replace its Wheel Pros stock with ASR Motorsport stock. (Stip. Ex. 31.)

Third, Leahy was employed by Wheel Pros until his resignation on November 20, 2024. (Kilger Tr. 127:17–128:16; First Liao Decl. Ex. A.) However, months earlier, on May 17, 2024,

Leahy was involved in a text message conversation with Lanzello and others, in which he provided size recommendations and information for certain wheel designs for Hale's forthcoming competing aftermarket wheel business, which would eventually launch as ASR Motorsport. (First Liao Decl. Ex. J, ECF No. 26-2 at 68–70.) On June 7 and 8, 2024, Leahy also participated in an ASR Motorsport planning meeting. (Stip. Exs. 6–7.)

Fourth, Palacios was employed by Wheel Pros until his resignation on December 9, 2024, and Defendants do not dispute this allegation. (Am. Compl. ¶ 54.b; Am. Answer ¶ 54.)[15] On August 4, 2024, Palacios was included in group text message conversation, in which the participants discussed ASR Motorsport branding and the purchase of the domain name "arenawheelco.com." (First Liao Decl. Ex. AA, ECF No. 26-2 at 166–82.) On October 11, 2024, Lanzello texted Palacios and others, requesting that the recipients of the text message provide him a list of Wheel Pros' vendors, proposing a strategy to reach out to those vendors on behalf of ASR Motorsport, and advising that the information contained in the text message "could put us all in a lawsuit if the wrong person says something." (First Liao Decl. Ex. EE.) Although the record does not include any specific response by Palacios to the August 4, 2024 and October 11, 2024 text messages, read together, these text messages indicate that Palacios was involved in the efforts discussed in these messages to found ASR Motorsport and compete with Wheel Pros. Moreover, Defendants have not provided any evidence to show that, after receiving the August 4, 2024 text message, Palacios disassociated himself with such efforts; rather, the implication to

---

[15] Although they do not admit to every allegation pled in Paragraph 54 of the Amended Complaint, in their Amended Answer, Defendants admit that the alleged final dates of employment of each of the Individual Defendants are correct. (*See* Am. Answer ¶ 54.)

be drawn from Lanzello's decision to include Palacios in the October 11, 2024 text message thread is that Palacios remained involved in such efforts while still employed by Wheel Pros.[16]

Fifth, Huallanca was employed by Wheel Pros until his resignation on December 16, 2024, and Defendants do not dispute this allegation. (Am. Compl. ¶ 54.d; Am. Answer ¶ 54.) On February 8, 2025, Huallanca emailed to his ASR Motorsport email account photographs of a computer screen displaying Wheel Pros' customer list, which shows Wheel Pros' customer accounts by year-to-date sales, including contact information and historical sales information, and identifies the Wheel Pros employee responsible for the account. (First Liao Decl. Ex. FF, ECF No. 26-2 at 195–212.) Based on the date displayed on the computer screen's task bar, it appears that the photographs were taken on August 21, 2024. (*Id.*)

Sixth, Thompson was employed by Wheel Pros until his resignation on December 3, 2024, an allegation that Defendants do not dispute. (Am. Compl. ¶ 54.e; Am. Answer ¶ 54.) On August 4, 2024, Thompson was included in the above-described group text message conversation, in which the participants discussed ASR Motorsport branding and purchased the domain name "arenawheelco.com." (First Liao Decl. Ex. AA.) Thompson participated in the text conversation by providing an "emphasis" reaction to A.D. Hale's suggestion that ASR Motorsport purchase the domain name "prestige world wide." (*Id.*) As in the case of Palacios, Defendants have not provided any evidence to show that Thompson disassociated himself with the efforts discussed in these messages to found ASR Motorsport and compete with Wheel Pros.

---

[16] Palacios also allegedly attended a November 4, 2020 meeting titled "ASR working session," along with Individual Defendants Lanzello, Noori, and Leahy. (Am. Compl. ¶ 107.) However, Wheel Pros has not provided evidence in the record to substantiate this allegation, and I therefore do not consider it. In their Amended Answer, Defendants admit that Lanzello sent a calendar invitation to the November 4, 2020 meeting but do not admit that the meeting actually occurred as scheduled. (Am. Answer ¶ 107.)

Defendants' opposition to the PI Motion entirely fails to address, and thus concedes, that the Individual Defendants violated their Non-Disclosure Agreements with Wheel Pros through their misuse of "Confidential Information" as defined by the agreements and/or their engagement in competitive activities while still employed at Wheel Pros. Instead, Defendants raise various arguments concerning whether information used by Defendants constitute "Developments" as defined in Paragraph 3 of the Non-Disclosure Agreements. (Opp'n at 26–28.) Since I find a likelihood of success on the merits of Wheel Pros' claim that Defendants misused "Confidential Information," I do not reach at this stage the question of whether it is likely that Defendants also misused any Wheel Pros "Developments."

Therefore, Wheel Pros has shown a likelihood of success on the merits of its breach of contract claims concerning the Individual Defendants' Non-Disclosure Agreements.

c.  <u>Lanzello's Violation of the Unit Grant Agreement</u>

Lanzello's Unit Grant Agreement provides, in relevant part:

> During the period of Executive's employment with the Partnership, Employer or any of their respective Subsidiaries and **for five (5) years following any Separation**, **Executive shall not**, directly or indirectly, own any interest in, **manage**, control, **participate in** (whether as an owner, operator, **manager,** consultant, officer, director, **employee**, investor, agent, representative or otherwise), **consult with, render services for or otherwise engage in** any business or entity which directly or indirectly competes with the business of supplying manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories for vehicle models or brands currently or planned to be supplied, manufactured and/or distributed by [Wheel Pros].
>
> . . . .
>
> During the period of Executive's employment with the Partnership, Employer or any of their respective Subsidiaries and **for five (5) years following any Separation**, **Executive shall not**, **and shall not cause any of his or her Affiliates to, directly or indirectly, solicit** (except pursuant to a general solicitation which is not directed specifically to any officer, manager or employee of the Partnership or any of its Subsidiaries) **or hire, retain or engage any officer, manager or employee** of the Partnership or any of its Subsidiaries (collectively, the "Company Employees"), **or encourage any such Company**

**Employee to leave his or her employment or hire any such Company Employee who has left such employment**; provided, however, that nothing in this Section 9(b) shall prevent Executive or any of his or her Affiliates from soliciting or hiring any former Company Employee whom has not been employed by the Partnership or any of its subsidiaries for the twelve (12) month period preceding such solicitation or hiring.

(Unit Grant Agreement ¶ 9(a)–(b) (emphasis added).)

Here, the record shows that Lanzello likely violated these provisions of the Unit Grant Agreement by: (1) developing ASR Motorsport while still employed by Wheel Pros (*see, e.g.*, Stip. Exs. 4–7), (2) soliciting Wheel Pros' employees to work for ASR Motorsports before and after the termination of Lanzello's employment with Wheel Pros in November 2024 (*see, e.g.*, Stip. Exs. 6–7), (3) soliciting Wheel Pros' customers to purchase from ASR Motorsports both before and after the termination of Lanzello's employment (*see, e.g.*, First Liao Decl. Ex. BB); and (4) working with others to determine what products to prioritize for development for ASR Motorsport while still employed by Wheel Pros (*see, e.g.*, Stip. Ex. 15).

In opposition, Defendants do not dispute that Lanzello has violated the terms of the Unit Grant Agreement, but instead argue that the Unit Grant Agreement is not enforceable because (1) Lanzello did not have the opportunity to read it before signing, (2) the restrictive covenants are not "reasonable in geographic scope and temporal duration," and (3) the consideration Lanzello received for signing (his shares in Wheel Pros) was wiped out when Wheel Pros filed for bankruptcy in September 2024. (Opp'n at 18–22; Clark Tr. 55:14–17, Krezalek Decl. Ex. EE, ECF Nos. 29-31.) None of these arguments are meritorious.

First, with respect to the argument that Lanzello did not have the opportunity to read the agreement before signing, courts applying Delaware law, which applies to the Unit Grant

Agreement,[17] generally hold that failure to read a document that a party signed is *not* a defense to a breach of contract claim. *See Reise v. Rose*, No. CPU4-17-965, 2019 WL 315330, at *5 (Del. Ct. Comm. Pleas, Jan. 23, 2019) ("Parties to a contract are presumed to have read what they have signed."). In any event, it is implausible that Lanzello, an executive at a large corporation who stood to earn "███████████████" in Wheel Pros shares as a result of signing the Unit Grant Agreement, would not have read it first. (July 11, 2025 Hr'g Tr. 350:10–13.) On this point, I emphasize that, based on my observation of Lanzello, his testimony at the PI Motion hearing about whether he signed the Unit Grant Agreement was not credible. For example, Lanzello testified that Wheel Pros representatives told him that he could not view the entire Unit Grant Agreement because "everyone's percentages and shares are in there." (July 11, 2024 Hr'g Tr. 349:21–350:6.) But a review of the Unit Grant Agreement reveals that this is simply not true. (*See generally* Unit Grant Agreement (providing that Lanzello will receive 2,850 "Class B Common Units" in Wheel Pros but not listing any other shareholders or the share amounts held by them).)

Second, on the current record, it appears likely that the Unit Grant Agreement's restrictive covenants are reasonable in geographic scope and temporal duration and thus are

---

[17] Paragraph 13(h) of the Unit Grant Agreement provides:

> The Delaware Revised Uniform Limited Partnership Act or Delaware General Corporation Law, if applicable, will govern all questions hereunder concerning the relative rights of the Partnership and its securityholders, and the internal laws of the State of Delaware will govern all other questions concerning the construction, validity and interpretation of this Agreement and the exhibits thereto, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(Unit Grant Agreement ¶ 13(h).)

enforceable under Delaware law. In *Sunder Energy, LLC v. Jackson*, the Supreme Court of Delaware held that "Delaware courts review non-compete and non-solicit agreements subject to Delaware law to ensure that they are . . . (i) reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities." 332 A.3d 472, 485 (D.E. 2024). In the event that a restrictive covenant is not reasonable in geographic scope and temporal duration, "Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business." *Id.* at 486.

Here, the non-compete and non-solicit provisions of the Unit Grant Agreement appear consistent with provisions that Delaware courts, and federal courts applying Delaware law, have found to be reasonable. *See, e.g.*, *Hough Assocs., Inc. v. Hill*, No. CIV.A 2385-N, 2007 WL 148751, at *6 (Del. Ch. Jan. 17, 2007) (finding five-year non-compete agreement enforceable); *Avaya, Inc. v. Ali*, No. 12-cv-1066, 2012 WL 2888474, at *7 (D. Mass July 13, 2012) ("Delaware law also condones broad geographic restrictions, up to and including non-competes with a global scope.").

The cases on which Defendants rely are not analogous. *Kodiak Bldg. Partners, LLC v. Adams* concerned a claim by a plaintiff construction industry conglomerate whose business model was "purchasing and then operating smaller companies in the construction industry," seeking to enforce a non-compete agreement signed by an individual who sold his smaller construction company to the plaintiff conglomerate. No. 2022-311, 2022 WL 5240507, at *1 (Del. Ch. Oct. 6, 2022). The Delaware Chancery Court declined to enforce the noncompete

agreement, finding that, while the plaintiff could enforce an agreement not to compete with the *smaller, geographically limited business that the defendant sold*, it could not enforce an agreement not to compete with the *entire plaintiff construction conglomerate*; in other words, the plaintiff could only protect "the goodwill and competitive space it purchased from [the defendant]." *Id.* at *12. Here, by contrast, the record suggests that the goodwill of Wheel Pros, of which Lanzello owned shares, extends nationally. (*See* July 10, 2025 Hr'g Tr. 83:19–20 (Tiffin testifying that Wheel Pros' "largest customers" are "national").) Likewise, Defendants are competing with Wheel Pros at a national scale. (*See* July 10, 2025 Hr'g Tr. 111:9–18 (Tiffin testifying that ASR Motorsport opened warehouses in the same regions where Wheel Pros has warehouses—specifically, in Los Angeles, Atlanta, Dallas, and New York).) Similarly, in *Hub Group, Inc. v. Knoll*, the Delaware Chancery Court declined to enforce a noncompete agreement restricting a former employee from competing with of the plaintiff's 25 separate entities in four countries—not, as here, a noncompete agreement restricting a company's equity holder running a business competing with that company in markets that span the United States. No. 2024-471, 2024 WL 3453863, at *1 (Del. Ch. July 18, 2024).

Since I find that, on the record before me on the PI Motion, the restrictive covenants in the Unit Grant Agreement are likely reasonable in geographic scope and temporal duration, I do not address whether "blue penciling" the provisions would be appropriate. However, I note that the Unit Grant Agreement concerns the sale of equity in Wheel Pros, which generally aligns with one of the contexts in which the Delaware Supreme Court has held that blue penciling may be appropriate. *See Sunder*, 332 A.3d at 486 (holding that blue penciling is appropriate "in the context of the sale of a business").

Third, Lanzello's argument that he received no consideration for signing the Unit Grant Agreement is squarely contradicted by the record. As Lanzello testified, he received "a few million dollars" worth of shares in Wheel Pros pursuant to the Unit Grant Agreement, for which he paid approximately $100,000 in taxes for the relevant tax year. (July 11, 2025 Hr'g Tr. 350:10–13, 351:10–352:8.) The fact that those shares *later* lost value upon Wheel Pros' bankruptcy filing does not negate the fact that Lanzello received consideration for his entry into the Unit Grant Agreement *at the time he signed it*. Indeed, the possibility that a company's business will suffer and its value will decrease is part of the normal risk undertaken by an equity holder in a company.

For all of these reasons, Wheel Pros has amply demonstrated not just serious questions on the merits, but that it is likely to succeed on the merits of its Defend Trade Secrets Act claim, its claim that the Individual Defendants have violated their non-disclosure agreements with Wheel Pros, and that Lanzello violated the Unit Grant Agreement.

### III.    Balance of Hardships and Public Interest

Finally, the balance of the hardships and the public interest weigh in favor of a tailored preliminary injunction to address the substantial and ongoing risks (1) that Defendants will continue to disseminate Wheel Pros' trade secret information beyond ASR Motorsport to a wider audience *and* will otherwise irreparably impair the value of those secrets, and (2) that Wheel Pros will continue to suffer a loss of customer goodwill resulting from Defendants' violation of their restrictive covenants. While Defendants are correct that an injunction forcing ASR Motorsport to close its business would place a significant hardship on Defendants (*see* Opp'n at 29–30), the preliminary injunction entered today does not sweep so broadly. Rather, the injunction preserves the best approximation of the status quo ante to ensure (1) that Defendants do not continue to disseminate and impair the value of Wheel Pros' trade secrets and cause the

loss of customer goodwill, and (2) that ASR Motorsport cannot unfairly compete by using Wheel Pros' trade secret information stolen by the Individual Defendants and by soliciting employees and customers in violation of the agreements into which the Individual Defendants entered.

Likewise, the public interest in upholding parties' freedom of contract supports the issuance of a preliminary injunction. Each of the Individual Defendants exercised their freedom of contract by entering into Non-Disclosure Agreements with Wheel Pros in exchange for their employment at the company, and Lanzello entered into additional restrictive covenants in exchange for "███████████" in equity in Wheel Pros through the Unit Grant Agreement. Defendants cite no authority supporting the conclusion that upholding the agreements that the parties freely negotiated would be against the public interest. *See Empower Energies, Inc. v. SolarBlue, LLC*, No. , 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016) ("There is a well-recognized public interest in enforcing contracts and upholding the rule of law.") (citing *Advance-Rumley Thresher Co. v. Jackson*, 287 U.S. 283, 288 (1932); *In re Biaggi*, 478 F.2d 489, 493 (2d Cir. 1978)); *Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd.*, 657 F. Supp. 3d 234, 243 (E.D.N.Y. 2023) (finding that the public interest weighed in favor of "holding the parties to their contractual obligations"); *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) ("[T]he Court concludes that it is in the public's interest to enforce the parties' contract as executed.").

Contrary to Defendants' position, the public interest does not favor Defendants simply because ASR Motorsport is a smaller and newer company than Wheel Pros. My order today does not foreclose competition brought on by ASR Motorsport, or indeed any new company entering the aftermarket wheel industry. Rather, my order today ensures that, pending the final resolution

of this action, Defendants compete with Wheel Pros on terms that are consistent with their contractual obligations.

## IV.    Issuance of a Preliminary Injunction

Here, Wheel Pro has demonstrated irreparable harm from Defendants' challenged conduct and a likelihood of success on the merits of its Defend Trade Secrets Act claim, its claims that the Individual Defendants violated their employment agreements with Wheel Pros, and its claim that Lanzello violated the Unit Grant Agreement. The balance of equities favors the grant of a tailored preliminary injunction to address the specific types of irreparable harm demonstrated in the record, and the public interest weighs in favor of upholding the parties' freedom of contract, as expressed in the Individual Defendants' entry into agreements with Wheel Pros. All four factors thus weigh in favor of granting a preliminary injunction.

Accordingly, it is hereby ordered that:

(1) Defendants are enjoined from using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information as defined in any written agreement between Wheel Pros and any Individual Defendant, including without limitation, the Non-Disclosure Agreements executed by Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca.

(2) Lanzello is enjoined from owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity which directly or indirectly engages in the Business (as defined in the Unit Grant Agreement), including ASR Motorsport, in accordance with the terms set forth in the Unit Grant Agreement.

(3) Lanzello is enjoined from directly or indirectly soliciting, hiring, retaining or engaging any Company Employees (as defined in the Unit Grant Agreement) in accordance with the terms of the Unit Grant Agreement, or engaging in any solicitation in violation of the Unit Grant Agreement, for the duration of the applicable restrictions set forth in Lanzello's Unit Grant Agreement.

(4) Defendants shall destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information, or other Wheel Pros' Confidential Information (as defined in the Individual Defendants' Non-Disclosure Agreements), or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party.

(5) Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to all "Developments," as defined in the respective Individual Defendants' Non-Disclosure Agreements, including, but not limited to, aftermarket wheels and automotive accessories, created or contributed to, in whole or in part, by any Individual Defendant while employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.

## CONCLUSION

For the reasons set forth above, Wheel Pros' Motion for a Preliminary Injunction (ECF No. 24) is granted in part as detailed above.

Dated: Central Islip, New York
       October 2, 2025


                          _____*/s/ Nusrat J. Choudhury*_____
                          NUSRAT J. CHOUDHURY
                          United States District Judge