**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Wheel Pros, LLC,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>ASR Motorsport, LLC, Nicholas Lanzello, Reza Noori,<br>Joseph Leahy, David Palacios, John Thompson, III, and<br>Danny Huallanca,<br><br>                              Defendants. | 2:25-cv-929<br>(NJC) (ARL)<br><br>SEALED |

## OPINION, ORDER AND CLARIFIED PRELIMINARY INJUNCTION

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Wheel Pros, LLC ("Wheel Pros") brings this action against Defendants ASR

Motorsport, LLC ("ASR Motorsport"), Nicholas Lanzello, Reza Noori, Joseph Leahy, David

Palacios, John Thompson III, and Danny Huallanca (collectively, "Defendants")[1] to stop them

from allegedly stealing and misappropriating confidential, proprietary, and trade secret

information from Wheel Pros, and to prevent them from soliciting Wheel Pros' clients and

employees, in violation of various agreements between the parties. (Am Compl. ¶¶ 146–211,

ECF No. 23.) Following Wheel Pros' filing of a motion for a preliminary injunction, I held a

two-day evidentiary hearing in July 2025 and received multiple rounds of briefing from the

parties prior to and following the hearing. (*See* ECF Nos. 24–26, 28–29, 35, 48, 50.) On October

2, 2025, I granted in part Wheel Pros' motion for a preliminary injunction. (ECF No. 61, ("PI

Order").) Defendants both appealed the PI Order (ECF No. 62) and filed a Motion to Stay the PI

---

[1] Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca are also referred to collectively as
the "Individual Defendants."

Order Pending Appeal (Mot. to Stay, ECF No. 63, Mem. in Supp., ECF No. 63-1 ("Motion")). Wheel Pros also subsequently appealed the PI Order. (ECF No. 71.)

Before the Court is the fully-briefed Motion, in which Defendants argue that the PI Order should be stayed or altered pending the resolution of Defendants' appeal. Defendants fail to meet their heavy burden to secure a stay of the PI Order for three principal reasons.

First, Defendants fail to show that they are likely to succeed on their arguments that the Court erred in enjoining Lanzello from violating the restrictive covenants in the Unit Grant Agreement, as they largely repeat verbatim arguments that the Court considered and rejected in the PI Order. Contrary to Defendants' contentions, the restrictive covenants are enforceable because Lanzello received two forms of consideration in exchange, because the temporal and geographic scope of the restrictions, considered together, are reasonable under Delaware law, and because Wheel Pros' Amended Joint Prepackaged Plan of Reorganization ("Reorganization Plan"), pursuant to Chapter 11 of the U.S. Bankruptcy Code, did not cancel the restrictive covenants. Contrary to Defendants' contentions, Lanzello's breach of the restrictive covenants long before Wheel Pros' reorganization in bankruptcy automatically cancelled the equity interests granted to him by the Unit Grant Agreement. As a result, the provisions of Wheel Pros' Reorganization Plan addressing the treatment of "*Existing* Equity Interests" is inapplicable to the Unit Grant Agreement.

Second, Defendants do not demonstrate a likelihood of success on their claim that the PI Order fails to adequately describe the proscribed conduct as required by Rule 65(d), Fed. R. Civ. P. The PI Order not only includes the definitions of both "Confidential Information" and "Developments" drawn from the Individual Defendants' Non-Disclosure Agreements, but it also details the specific categories of Confidential Information that the Individual Defendants

disclosed in violation of their Non-Disclosure Agreements and where such information is described or located in the record. Moreover, consistent with the spirit of the PI Order, the Court clarifies in this Opinion and Order the definitions of the "Confidential Information" that Defendants must destroy and are preliminarily enjoined from disseminating, among other things, and "Developments" that Defendants are preliminarily enjoined from "marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control" as set forth in the PI Order.

Third, the balance of equities strongly weighs against a stay because the terms of the preliminary injunction, as clarified below, will not cause Defendants any irreparable harm. By contrast, a stay will cause Wheel Pros irreparable harm from the substantial and ongoing risk that Defendants will continue to disseminate and impair the value of Wheel Pros' trade secrets and engage in conduct that threatens the loss of customer goodwill, including by soliciting Wheel Pros' customers and employees to expedite ASR Motorsport's entry into markets across the country and the entry of certain products to market, in violation of the Individual Defendants' agreements with Wheel Pros. The Court has fully considered the hardship that Lanzello may experience from being preliminarily enjoined from violating the restrictive covenants in the Unit Grant Agreement through his continued competition with Wheel Pros as president of ASR Motorsport. However, any such hardship is the result of the non-compete agreement into which Lanzello voluntarily entered by exercising his right to freedom of contract and in exchange for significant consideration. The public interest is advanced by enforcing the Individual Defendants' agreements with Wheel Pros, and the tailored preliminary injunctive relief fashioned by the Court merely requires Defendants to compete with Wheel Pros on terms that are consistent with their contractual obligations.

Finally, the Court declines Defendants' invitation to modify the PI Order to allow Lanzello to continue serve as ASR Motorsport's president for an additional period of time. Since the initiation of this action nearly one year ago in February 2025, Wheel Pros has sought a temporary restraining order and preliminary injunction enforcing the non-compete restrictions of the Unit Grant Agreement by enjoining Lanzello from working for ASR Motorsport while this litigation is pending. The enforceability of the non-compete provision was a central focus of the July 2025 hearing on Wheel Pros' motion for a preliminary injunction and the parties' substantial briefing before and after the hearing. By the time the PI order was issued in October 2025, ASR Motorsport had ample time—nearly eight months—to plan for an orderly transition to comply with the preliminary injunction enjoining Lanzello from working as ASR Motorsport's president in violation of his contractual obligations. Further time is not warranted.

## BACKGROUND

The Court assumes the parties' familiarity with the factual record, procedural history, and this Court's prior rulings and thus only recounts the procedural background that is relevant to resolving Defendants' Motion.

On May 16, 2025, Wheel Pros moved for a preliminary injunction, seeking immediate relief from Defendants' alleged widespread use of Wheel Pros' confidential information and trade secrets and violations of non-compete and non-solicitation agreements between Wheel Pros and the Individual Defendants. (Mot. for Prelim. Injunction, ECF. No. 24; Mem. in Supp., ECF No. 25-2 ("PI Motion.") The Court held an evidentiary hearing on July 10 and 11, 2025 and required the filing of supplemental briefing. (*See* Elec. Order, Jul. 10, 2025; Elec. Order, Jul. 13, 2025.)

On October 2, 2025, the Court issued the PI Order, which granted the PI Motion in-part.

(ECF No. 61.) Specifically, the Court ordered the following preliminary injunctive relief:

(1) Defendants are enjoined from using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information as defined in any written agreement between Wheel Pros and any Individual Defendant, including without limitation, the Non-Disclosure Agreements executed by Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca.

(2) Lanzello is enjoined from owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity which directly or indirectly engages in the Business (as defined in the Unit Grant Agreement), including ASR Motorsport, in accordance with the terms set forth in the Unit Grant Agreement.

(3) Lanzello is enjoined from directly or indirectly soliciting, hiring, retaining or engaging any Company Employees (as defined in the Unit Grant Agreement) in accordance with the terms of the Unit Grant Agreement, or engaging in any solicitation in violation of the Unit Grant Agreement, for the duration of the applicable restrictions set forth in Lanzello's Unit Grant Agreement.

(4) Defendants shall destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information, or other Wheel Pros' Confidential Information (as defined in the Individual Defendants' Non-Disclosure Agreements), or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party.

(5) Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to all "Developments," as defined in the respective Individual Defendants' Non-Disclosure Agreements, including, but not limited to, aftermarket wheels and automotive accessories, created or contributed to, in whole or in part, by any Individual Defendant while employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.

(PI Order at 55–56.) The PI Order sets forth factual findings supporting the issuance of the preliminary injunction (PI Order at 4–16, 24–55) as well as legal conclusions (*id*. at 24–55).

On October 6, 2025, Defendants appealed the PI Order. (ECF No. 62). Several days later, on October 8, 2025, Defendants filed a Motion to Stay the Preliminary Injunction Pending Appeal. (ECF No. 63.) Defendants contend that the restrictive covenants in the Unit Grant Agreement enforced by the PI Order are not enforceable because: (1) the agreement was cancelled in bankruptcy and, (2) the restrictive covenants were not supported by adequate

consideration and are too broad in scope. (Motion at 5–19.) They also argue that the PI Order

lacks the detail required by Rule 65(d) in that it refers to extrinsic documents for the definitions

of the terms "Confidential Information" and "Developments." (*Id*. at 19–23.) Last, Defendants

argue that Wheel Pros will not be injured by a stay and that a stay pending appeal will not harm

the public interest. (*Id*. at 22–25.) As an alternative to a stay, Defendants request that the

injunction be modified to allow Lanzello to return to his role as President at ASR Motorsport for

"a short period of time" in order to help find a successor to lead the company for the duration of

the preliminary injunction. (*Id*. at 25.)

Wheel Pros opposed the Motion, arguing that Defendants have not met their

"exceptionally heavy" burden to justify a stay of the PI Order for two principal reasons. (Wheel

Pros' Mem. of Law in Opp. to Defs.' Mot. to Stay Pending App., ECF No. 65 ("Opposition") at

2–3.) It argues that Defendants have not shown a likelihood of success on the merits of the

appeal because the Reorganization Plan did not cancel the restrictive covenants set forth in the

Unit Grant Agreement, which was an executory contract supported by adequate consideration,

and the restrictive covenants are reasonable in geographic and temporal scope. (*Id*. at 5–13.) It

further argues that excusing Lanzello's violation of the restrictive covenants because of Wheel

Pros' reorganization would "deeply offend notions of equity and fairness." (*Id*. at 8.) Wheel Pros

also contends that the balance of equities weighs against a stay because Wheel Pros would be

irreparably harmed absent the preliminary injunction, the public interest weighs against a stay,

and Defendants fail to demonstrate any irreparable harm that is "actual and immediate" rather

than "speculative." (*Id*. at 3–5, 16–18.) Finally, Wheel Pros points to text in the PI Order that

provides sufficient definition of the terms "Confidential Information" and "Developments" and

argues that permitting Lanzello to return to ASR Motorsport is inconsistent with the spirit of the

PI Order, and that therefore even a temporary stay is not warranted. (*Id.* at 13–16.)

On October 20, 2025, the Court requested supplemental briefing on the following issues:

> (1) whether the Unit Grant Agreement is an "executory contract" in light of Wheel Pros, LLC's Amended Joint Prepackaged Plan of Reorganization ("Reorganization Plan") and (ECF No. 48-6);

> (2) whether the Unit Grant Agreement should be understood as an "incentive and retentions plan[]" or any other type of Compensation and Benefits Program as defined in the Reorganization Plan (ECF No. 48-6);

> (3) whether the Unit Grant Agreement, in its entirety, was cancelled by any provision of the Reorganization Plan, including but not limited to Section G, Cancellation of Existing Securities, Agreements, and Interests of Article V of the Reorganization Plan; and

> (4) whether, even if the Unit Grant Agreement's grant of equity interests to Lanzello was cancelled by the Reorganization Plan, the Agreement's non-compete provision should nevertheless be enforced in the interests of equity.

(Elec. Order, Oct. 20, 2025.)

On October 27, 2025, the parties submitted supplemental briefs in response. (Defs. Supp. Mem. of Law on Force and Effect of Unit Grant Agreement ("Defendants' Supplement"), ECF No. 68; Wheel Pros' Supp. Mem. of Law in Opp. to Defs. Mot. to Stay Pending App. ("Wheel Pros' Supplement"), ECF No. 67.) The Court permitted both parties to file replies to the supplemental briefs, which were filed on October 31, 2025. (ECF Nos. 69 & 70.)

## LEGAL STANDARDS

Rule 65(d) of the Federal Rules of Civil Procedure, which governs the content and scope of injunctions and restraining orders, requires that every injunction "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. Civ. R. P. 65(d) ("Rule 65(d)"). "To comply with the specificity and clarity requirements" of Rule 65(d), "an injunction must be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *Fed. Trade Comm'n v. Shkreli*, No. 22-

728, 2024 WL 1026010, at *3 (2d Cir. Jan. 23, 2024), *cert. denied*, 145 S. Ct. 171 (2024) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240–41 (2d Cir. 2001)).

This Court analyzes a motion to stay a preliminary injunction pending appeal under Fed. R. Civ. P Rule 62(d) ("Rule 62(d)"). The rule provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." While "the plain[] text of Rule 62(d) suggests that district courts retain the power to modify a preliminary injunction even after it has been appealed, '[t]his rule has been narrowly interpreted to allow district courts to grant only such relief as may be necessary to preserve the status quo pending an appeal where the consent of the court of appeals has not been obtained.'" *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-cv-181, 2020 WL 915824, at *2 (S.D.N.Y. Feb. 26, 2020) (quoting *Vasile v. Dean Witter Reynolds, Inc.*, 205 F.3d 1327 (Table) (2d Cir. 2000)). [2] The court's power to preserve the status quo generally "includes the power to clarify the terms of an injunction," but the court's clarifications may not go so far as to "alter the posture of the case on appeal." *Flatiron Health, Inc. v. Carson*, 602 F. Supp. 3d 482, 486 (S.D.N.Y. 2020) (citing *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962)). Once an order has been appealed, "jurisdiction passes to the appellate court." *Ideal Toy Corp.*, 302 F.2d at 625 (2d Cir. 1962). Thus, any orders clarifying the terms of an injunction must be "consistent with the spirit" of the original injunction. *Flatiron Health, Inc.*, 602 F. Supp. 3d 482, 486 (S.D.N.Y. 2020) (quoting *States v. Spectrum Brands, Inc.*, No. 15-cv-371, 2018 WL 502736, at *1, 3 (W.D. Wis.

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, brackets, alterations, and citations.

Jan 19, 2018)).

"When modifying a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984); *see also Dist. Attorney of New York Cty. v. Republic of Phil.*, 681 F. App'x 37, 41 (2d Cir. 2016) (explaining that "[t]he same standard applies to modification of an injunction" as to the initial grant of a preliminary injunction).

Further, a "stay is not a matter of right, even if irreparable injury might otherwise result." *Sarr v. Garland*, 50 F.4th 326, 334–35 (2d Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)). Rather, a stay is "an exercise of judicial discretion," *id.,* and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–673 (1926). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Mahdawi v. Trump*, 136 F.4th 443, 449 (2d Cir. 2025) (quoting *Nken*, 556 U.S. at 433–34).

The Second Circuit has directed courts to consider four factors in determining whether to issue a stay:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Mahdawi*, 136 F.4th at 449; *see also Leroy v. Hume*, 563 F. Supp. 3d 22, 25 (E.D.N.Y. 2021) (reciting the same factors). The first two factors—a strong showing of likelihood of success on the merits and irreparable injury absent a stay—are the "most critical." *Mahdawi,* 136 F.4th at 449. The factors as a whole, however, are treated "somewhat like a sliding scale," in that "more of one [factor] excuses less of the other." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006)

*see also Gen. Mills, Inc.*, 2020 WL 915824, at *2 (S.D.N.Y. Feb. 26, 2020). The movant bears a heavy burden when seeking a stay of a preliminary injunction because the stay factors "overlap[] substantially" with the factors considered before issuing a preliminary injunction. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 37 (2d Cir. 2010). Thus, absent any new facts or developments, a request to stay a preliminary injunction "will almost always be logically inconsistent with a prior finding of irreparable harm that is imminent as required to sustain the same preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999).

## DISCUSSION

Defendants fail to meet their heavy burden to secure a stay of the preliminary injunction because they do not make the required strong showing that they are likely to succeed on the merits of their arguments on appeal, that they will suffer irreparable harm, that Wheel Pros will not be irreparably harmed by a stay, or that the public interest favors a stay. First, Defendants' contention that the Court erred in issuing a preliminarily injunction barring Lanzello from violating the restrictive covenants in the Unit Grant Agreement is largely based on near verbatim repetition of arguments considered and rejected in the PI Order. The restrictive covenants are enforceable, however, because Lanzello was provided two forms of consideration in exchange and because the temporal and geographic scope of the restrictions, considered holistically, are reasonable under Delaware law. Further, the restrictive covenants remain enforceable notwithstanding Wheel Pros' Reorganization Plan. The Reorganization Plan provisions addressing the treatment of "Existing Equity Interests" do not apply to the Unit Grant Agreement because, before the Reorganization Plan went into effect, the equity interests Lanzello received through the agreement had been automatically cancelled pursuant to the agreement's terms due

to his repeated breaches of the restrictive covenants and his ultimate termination for cause on November 20, 2024. Defendants are thus unlikely to succeed on their argument that Wheel Pros cannot enforce the restrictive covenants in this litigation.

Second, Defendants do not demonstrate a likelihood of success on their claim that the PI Order fails to describe the proscribed conduct with sufficient specificity as required by Rule 65(d). The PI Order includes the definitions of both "Confidential Information" and "Developments" drawn from the Individual Defendants' Non-Disclosure Agreements in its factual findings and legal conclusions. More importantly, the PI Order identifies specific categories of Confidential Information that the Individual Defendants disclosed in violation of their Non-Disclosure Agreements and where such information is described or located in the record, providing adequate notice to Defendants of the specific information that they are required to destroy and are enjoined from using, disclosing, accessing, reviewing, and transferring. Moreover, consistent with the spirit of the PI Order, the Court clarifies below the definition of the "Confidential Information" that Defendants must destroy and are preliminarily enjoined from disseminating, among other things, and the "Developments" that Defendants are preliminarily enjoined from "marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control" under the PI Order. Accordingly, Defendants fail to show a likelihood of success in their claim that the Court's preliminary injunction fails to provide explicit notice of the precise enjoined conduct as required by Rule 65(d).

Third, for the same reasons, Defendants fail to show that they will experience any irreparable harm absent a stay of the preliminary injunction. Defendants' concern that they may unintentionally violate the terms of the PI Order is addressed through the clarification provided below, which is consistent with the spirit of the PI Order itself. Moreover, the Court has fully

considered any hardship that Lanzello may experience from being preliminarily enjoined from violating the restrictive covenants in the Unit Grant Agreement, which prevent him from serving as the president of ASR Motorsport—a direct competitor to Wheel Pros that he helped found while still employed by Wheel Pros. Lanzello voluntarily entered into the restrictive covenants and, in exchange, received significant consideration in the form of both equity interests and continued employment with Wheel Pros at an executive level accompanied by significant compensation. Because those restrictions are enforceable, any hardship that Lanzello may experience is the result of his own decisions and conduct—not the PI Order. Moreover, Defendants fail to show that Lanzello's departure from ASR Motorsport will cause irreparable harm where the company has had nearly eight months since the filing of Wheel Pros' preliminary injunction motion in February 2025 and the issuance of the PI Order—more than sufficient time to determine how to reallocate Lanzello's duties.

Fourth, as this Court found in the PI Order, Wheel Pros will be substantially injured by any stay of the preliminary injunction. Defendants have already disseminated Wheel Pros' confidential information to a wider audience. I have found a substantial and ongoing risk that, absent preliminary injunctive relief, Defendants will continue to do so in order to expedite ASR Motorsport's entry into different wheel markets across the country and the entry of certain products to market. Moreover, Lanzello's direct competition with Wheel Pros has already caused Wheel Pros to lose a business relationship and goodwill with at least one customer—Rayco II, World of Spoilers, Inc. ("Rayco")—and risks causing the continued loss of business relationships and goodwill with other customers. A stay of the PI Order would permit such misconduct to continue, causing Wheel Pros further irreparable harm.

Fifth, staying the preliminary injunction does not serve the public interest. As I found in

12

the PI Order, a tailored preliminary injunction is necessary to address the ongoing and substantial risk that Defendants will continue to disseminate and impair the value of Wheel Pros' trade secrets and engage in conduct that threatens the loss of customer goodwill, including by soliciting employees and customers in violation of the Individual Defendants' agreements with Wheel Pros and through Lanzello's continued competition with Wheel Pros as ASR Motorsport's president. Allowing such conduct to continue does not serve the public, while enforcing the Individual Defendants' freedom to contract is in the public interest. Moreover, the tailored preliminary injunctive relief fashioned in the PI Order does not prohibit competition against Wheel Pros; it merely requires Defendants to compete with Wheel Pros on terms that are consistent with their contractual obligations.

Finally, for the reasons explained below, I do not modify the PI Order to allow Lanzello to continue serve as ASR Motorsport's president for any additional period of time. After the filing of Wheel Pros' preliminary injunction motion, which sought to enforce Lanzello's non-compete agreement with Wheel Pros, ASR Motorsport and Lanzello had nearly *eight months*— more than ample time—to plan for an orderly transition in the event the motion was granted. More than three months have passed since the October 2, 2025 PI Order was issued. Defendants fail to show that ASR Motorsport or Lanzello need any additional time to allocate Lanzello's duties to other staff.

## I.      Motion to Stay the Preliminary Injunction

### a.      Likelihood of Success on the Merits

Defendants argue that their appeal of the PI Order is likely to succeed on the merits for two reasons. First, according to Defendants, the Court erred in enjoining Lanzello from violating the restrictive covenants set forth in the Unit Grant Agreement because they are unenforceable.

(Motion at 6–19.) Defendants contend that the Unit Agreement was cancelled in its entirety during the reorganization of Wheel Pros in bankruptcy proceedings. (*Id*. at 6–7 (citing Plan of Reorganization, *In re Wheel Pros, LLC*, No. 24-11939 (ECF No. 214) at 32 (Bankr. D. Del. Oct. 13, 2024) (the "Reorganization Plan").) Defendants further argue that the Unit Grant Agreement is unenforceable because Lanzello did not receive adequate consideration for his agreement to be bound by its terms and because the restrictive covenants are unreasonable in geographic scope and temporal duration. (*Id*. at 8–19). Second, Defendants argue they are likely to succeed in their appeal of the preliminary injunction because the PI Order fails to satisfy Rule 65(d)(1)(C), Fed. R. Civ. P., which requires the Court to describe the enjoined conduct with sufficient detail and particularity. (*Id.* at 19–22.)

For the reasons explained below, Defendants have not shown that they are likely to succeed on the merits of their appeal because the Unit Grant Agreement's restrictive covenants are enforceable and the PI Order meets the requirements of Rule 65.

### i.  *The Unit Grant Agreement's Restrictive Covenants*

Lanzello's Unit Grant Agreement includes the following restrictive covenants:

During the period of Executive's[3] employment with [Wheel Pros] the Partnership, Employer or any of their respective Subsidiaries and *for five (5) years following any Separation, Executive shall not*, directly or indirectly, own any interest in, *manage*, control, *participate in* (whether as an owner, operator, *manager*, consultant, officer, director, *employee*, investor, agent, representative or otherwise), *consult with, render services for or otherwise engage in any business or entity which directly or indirectly competes with the business of supplying manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories* for vehicle models or brands currently or planned to be supplied, manufactured and/or distributed by [Wheel Pros].
. . . .
During the period of Executive's employment with the Partnership, Employer or

---

[3] "Executive" in the Unit Grant Agreement refers to Lanzello. (Am. Compl, Ex. B, ECF No. 23-1 at 1.)

any of their respective Subsidiaries and *for five (5) years following any Separation, Executive shall not, and shall not cause any of his or her Affiliates to, directly or indirectly, solicit* (except pursuant to a general solicitation which is not directed specifically to any officer, manager or employee of the Partnership or any of its Subsidiaries) *or hire, retain or engage any officer, manager or employee* of the Partnership or any of its Subsidiaries (collectively, the "Company Employees"), *or encourage any such Company Employee to leave his or her employment or hire any such Company Employee who has left such employment*; provided, however, that nothing in this Section 9(b) shall prevent Executive or any of his or her Affiliates from soliciting or hiring any former Company Employee whom has not been employed by the Partnership or any of its subsidiaries for the twelve (12) month period preceding such solicitation or hiring.

(Am. Compl, Ex. B, ECF No. 23-1 ("Unit Grant Agreement") at ¶ 9(a)–(b) (emphasis added).)

The Unit Grant Agreement identifies the specific consideration provided to Lanzello in exchange for his entry into these restrictive covenants as follows:

Executive acknowledges that the provisions of this Section 9 [containing the restrictive covenants] *are in consideration of: (i) Executive's employment with the Partnership, Employer and/or their respective Subsidiaries and (ii) the issuance of the Executive Securities by the Partnership on the Issuance Date.*

(*Id*. at 10 (emphasis added).) Additionally, the agreement frames the restrictive covenants as "reasonable" as follows:

In addition, Executive agrees and acknowledges that the restrictions contained in Section 8 and this Section 9 are reasonable, do not preclude Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living. Executive further agrees and acknowledges that the potential harm to the Partnership and its Subsidiaries of the non-enforcement of Section 8 and this Section 9 outweighs any potential harm to Executive of its enforcement by injunction or otherwise. Executive acknowledges that he or she has carefully read this Agreement and consulted with legal counsel of his or her choosing regarding its contents or has voluntarily and knowingly foregone such consultation, has given careful consideration to the restraints imposed upon Executive by this Agreement and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of the Partnership and its Subsidiaries now existing or to be developed in the future. Executive expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter and time period.

(*Id*.)

Moreover, Section 3 of the Unit Grant Agreement provides that a violation of the

restrictive covenants will lead to the *automatic cancellation* of the equity granted to Lanzello under the terms of the agreement:

> *In the event of a Separation for any reason . . . or if Executive has at any time* (including following a Separation) *breached* (a "Restrictive Covenant Breach") any of the provisions of Section 8 or Section 9 or any other confidentiality, non-competition, non-solicitation or no-hire obligations set forth in any other written agreement between Executive, on the one hand, and the Partnership, Employer or any of their respective Subsidiaries, on the other hand, *all Unvested Profit Interest Units will be automatically cancelled* upon such a Separation or such Restrictive Covenant Breach without any consideration paid therefor and without further action on the part of the Partnership or any holder of any of the Unvested Profit Interest Units. In addition, *in the event (a) of a Separation resulting from a termination of Executive's employment* by the Partnership, Employer or any of their respective Subsidiaries or (b) of a Restrictive Covenant Breach at any time (including following a Separation), *all Vested Profits Interest Units shall also be automatically cancelled* upon such Separation or such Restrictive Covenant Breach without any consideration paid therefor and without further action on the part of the Partnership or any holder of any of the Vested Profits Interest Units.

(*Id*. at 3–4 (emphasis supplied).)

### 1. Lanzello Received Adequate Consideration for Entry into the Unit Grant Agreement's Restrictive Covenants

As they argued in opposition to the underlying PI Motion, Defendants argue that Lanzello received inadequate consideration in exchange for entering the Unit Grant Agreement because the Profit Interest Units he received lost all value during Wheel Pros' bankruptcy. (Motion at 8–9.)[4] According to Defendants, courts must "look at the adequacy of consideration to determine whether a restrictive covenant is unreasonable, and, in doing so, analyze the consideration *at the time the restrictive covenant is sought to be enforced*." (*Id*. at 8 (emphasis in original).) According to Defendants, because "the only consideration Wheel Pros gave to Lanzello were the [profit interest units], which could not be freely transferred, and which were shortly thereafter

---

[4] Defendants previously raised this argument in opposition to the PI Motion, arguing that "the overbroad restrictive covenants are unenforceable due to failure of consideration." (PI Opposition at 22.)

destroyed by Wheel Pros' *voluntary* decision to restructure . . . there was no adequate consideration measured at the time the restrictive covenant was sought to be enforced by Wheel Pros." (*Id.* (emphasis in original).)

Wheel Pros argues that Delaware law does not support Defendants' position, relying on a series of cases holding that courts only evaluate whether there was adequate consideration at the time the parties *entered into* the agreement—not when the parties *seek to enforce* the agreement's terms. (Opposition at 10.) For example, in *Schell Bros., LLC v. Pickard*, No. 2022-642, 2023 WL 2581711 (Del. Ch. Mar. 21, 2023), the court recognized that "[w]hen analyzing the sufficiency of the consideration exchanged in a contract, Delaware courts limit our inquiry into consideration to its existence and not whether it is fair or adequate." *Id.* at *4. Similarly, the court in *Payscale Inc. v. Norman*, No. 2025-118, 2025 WL 1622341 (Del. Ch. June 9, 2025), analyzed consideration "when the parties executed the Incentive Equity Agreements . . . ." *Id.* at *5. Wheel Pros also points to the express terms of the Unit Grant Agreement, which state that the restrictive covenants are in exchange for Lanzello's continued employment with Wheel Pros in addition to a grant of equity interests, and Lanzello's testimony that he signed the Unit Grant Agreement as a condition of his promotion to Regional Vice President at the company. (Opposition at 10–11 (citing Unit Grant Agreement, ¶ 9(e); Reply Aff. of Katharine J. Liao, Esq. in Further Support of Mot. for Prelim. Injunction (ECF No. 36), Exhibit A, Lanzello Dep., 400:20–401:7).)

As an initial matter, the record establishes that Lanzello received two forms of consideration in exchange for his entry into the Unit Grant Agreement: equity shares in Wheel Pros and his continued employment with the company. Paragraph 9 of the Unit Grant Agreement explicitly states that its non-competition and non-solicitation provisions "are *in consideration*

*of . . .* Executive's employment with the Partnership, employer and/or their respective Subsidiaries and . . . the issuance of the Executive Securities." (Unit Grant Agreement ¶ 9(e) (emphasis added).) Delaware law "permits continued employment to serve as consideration for an at-will employee's agreement to a restrictive covenant." *Newell Rubbermaid Inc. v. Storm*, No. CV 9398, 2014 WL 1266827, at *9 (Del. Ch. Mar. 27, 2014); *see also All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *3 (Del. Ch. Aug. 9, 2004) ("In Delaware, employment or continued employment may serve as consideration for an at-will employee's agreement to a restrictive covenant."), *aff'd*, 880 A.2d 1047 (Del. 2005). Accordingly, Defendants' argument that "the only consideration Wheel Pros gave to Lanzello were the Units" is squarely contradicted by the factual record, which establishes that Lanzello was *also* provided consideration in the form of continued employment. (*See* Motion at 8; Unit Grant Agreement ¶ 9(e).) Defendants' arguments to the contrary are unpersuasive.

Further, Defendants—once again repeating arguments made in opposition to the preliminary injunction motion, which were rejected in the PI Order—fail to identify any controlling authority for the notion that a court must assess the adequacy of consideration for a party's agreement to a contract containing forward-looking restrictive covenants by analyzing whether the consideration provided when the contract was formed retains value at the time the covenants are enforced. As in its brief opposing the motion for a preliminary injunction, Defendants again rely solely on a misreading of *Sunder Energy, LLC v. Jackson*, 332 A.3d 472 (Del. 2024). (*See* Motion at 8; PI Opposition at 22.) In *Sunder Energy*, the Supreme Court of Delaware assessed the lower court's refusal to blue pencil restrictive covenants contained in a new LLC operating agreement. The new operating agreement at issue superseded the default provisions of the Delaware Limited Liability Company Act under which the LLC had previously

operated, which did not contain any restrictive covenants. *Sunder*, 332 A.3d. at 478. The consideration exchanged for the appellee to be bound by the covenants in the new agreement was but one of many factors considered by the court in its blue-penciling analysis. *Id.* at 485–490. In *Sunder*, the court found it notable that the employee who was challenging the enforceability of the covenants in the new LLC operating agreement "received minimal-to-no separate compensation *in exchange for his agreement* to be bound by the Covenants." *Id*. at 489 (emphasis added). By analyzing what the employee was offered in exchange for his agreement, the *Sunder* court focused on the provisions of the new operating agreement itself, at the time it was entered. Contrary to Defendants' assertions, the value of the consideration at the time the restrictive covenant was to be *enforced* did not guide the court's analysis. *Sunder* is distinguishable from the situation here, where Wheel Pros seeks to enforce restrictive covenants set forth in an agreement for which two different forms of consideration were provided to Lanzello at the time he entered into the agreement.

Defendants thus fail to identify any legal authority to support their assertion that the Unit Grant Agreement is unenforceable because the profit interest units granted to Lanzello through the agreement had no value by the time Wheel Pros sought to enforce it. Indeed, courts assess the adequacy of consideration provided for a party's entry into a contract containing restrictive covenants at the time the parties *entered* the contract—not at the time the non-breaching party seeks to enforce the contract. *See Payscale Inc.*, 2025 WL 1622341, at *5 (Del. Ch. June 9, 2025) (assessing the value of consideration "*when the parties executed* the Incentive Equity Agreements" (emphasis added)); *cf. Newell Rubbermaid Inc. v. Storm*, No. 14-cv-9398, 2014 WL 1266827, at *9 (Del. Ch. Mar. 27, 2014) ("Delaware courts limit our inquiry into consideration to its existence and not whether it is fair or adequate.").

Accordingly, Defendants' argument that the Unit Grant Agreement cannot be enforced because Lanzello did not receive adequate consideration for his entry into the restrictive covenants set forth in the agreement is without merit.

### 2. *The Geographic and Temporal Scope of the Restrictive Covenants are Enforceable*

In support of the Motion to Stay, Defendants repeat another argument made in opposition to Wheel Pros' motion for a preliminary injunction, that the restrictive covenants of the Unit Grant Agreement are geographically and temporally overbroad. (*See* Motion at 11–18; PI Opposition at 18–22.) According to Defendants, the restrictive covenants "expand beyond the area in which Lanzello would gain any market advantage from his previous employment with Wheel Pros," including markets into which Wheel Pros has not yet entered. (Motion at 13.) They also argue that the restrictive covenants are "temporally overbroad because they are longer than necessary to protect Wheel Pros' business interests," and "Wheel Pros did not meet their burden of proving that their economic interest in after-market wheels and accessories is in any way related to a five-year timeline." (*Id.* at 13, 15.) Finally, they argue that the restrictive covenants are overbroad when the geographic and temporal scope are considered together. (*Id.* at 15–18.)

On this point, Defendants mostly repeat arguments made in their opposition to the preliminary injunction motion, relying on largely the same case law, which the Court carefully considered and rejected in the PI Order. For example, in opposition to the PI Motion, Defendants argued:

> Recently, in a series of cases starting with *Kodiak* . . . the Delaware Chancery Court and the Delaware Supreme Court have affirmed that Delaware law will not enforce or reform post-employment restrictions that are unclear or overbroad. *See e.g. Hub Group, Inc. v. Knoll, C.A.* No. 2024-0417, 2024 WL 3453863, at *8–12 (Del. Ch. July 18, 2024).

(Opposition to PI at 19.) In the Motion to Stay, Defendants repeat this same argument almost

verbatim as follows:

> A series of cases starting with *Kodiak Bldg. Parnters, LLC,* the Delaware Chancery Court and the Delaware Supreme Court have affirmed that Delaware law will not enforce or reform post-employment restrictions that are so overbroad. *See, e.g.* 2022 WL 5240507, at *11; *Hub Grp.*, Inc., 2024 WL 3453863, at *8–12.

(Motion at 12.)

Defendants' attempt to rebut the PI Order's reliance on *Hough Associates, Inc. v. Hill,* Civ.A. 2385-N, 2007 WL 148751 (Del. Ch. Jan. 17, 2007), and *Avaya, Inc. v. Ali*, Civ.A. 12-10660, 2012 WL 2888474 (D. Mass. July 13, 2012), is also a rerun of arguments they previously raised in their opposition to the preliminary injunction motion. For example, Defendants argued as follows in opposition to the PI Motion:

> Here, unlike in *Hough Assocs*., Wheel Pros does not limit the extensive duration of the non-competition clauses to a reasonable geographic scope. The five-year non-compete is plainly unenforceable because they have not met their burden of proving that their economic interest in after-market wheels and accessories is in any way tied a five-year timeline.

(Opposition to PI at 21). Defendants repeat this argument almost verbatim in the Motion to Stay:

> Here, unlike in *Hough Assocs*., Wheel Pros did not limit the extensive duration of the non-competition clauses to a reasonable geographic scope. The five-year non-compete is plainly unenforceable because Wheel Pros did not meet their burden of proving that their economic interest in after-market wheels and accessories is in any way tied to a five-year timeline.

(Motion at 15.)

However, I already considered and rejected the aforementioned arguments in the PI Order, which Defendants repeat nearly verbatim in their Motion to Stay briefing. I found that the Unit Grant Agreement's non-compete and non-solicitation restrictions are consistent with provisions that Delaware courts and federal courts applying Delaware law have found to be reasonable and distinguished the cases on which Defendants rely. (*See* PI Order at 51–52.)

Defendants arguments remain unpersuasive. Indeed, in *Hough Associates*, the Delaware

Chancery Court found the five-year restrictive covenant reasonable because adequate consideration was provided in exchange and the covenants "protected [the former employer]'s legitimate economic interests." 2007 WL 148751 at *14. Further, in *Avaya*, the court found that "Delaware law also condones broad geographic restrictions, up to and including non-competes with a global scope . . . when the relevant competitive market is equally broad or global." *Avaya.*, 2012 WL 2888474, at *7 (D. Mass. July 13, 2012). Both *Hough Associates* and *Avaya* illustrate that Delaware law scrutinizes non-compete agreements in light of the specific interests they are tailored to protect. Here, the record clearly establishes that the five-year duration of the restrictive covenants in the Unit Grant Agreement is tailored to protect Wheel Pros economic interests. For example, Wheel Pros' Global Vice President of Sales Eric Tiffin testified that the five-year length of the restrictive covenants in Wheel Pros' unit grant agreements reflects that "[p]roduct and industry information usually is consistent over, you know, near a five-year term. So, you know, with the amount of information [regional vice president] level and higher typical where equity is issued they have access to a multitude of proprietary information." (July 10, Hr'g Tr. 78:2–11.) Similarly, the geographic scope of the restrictive covenants is tailored to serve the "relevant competitive market" in which Wheel Pros currently operates, which is a market spanning the United States. *Avaya, Inc.*, 2012 WL 2888474, at *7; Tiffin, July 10, 2025 Hr'g Tr. 83:19–20 (testifying that Wheel Pros' "largest customers" are "national"); Tiffin, July 10, 2025 Hr'g Tr. 111:9–18 (ASR Motorsport opened warehouses in Los Angeles, Atlanta, Dallas, and New York—just like Wheel Pros). Accordingly, the restrictive covenants in the Unit Grant Agreement are specifically tailored to serve Wheel Pros' economic interests, and Defendants' repetition of prior arguments does not carry their heavy burden to show a likelihood of success on appeal. *See Carroll v. Trump*, 687 F. Supp. 3d 394, 400–01 (S.D.N.Y. 2023) (finding that the

22

defendant "has not provided a single reason for the court to find that there is any likelihood that

he will succeed on appeal" when "many of [defendant's] points in his current motion repeat

almost verbatim those offered in his prior briefing"). Holding otherwise would be "logically

inconsistent" with the PI Order. *Rodriguez ex rel. Rodriguez*, 175 F.3d at 235.

Defendants further contend that the PI Order erred by failing to consider how the

temporal and geographic scope of the non-compete operate *together* to unreasonably restrain

Lanzello, even if neither restriction is excessive in and of itself. (Motion at 15–18.) They rely on

*Centurion Serv. Grp., LLC v. Wilensky*, No. 23-cv-0422, 2023 WL 5624156 (Del. Ch. Aug. 31,

2023) ("*Centurion*"), where the court instructed:

> When evaluating the reasonableness of a restrictive covenant, a court must consider how
> the temporal and geographic restrictions operate together. The two dimensions
> necessarily interact . . . [t]o examine each dimension individually overlooks the
> interaction and enables employers to justify restrictions that are unreasonably onerous in
> combination.

*Id.* at *3. On this basis, Defendants argue that the restrictive covenants in the Unit Grant

Agreement, which temporally restrict Lanzello from competing against Wheel Pros for five years

and geographically restrict him from competing with Wheel Pros anywhere it does business, or

actively planned to do business at the time the agreement was executed, are over broad. (Motion

at 17–18.)

Wheel Pros contends that *Centurion* is distinguishable because the restrictive covenants

in that action prohibited the defendant from working in areas related to Centurion's "core

business," in addition to "areas [where] Centurion *might have thought about entering, and where

Centurion does or thought about doing any other activity*" for a period of two years. (Opposition

at 12 (quoting *Centurion Serv. Grp., LLC*, 2023 WL 5624156 at * 4 (emphasis in Opposition)).)

The geographic scope of the restrictive covenant in *Centurion* included the entire United States

as well as any area where "Centurion actively planned to solicit and engage in any business activities in which it was engaged or actively plan[ned] to engage [in] at any time" during the defendant's employment. *Centurion Serv. Grp., LLC*, 2023 WL 5624156 at * 4. The court found that the two-year restrictive covenants with such a broad geographic scope were unreasonable in light of the exceptionally broad and poorly defined scope of business activities at issue. *Id*. Wheel Pros argues that, by contrast, the Unit Grant Agreement "clearly defines Wheel Pros' business as supplying, manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories for vehicle models or brands and therefore, defines the scope of restricted activities, unlike in *Centurion*." (Opposition at 12 (quoting Unit Grant Agreement at ¶ 9(a)).)

Defendants' reliance on *Centurion* is misplaced. The court in *Centurion* noted that "whether the duration of a restrictive covenant is reasonable turns on the specific facts of the case before the Court." *Centurion Serv. Grp., LLC*, 2023 WL 5624156 at *4. The restrictive covenants at issue in that case "fail[ed] to define precisely what Centurion's business is," and as a result, "one could argue that [the former employee] could be in breach of the non-compete if he were employed" in his relevant industry anywhere in the country or abroad. *Id*. The court also found insufficient justification for the restrictive covenants because the plaintiff offered only "vague and everyday concerns" rather than a "particularly strong economic interest" of the plaintiff in enforcing the covenants. *Id*. at *5.

By contrast, here there is ample factual support for Wheel Pros' "strong economic interest" in enforcing restrictive covenants of the temporal and geographic scope as the covenants in Lanzello's Unit Grant Agreement. *Id*. Indeed, a holistic assessment shows that temporal and geographic scope of the restrictive covenants are reasonable because they are

specifically tailored to protect Wheel Pros' interests as addressed above. The five-year duration of the restrictive covenants corresponds to specific industry practices and knowledge that they are meant to protect. (*See* Tiffin, July 10, Hr'g Tr. 78:2–11 (testifying that the restrictive covenants are typically for five years because "[p]roduct and industry information usually is consistent over, you know, near a five-year term").) The geographic scope of the restrictive covenants is also reasonable because it is tailored to protect Wheel Pros' goodwill across the United States—the market in which it operates. *See Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) ("While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection."). As one court has explained:

> If that market or the customer base of the business "extends throughout the nation, or indeed even internationally, and the employee would gain from the employment some advantage in any part of that market," then the employer and the business may enter into an enforceable contract prohibiting the employee "from soliciting those customers on behalf of a competitor *regardless* of their geographic location."

*Kan-Di-Ki, LLC*, 2015 WL 4503210, at *20 (emphasis added) (quoting *Rsch. & Trading Corp*, 1992 WL 345465, at *12).

In the PI Order, I made the factual finding that Wheel Pros conducts business "in markets that span the United States," as shown by evidence in the record including, but not limited to Tiffin's testimony that Wheel Pros' "largest customers" are "national." (PI Order at 52 (finding that "the record suggests that the goodwill of Wheel Pros . . . extends nationally" (citing July 10, 2025 Hr'g Tr. 82:19–20)).) Wheel Pros' customers are retailers and distributors of after-market wheels and accessories—such as Tire Agent, ███████████—which purchase Wheel Pros products and sell them to consumers. (*See* PI Order at 15 (discussing Defendants' solicitation of

Wheel Pros' customers); *id.* at 4 ("Wheel Pros' clients include over 10,000 retailers and a network of distribution centers across North America and Australia." (citing Am. Compl. ¶ 4).)[5] Wheel Pros has 30,000 active customers, which "range from national accounts all the way down to brick and mortar retailers." (Tiffin, July 10, 2025 Hr'g Tr. 64:15–18.) Tiffin supervises four regional vice presidents in the United States, whose regions cover activity relating to Wheel Pros warehouses in Los Angeles, Atlanta, Dallas, and New York. (Tiffin, July 10, Hr'g Tr. 65:1–6; *id.* 111:9–18.)[6] ASR Motorsport opened warehouses in those same regions to compete with Wheel Pros. (Tiffin, July 10, 2025 Hr'g Tr. 111:9–18.) Thus, according to the factual findings in the PI Order, Wheel Pros conducts business across the entire United States and the market for its business is properly understood to be national. Accordingly, the PI Order preliminarily enjoins Lanzello from competing with Wheel Pros anywhere in the United States.

Additionally, Delaware courts have upheld non-compete provisions that last five years *and* cover a wide geographic scope in the case of employees with knowledge and expertise comparable to that of Lanzello. *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (finding the "temporal and geographic[al] limits" of a five-year non-compete agreement covering twenty-three states to be reasonable, "*especially*" considering "*the competitive nature of the industry and the depth of [employee]'s knowledge*" (emphasis added)); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (finding reasonable a four-year non-compete that covered the entire United States). Lanzello was not an

---

[5] As found in the PI Order, retailer Rayco was formerly a Wheel Pros customer, but Defendants' conduct caused Wheel Pros' to lose goodwill and a business relationship with Rayco. (PI Order at 36–37.)

[6] Although Tiffin testified that he oversees 40 distribution centers for Wheel Pros, he did not specify where in the United States those centers are located, other than Los Angeles, Atlanta, Dallas, and New York.

ordinary employee with rudimentary knowledge about Wheel Pros' operations. He was a regional vice president overseeing sales and operations over a broad geographic area—Wheel Pros' Northeast region, which includes New York City, New Jersey, parts of Michigan and Ohio, and the rest of the Northeast—and had specialized knowledge about Wheel Pros' pricing, customers, and sales strategy. (*See* ECF No. 29-11, Exhibit J at 35:14–36:9 (Lanzello testifying that the Northeast region consisted of seven to nine warehouses "[m]ostly in the northeast, a little bit into Ohio and to Michigan."); Decl. of Wheel Pros' Global Vice President of Sales Eric Tiffin, ECF No. 35-3, at ¶¶ 2–3 (Tiffin attests that Wheel Pros operates "across five (5) different countries" and that the Northeast Region includes New York and New Jersey)).) Thus, I also find that the non-compete provisions in the Unit Grant Agreement are reasonable in light of the "industry and the depth of [Lanzello's'] knowledge." *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *19.

Defendants' portrayal of the restrictive covenants in the Unit Grant Agreement as a "restraint on an after-market wheel regional sales manager's ability to seek employment just about anywhere in the world" is inaccurate. (Motion at 15.) Section 9(a) of the Unit Grant Agreement restricts Lanzello from competing with Wheel Pros "within any state in the United States or similar geographical area outside of the United States in which [Wheel Pros] has conducted or has actively planned to conduct the Business as of the date hereof." Pursuant to these terms, Lanzello is geographically restricted from competing with Wheel Pros in: (1) any state in the United States where Wheel Pros has conducted or actively planned to conduct business as of July 6, 2021—the date on which Lanzello signed the Unit Grant Agreement, and (2) any geographic regions outside of the United States that are similar to a state, in which Wheel Pros had conducted business or had been actively planning to conduct business as of July 6,

2021. As noted above, I made a factual finding in the PI Order that Wheel Pros marketed its goods across the United States. (PI Order at 52.) I did not, however, make any factual findings concerning specific locations *outside of the United States* where Wheel Pros had conducted business or had been actively planning to conduct business as of July 6, 2021, because the parties failed to address any such locations in their evidentiary submissions.[7] Accordingly the United States is the relevant market for enforcement of the non-compete restriction.

Defendants also argue that the PI Order erred in analogizing the restrictive covenants in Lanzello's Unit Grant Agreement to restrictive covenants in the context of a sale of a business. (Motion at 10–11.) As a threshold matter, Defendants' briefing on this point incorrectly suggests that the PI Order relied solely on caselaw concerning the enforcement of restrictive covenants in the context of the sale of a business and not employment agreements. (*See id*.) Defendants are wrong. The PI Order set forth caselaw addressing the reasonableness of restrictive covenants that were a part of employment agreements, including *Hough Associates, Inc.*, 2007 WL 148751 at *6, which enforced a five-year non-compete and *Avaya, Inc.*, 2012 WL 2888474 at *1–3, 7, which enforced a non-compete "with a global scope," both of which concerned restrictive covenants in employment agreements. (PI Order at 51.) I also found that Defendants relied on

---

[7] Indeed, neither party submitted evidence of any specific locations outside of the United States similar in geographic size to a state in the United States where Wheel Pros has conducted business or had been actively planning to conduct business as of July 6, 2021. Rather, Tiffin generally attested that Wheel Pros operates "across five (5) different countries" without identifying those countries by name. (ECF No. 35-3, at ¶¶ 2– 3.) At the preliminary injunction motion hearing, Tiffin further testified that his full responsibilities include Wheel Pros distribution centers "which are 40 around the globe" as well as supervisory responsibilities over four regional Vice Presidents in the United States "two regional managers internationally . . ." (Tiffin, July 10, Hr'g Tr. 65:1-6.) However, Tiffin did not identify the geographic scope of the locations where Wheel Pros does business outside the United States or where it had been actively planning to do business outside of the United States as of July 6, 2021, and the Court made no factual findings regarding such locations outside of the United States in the PI Order.

cases that were distinguishable. (PI Order at 51–52 (distinguishing *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-311, 2022 WL 5240507, at *1 (Del. Ch. Oct. 6, 2022), and *Hub Group., Inc. v. Knoll*, No. 2024-471, 2024 WL 3453863, at *1 (Del. Ch. July 18, 2024)).)

Defendants' critique thus boils down to a challenge to the inclusion of the following reasoning in the PI Order:

> Since I find that, on the record before me on the PI Motion, the restrictive covenants in the Unit Grant Agreement are likely reasonable in geographic scope and temporal duration, I do not address whether 'blue penciling' the provisions would be appropriate. However, I note that the Unit Grant Agreement concerns the sale of equity in Wheel Pros, which generally aligns with one of the contexts in which the Delaware Supreme Court has held that blue penciling may be appropriate. *See Sunder*, 332 A.3d at 486 (holding that blue penciling is appropriate "in the context of the sale of a business.")

(PI Order at 52.)

Defendants identify no error in such reasoning. As noted, in the PI Order, the conclusion that the restrictive covenants are reasonable in scope is based on analysis of caselaw in which employees agreed to such restrictions in employment agreements. In the PI Order, I noted, in passing, that Lanzello's acceptance of the restrictive covenants in an agreement that granted him both continued employment *and* equity interest in Wheel Pros "generally aligns with" the sale of a business. (PI Order at 52.) Nevertheless, I did not actually blue pencil the agreement or rely on the caselaw concerning restrictive covenants in the context of the sale of a business in determining that the restrictive covenants set forth in the Unit Grant Agreement are reasonable. (*See id.* at 51–52.)

According to Defendants, the Unit Grant Agreement should only be understood to be "an employment-related noncompete agreement" and the PI Order erred in suggesting something otherwise. (Motion at 11.) In support, Defendants rely on *Weil Holdings II, LLC v. Alexander*, 2025 WL 689191 (Del. Ch. Mar. 4, 2025), where the court considered a non-compete restriction

29

that "was not negotiated in the context of a sale of a business" and was generally not negotiated "in any substantive way." 2025 WL 689191 at *7 (Del. Ch. Mar. 4, 2025). The court declined to enforce the non-compete because, even assuming that the "Defendant was a sophisticated investor with an opportunity to negotiate the Noncompete, his position as a unitholder employee placed him in a disparate bargaining position." *Id*. Defendants argue that Lanzello is a "unitholder employee" no different than the defendant in *Weil*, given that Lanzello purportedly had no bargaining power and did not negotiate the Unit Grant Agreement. (Motion at 11.) On that basis, Defendants argue the restrictive covenants should be subjected to a higher level of scrutiny. (*Id*.)

Defendant's arguments relying on *Weil* fail to show a likelihood of success on appeal for two reasons. First, as addressed above, in the PI Order, I explicitly declined to address whether blue penciling the non-compete covenant was appropriate and did not base my conclusion that the restrictive covenants are reasonable on the sale-of-business caselaw that Defendants seek to distinguish. Second, *Weil* is clearly distinguishable from this action because the restrictive covenants at issue there were "potentially indefinite" in temporal scope, and the geographic scope could change dramatically over time. *Weil,* 2025 WL 689191 at *5. The court therefore concluded: "Taken together, the duration and geographic scope of the Noncompete could indefinitely restrict Defendant from practicing podiatric medicine in a geographic region that is constantly subject to change." *Id*. at *6. Thus, the covenant at issue in *Weil* imposed both greater and more variable restrictions than the five-year restrictive covenants prohibiting Lanzello from competing with Wheel Pros in the United States, which I determined is "likely reasonable in geographic scope and temporal duration" based on caselaw enforcing restrictive covenants in employment agreements. (*See* PI Order at 51–52.) Further, the court in *Weil* "[took] into

30

*account*" the fact that the defendant "did willingly agree to [the noncompete] as part of an investment in which he held himself out as a sophisticated party, as opposed to simply accepting it as a precondition of employment." *Weil,* 2025 WL 689191 at *5 (emphasis added). Although the court treated the defendant as a sophisticated party, rather than a regular employee, the restrictive covenants were nevertheless unreasonable because of their limitless temporal scope and excessive and changing geographic scope.

Defendants concede that the reason non-compete provisions are afforded greater latitude when associated with the sale of a business is "because they are seen as protecting the goodwill and value of the business being sold." (Motion at 10.) Here, Tiffin testified that the rationale behind the five-year length of the restrictive covenants in the Unit Grant Agreement is that "[p]roduct and industry information usually is consistent over . . . a five-year term" and that the life cycle of a wheel is "typically" five-years. (July 10, Hr'g Tr. 78:2–11.) Wheel Pros asked company executives who had intimate knowledge of the company's product, sales data, and other confidential information to enter into these restrictive covenants. (*Id*. at 78:2–9.) Lanzello was asked to do so because he was a vice president for Wheel Pros' Northeast Region with "relatively unrestricted" access to sales data:

> [Regional Vice Presidents] are typically involved in every part of the organization. They are involved in decisions with some of our largest customers which sometimes are national. So they need to have access across all of our network to understand what's going on. So, yeah. It's critical to the business. Also our [Regional Vice President] team is intimately involved with working with product development design . . . so they get full access.

(Tiffin, *Id.* at 82:18–83:2). Wheel Pros asked Lanzello, as an executive leader, to sign the Unit Grant Agreements precisely because he was given access to extensive sensitive and confidential data that he could misappropriate to compete against Wheel Pros and destroy the company's goodwill with its customers. As shown by the factual findings in the PI Order, Lanzello has done

just that with respect to Wheel Pros' former customer Rayco and will likely continue to engage in similar misconduct absent the tailored preliminary injunction. Thus, the Court committed no error in the PI Order when it evaluated the reasonableness of the restrictive covenants based on caselaw in the employment agreement context, explicitly declined to decide whether blue penciling the Unit Grant Agreement is appropriate, and simply observed that "the Unit Grant Agreement concerns the sale of equity in Wheel Pros, which generally aligns with one of the contexts in which the Delaware Supreme Court has held that blue penciling *may* be appropriate. (PI Order at 52 (emphasis added) (citing *Sunder*, 332 A.3d at 486).)

Accordingly, Defendants do not show a likelihood of success on their arguments that the restrictive covenants in the Unit Grant Agreement are unenforceable due to their temporal and geographic scope.

3.  *The Restrictive Covenants in the Unit Grant Agreement Were Not Cancelled in Bankruptcy*
    a.  The Parties' Arguments

The parties have addressed the impact of Wheel Pros' Reorganization Plan on the status of the Unit Grant Agreement in multiple rounds of briefing. It was first addressed in Defendants' brief supporting the Motion to Stay and Wheel Pros' opposition. (*See* Motion at 6–7; Opposition at 6–9.) The parties further addressed this question in supplemental briefing in response to questions from the Court. (*See* Defendants' Supplement; Wheel Pros' Supplement.) Through the course of this briefing, the parties' positions on the Reorganization Plan's impact on the Unit Grant Agreement have shifted to a degree.

Defendants first argue that under the plain text of Wheel Pros' Reorganization Plan, the Unit Grant Agreement was cancelled in its entirety. (Motion at 6.) They rely on Article IV, Section G, which addresses the "Cancellation of Existing Securities, Agreements, and Interests."

(*Id.* (citing Reorganization Plan at 32).) Section G of Article IV provides that, upon the effective date of Wheel Pros' reorganization:

> [A]ll notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims . . . or *Existing Equity Interests shall be cancelled, and any rights of any Holder in respect thereof shall be deemed cancelled and of no force or effect*, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), of the Debtors and any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect . . . .

(Reorganization Plan at 32 (emphasis added).) The Reorganization Plan defines "Existing Equity Interests" as "any Interests in Wheel Pros Holdings, L.P. existing immediately prior to the occurrence of the Effective Date" of the Reorganization Plan. (Reorganization Plan at 8.) In their brief, Defendants focus on the Reorganization Plan's definition of "Interest" as:

> . . . any Equity Security, equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, *agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor* . . . .

(Motion at 7 (citing Reorganization Plan at 11 (emphasis in Motion)).) Defendants argue that the Unit Grant Agreement falls within the definition of "Interest" because it is both an "agreement[] to acquire . . . profit interests" and falls within the category of "any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or ownership interest by the Debtor . . . ." (Motion at 7 (citing Reorganization Plan at 11).) [8]

---

[8] Defendants misrepresent the record when they assert that "the District Court went so far as shutting down testimony" by "improperly sustaining an 'asked and answered' objection" when

In opposition, Wheel Pros points out that Defendants' omitted part of the definition of

"Interest" set forth in the Reorganization Plan. (Opposition at 7.) The full definition reads as

follows:

> . . . any Equity Security, equity, ownership, profit interest, unit or share in any Debtor and
> any other rights, options, warrants, rights, restricted stock awards, performance share
> awards, performance share units, stock appreciation rights, phantom stock rights,
> redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled
> restricted stock units, other securities, agreements to acquire the common stock, preferred
> stock, limited liability company interests, or other equity, ownership, or profits interests
> of any Debtor or any other agreements, arrangements or commitments of any character
> relating to, or whose value is related to, any such interest or other ownership interest in
> any Debtor (**whether or not arising under or in connection with any employment
> agreement, separation agreement, or employee incentive plan or program of a
> Debtor as of the Petition Date and whether or not certificated, transferable,
> preferred, common, voting, or denominated "stock" or similar security**).

(Reorganization Plan at 11 (emphasis in Opposition to highlight the part of the definition of

"Interest" that Defendants did not include).) Relying on the full definition, Wheel Pros argues

that "the [Reorganization] Plan contemplates the cancellation of equity interests and holders'

rights in those interests, but not the cancellation of underlying executory contracts like

employment agreements, separation agreements, and the [Unit Grant Agreement]." (Opposition

at 7.) In other words, Wheel Pros contends that the Unit Grant Agreement itself was not

cancelled; rather, only the specific provisions pertaining to the equity interests were cancelled,

---

Tiffin "was being questioned regarding whether the Unit Grant Agreement itself (not just the unit
shares) was cancelled in Bankruptcy." (Motion at 7 (citing July 10 Hr'g Tr. at 170:17–171:3).)
Defendants' counsel posed the following four questions in a row to Tiffin: "And you're aware
that as part of that plan of reorganization, all existing equity interest in Wheel Pros were deemed
cancelled with no force and effect?" (July 10 Hr'g Tr. at 170:13–15); "So the Unit Grant to
Lanzello was canceled and with no force and effect following the bankruptcy?" (*id*. at 170:17–
18); "Well, the equity grant to Lanzello was certainly canceled and with no force and effect?"
(*id*. at 170:20–21); "So not only was the equity rendered valueless, it was fully canceled and of
no force and effect? That was the language." (*id*. at 170:24–171:1.) It was after this final, near-
verbatim question of whether the equity grant to Lanzello was canceled with no force and effect
that the Court sustained Plaintiff's counsel's objection to that fourth question as asked and
answered. (*See id*. at 171:2–3.)

leaving the rest of the Unit Grant Agreement, including the restrictive covenants, in effect.

According to Wheel Pros, other provisions of the Reorganization Plan reinforce its reading, including Article V, Section G, which pertains to the treatment of executory contracts and unexpired leases. This section provides that the "Debtors or the Reorganized Debtors, as applicable, shall assume all Employment Agreements" and "all Compensation and Benefit Programs," excluding "any *provisions* . . . that provide for rights to acquire Interests, Existing Equity Interests, or New Equity Interests, which . . .  shall be deemed terminated on the Effective Date." (Opposition at 8 (quoting the Reorganization Plan at 40 (emphasis in Opposition)).) On this basis, Wheel Pros argued that "the Reorganization Plan distinguishes between *provisions* granting rights in equity interests, which were cancelled, and the employment and other agreements and programs containing those provisions, whose other terms remain enforceable." (*Id.* (emphasis in Opposition).) At this point, Wheel Pros argued that the Unit Grant Agreement was an executory contract under which both parties had unperformed material obligations that would "ride through" and were enforceable after the bankruptcy petition was filed unless explicitly rejected. (*Id.* at 7 (quoting *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 504 (3d Cir. 2021)).) According to Wheel Pros, because the Unit Grant Agreement was not explicitly rejected, and executory contracts were "deemed assumed" by the Reorganization Plan, the Unit Grant Agreement was still in effect. (*Id.* at 8.) Finally, Wheel Pros argued that "the outcome of Defendants' [Unit Grant Agreement]-cancellation argument would . . . deeply offend notions of equity and fairness." (*Id.*) Because Lanzello "indisputably breached the [Unit Grant Agreement] at least seven (7) months before Wheel Pros filed its bankruptcy petition," to excuse his "breaching conduct and future compliance" with the Unit Grant Agreement's covenants because of the bankruptcy proceedings would "be patently unfair." (*Id.* at 8–9.)

On October 20, 2025, I ordered the parties to submit supplemental briefing to address:

(1) whether the Unit Grant Agreement is an "executory contract" in light of Wheel Pros, LLC's Amended Joint Prepackaged Plan of Reorganization ("Reorganization Plan") and (ECF No. 48-6);

(2) whether the Unit Grant Agreement should be understood as an "incentive and retentions plan[]" or any other type of Compensation and Benefits Program as defined in the Reorganization Plan (ECF No. 48-6);

(3) whether the Unit Grant Agreement, in its entirety, was cancelled by any provision of the Reorganization Plan, including but not limited to Section G, Cancellation of Existing Securities, Agreements, and Interests of Article V of the Reorganization Plan; and

(4) whether, even if the Unit Grant Agreement's grant of equity interests to Lanzello was cancelled by the Reorganization Plan, the Agreement's non-compete provision should nevertheless be enforced in the interests of equity.

(Elec. Order, Oct. 20, 2025.)

In supplemental briefing, Defendants continue to rely on Article IV, Section G of the Reorganization Plan and its definitions of "Existing Equities" and "Interests," and argue that the Profit Interest Units granted to Lanzello in the Unit Grant Agreement were cancelled pursuant to the terms of the Reorganization Plan. (Defendants' Supplement at 3–4.) Defendants also rely on Article V, Section G.1 of the Reorganization Plan to argue that the Unit Grant Agreement is an employee equity or equity-based incentive plan that was expressly cancelled by the Reorganization Plan and deemed to be a non-executory contract. (*Id*. at 5–7). Article V, Section G.1 of the Reorganization Plan provides that:

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, ***except for: (a) all employee equity or equity-based incentive plans, <u>and</u> any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests, Existing Equity Interests, or New Equity Interests, <u>which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date</u>***.

(*Id*. at 5 (quoting Reorganization Plan at 40 (emphasis in Defendants' Supplement)).) According to Defendants, "[t]here can be no dispute that the [Unit Grant Agreement] is an 'employee equity or equity-based' incentive plan," because the first page of the Unit Grant Agreement states that "the Partnership and Executive desire to enter into *an agreement pursuant to which*, as part of the *incentive arrangements* between the Partnership, Employer and Executive, the Partnership will grant to Executive *2,850 Class B Common Units of the Partnership*." (*Id*. (quoting Unit Grant Agreement at 1 (emphasis in Defendants' Supplement)).) In the alternative, Defendants argue that even if the Unit Grant Agreement is considered an executory contract, it could not be "assumed in part and rejected in part," contrary to Wheel Pros' argument that the Reorganization Plan canceled out only the equity-granting provisions of the Unit Grant Agreement while leaving the restrictive covenants intact. (*Id*. at 7–8.)

Finally, in its supplemental brief, Defendants argue that the Delaware Chancery Court's decision in *North American Fire Ultimate Holdings, LP v. Doorly*, 2025 WL 736624 (Del. Ch. Mar. 7, 2025), rebuts Wheel Pros' argument that it would be unfair to not enforce the Unit Grant Agreement's restrictive covenants merely because the grant of equity to Lanzello was cancelled by the Reorganization Plan. (Defendants' Supplement at 9.) In *Doorly*, the plaintiff employer issued 300,000 Class B units to the defendant employee pursuant to an agreement that contained restrictive covenants. 2025 WL 736624, at *1 (Del. Ch. Mar. 7, 2025). The agreement identified the units as "adequate and sufficient consideration" for the restrictive covenants and did not mention any additional consideration, such as a promotion, increased compensation, or expanded responsibilities. *Id.* Shortly after entering the agreement, the defendant was terminated for cause, which resulted in an automatic forfeiture of the units. *Id*. Later, when the employer brought a lawsuit seeking to enforce the restrictive covenants, the court held that they were unenforceable

for lack of consideration since the units—which were the only consideration exchanged for the restrictive covenants—had been forfeited. *Id.* at 3. Analogizing to *Doorly*, Defendants argue that if Lanzello's Profit Interest Units were cancelled in the bankruptcy, as Wheel Pros argues, then the entire Unit Grant Agreement, including the restrictive covenants, fail for lack of consideration. (Defendants' Supplement at 8–10; *see also id.* at 10 (citing *Payscale Inc. v. Norman*, 2025 WL 1622341 (Del. Ch. June 9, 2025)).)

In its supplemental brief filed in response to the October 20, 2025 Order, Wheel Pros makes three main arguments. First, it shifts from its previous argument that the Unit Grant Agreement was an executory contract to argue that the agreement was *not* an executory contract on the effective date of the Reorganization Plan because Lanzello's employment was terminated for cause prior to that time. (Wheel Pros' Supplement at 2–3.) Arguing that contracts where "performance remains due on only one side" are to be considered non-executory, Wheel Pros contends that Lanzello's termination rendered the Unit Grant Agreement a non-executory contract because there were no further material obligations for Wheel Pros to perform. (*Id.* at 3–4.)

Second, in the alternative, Wheel Pros argues that even if the Unit Grant Agreement is an executory contract, its restrictive covenants remain intact because "rejection of an executory contract 'constitutes a breach, not a recission or termination.'" (*Id.* at 6 (quoting *Mission Prod. Holdings, Inc. v. Tempnology*, LLC, 587 U.S. 370, 372, 381 (2019)).) Wheel Pros contends that a debtor's rejection of an executory contract "relieves the debtor's estate of the obligation to perform, while leaving intact those provisions that survive a breach under non-bankruptcy law." (*Id.* at 6) On this basis, Wheel Pros argues that "the cancellation provision in [the Reorganization Plan] applied to equity interests and arrangements—*not* to ongoing personal covenants and non-

competition and confidentiality obligations." (*Id.* at 7 (emphasis in original).) It also points to the severability provisions of the agreement for support for its position that the restrictive covenants remain intact, even if the equity granting provisions are no longer valid. (*Id.* at 7–9.)

Third, Wheel Pros argues that "equitable considerations independently compel enforcement of Lanzello's surviving restrictive covenants" because the factual record demonstrates that Wheel Pros intended for the covenants to remain intact. (Wheel Pros' Supplement at 9.) Wheel Pros relies on testimony by Tiffin and Executive Vice President John Vang stating that they interpreted the Reorganization Plan to cancel the equity interests they gained through unit grant agreements even though they remained bound by the restrictive covenants in those agreements. (*Id.* at 9–10.) According to Wheel Pros, the interpretation that the Reorganization Plan cancelled Lanzello's restrictive covenants would contradict Tiffin and Vang's understanding of their own unit grant agreements and mean that Wheel Pros "intended to cancel virtually all restrictive covenants with current and former employees in one fell swoop," which would not align with the company's interests following reorganization through bankruptcy. (*Id.* at 10.) Further, Wheel Pros argues that "[a]ny contrary reading of the plan would result in Lanzello having released himself from his restrictive covenants by virtue of his breach of those covenants – a result equity cannot countenance." (*Id.*)

On October 28, 2025, I permitted the parties to file replies to each side's supplemental briefing (Elec. Order, Oct. 28, 2025). On reply, Defendants argue that regardless of whether the Unit Grant Agreement is considered executory or non-executory, it is still cancelled in its entirety by the plain language of the Reorganization Plan. (Defs.' Add. Supp. Mem. of Law on Force & Effect of Unit Grant Ag. ("Defendants' Supp. Reply"), ECF No. 69 at 1–3.) Once again relying on *Doorly,* 2025 WL 736624 (Del. Ch. Mar. 7, 2025), Defendants argue that the Unit

Grant Agreement was rendered unenforceable for lack of consideration after Wheel Pros' bankruptcy cancelled Lanzello's equity interests. (*Id.* at 3–4.) Further, Defendants argue that the equity-granting provisions of the Unit Grant Agreement cannot be severed and preserved from the agreement itself, irrespective of the Unit Grant Agreement's severability provision. (*Id.* at 4 – 6.) Last, Defendants argue that equity considerations do not support enforcement of the Unit Grant Agreement because the Reorganization Plan "unambiguously indicates Wheel Pros' intention to destroy the existing equity structure." (*Id*. at 6.)

On reply, Wheel Pros argues that although the Reorganization Plan "cancelled Wheel Pros' prepetition equity interests to satisfy § 1129(b) [of the Bankruptcy Code], it neither did, nor could it, eliminate Lanzello's distinct contractual obligations to the company." (Wheel Pros' Supp. Reply Mem. of Law in Opp. to Stay Pend. Appeal ("WP Supp. Reply"), ECF No. 70 at 3.) Wheel Pros also argues that the Unit Grant Agreement is not an "incentive plan" because the company's separate Limited Partnership Agreement differentiates between award agreements and equity plans, and award agreements—not incentive plans—are specifically called "Unit Grant Agreements." (*Id*.) Further, Wheel Pros points out that Article IV, Sections F and R of the Reorganization Plan "expressly retained all rights, claims, and causes of action belonging to the Reorganized debtors," even though it cancelled all ownership and equity interests. (*Id.* at 4.) According to Wheel Pros, this further supports the notion that "[t]he [Reorganization] Plan therefore distinguishes between cancelling ownership interests and preserving enforceable rights." (*Id*.) Finally, Wheel Pros argues that equitable principles compel the enforcement of the restrictive covenants and Lanzello's "protests of unfairness should be summarily disregarded" because of the substantial compensation he received from the Unit Grant Agreement. (*Id*. at 6.)

b.    <u>Analysis</u>

40

As a threshold matter, Lanzello violated the restrictive covenants of the Unit Grant Agreement long before Wheel Pros entered bankruptcy proceedings in September 2024.[9] As I found in the PI Order, Lanzello violated the restrictive covenants in February 2024, while he was employed as Wheel Pros' Vice-President for the Northeast Region, when he began engaging in activities to found ASR Motorsport with Arthur Hale, the former CEO of a company that Wheel Pros purchased and who was also subject to a separate non-compete agreement with Wheel Pros, which was scheduled to expire on May 15, 2024. (*Id.* at 9–10; July 11, 2024 Hr'g Tr. 299:9.) The PI Order sets forth detailed factual findings concerning Lanzello's numerous, egregious violations of the Unit Grant Agreement's confidentiality and non-compete terms while still employed at the company. (*See generally* PI Order at 8–16.) They include the following:

- in February 2024, Lanzello shared highly sensitive Wheel Pros' sales data with Arthur Hale (*id.* at 9);

- in February 2024 Lanzello exchanged messages with Hale regarding wheel designs and Hale's plans to re-enter the aftermarket wheels industry (*id*);

- in June 2024 Lanzello met with Hale, Leahy, and Junjie Chen, a former Wheel Pros employee, to discuss wheel designs and business plans for starting ASR Motorsport (*id.* at 10–11);

- in July 2024, Lanzello worked on business plans and wheel designs for ASR Motorsport during working hours at Wheel Pros (*id.* at 11);

- in August 2024, Lanzello solicited Wheel Pros customers on behalf of ASR Motorsport (*id.* at 13).

As a result of these numerous violations of his non-compete and confidentiality agreements with Wheel Pros and his misappropriation of Wheel Pros' trade secrets, Lanzello was terminated by

---

[9] Wheel Pros filed its Chapter 11 bankruptcy petition on September 8, 2024. *See In re Wheel Pros, LLC*, No. 24-11939 (ECF No. 1) (Bankr. D. Del. Sept. 8, 2024).

Wheel Pros, for cause, on November 20, 2024. (Am. Compl. ¶ 68.)

Of critical significance here is the fact that Lanzello's equity interest in Wheel Pros was entirely extinguished as a result of his violations of the confidentiality and non-compete terms of the Unit Grant Agreement starting in February 2024 *and* his termination for cause in November 2024. Paragraph 3 of the Unit Grant Agreement provides:

> *Cancellation of Profits Interest Units*. In the *event of a Separation for any reason . . . or* if the Executive has at any time (including following a Separation*) breached (a "Restrictive Covenant Breach") any of the provisions of Section 8 or Section 9* or any other confidentiality, non-competition, non-solicitation or no-hire obligations set forth in any other written agreement. . . all Unvested Profit Interest Units will be *automatically cancelled* upon such a Separation or such Restrictive Covenant Breach without any consideration paid therefore and without further action . . .

(Unit Grant Agreement at 3–4 (emphasis added).) Paragraph 3 further provides:

> In addition, in the event (a) of *a Separation* resulting from a termination of Executive's employment by the Partnership, Employer or any of their respective Subsidiaries *for cause* or (b) of *a Restrictive Covenant Breach* at any time (including following a Separation), *all Vested Profits Interest Units shall also be automatically cancelled upon such Separation or such Restrictive Covenant Breach* without any consideration paid therefore and without further action . . .

(*Id*. (emphasis added).) According to the plain terms of Paragraph 3, (1) any *unvested* profit interest units conveyed through the Unit Grant Agreement are automatically cancelled in the event of the employee's breach of the non-compete and non-solicitation restrictive covenants *as well as* termination of employment with Wheel Pros for any reason; and (2) any *vested* profit interest units conveyed through the agreement are automatically cancelled in the event of the employee's termination for cause *as well as* any breach of the restrictive covenants *at any time.*

Thus, according to the plain terms of Paragraph 3 of the Unit Grant Agreement, by November 20, 2024, if not before, all of Lanzello's equity interests in Wheel Pros obtained through the Unit Grant Agreement—whether vested or unvested—had been automatically extinguished. The cancellation of these equity interests was automatic both because Lanzello had

repeatedly breached the Unit Grant Agreement's confidentiality, non-competition, and non-solicitation clauses between February 2024 and his termination, and because Lanzello was terminated for cause on November 20, 2024. Accordingly, as of November 20, 2024, Lanzello had no equity interests in Wheel Pros by virtue of the Unit Grant Agreement, and Wheel Pros had no material obligations left to perform under the agreement.

The question remains whether the Unit Grant Agreement was an executory or non-executory contract at the time the Reorganization Plan went into effect on December 2, 2024. *In re Wheel Pros, LLC*, No. 24-11939 (ECF No. 359) (Bankr. D. Del. Dec. 2, 2024.) The Second Circuit "characterize[s] an executory contract as one "on which performance remains due to some extent on both sides." *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008); *see also In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010), *as amended* (June 24, 2010) (defining executory contracts as those "under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other"); *In re Spectrum Info. Techs., Inc.*, 193 B.R. 400, 404 (Bankr. E.D.N.Y. 1996) (same). On the other hand, contracts are *non*-executory when performance is due by only one party to the contract—*either* the bankrupt party *or* the other party. *See In re NanoDynamics, Inc.*, 735 F. App'x 762, 764 (2d Cir. 2018); *In re Avianca Holdings S.A.*, 618 B.R. 684, 696 (Bankr. S.D.N.Y. 2020) (holding that when "performance remains due on only one side, the contract is non-executory, and hence, neither assumable nor rejectable.");

Courts evaluate whether a contract is executory or non-executory "as of the date the bankruptcy petition was filed." *In re NanoDynamics, Inc.*, 735 F. App'x 762, 764 (2d Cir. 2018). "However, even if a court finds an executory contract on the petition date, post-petition events

may indicate that no executory contract remains for the bankruptcy plan to [either] assume or reject at the time it takes effect." *In re Worldcom, Inc.*, No. BKR. 02-13533, 2010 WL 2465362, at *4 (Bankr. S.D.N.Y. June 11, 2010); *In re Majestic Cap., Ltd.*, 463 B.R. 289, 299 (Bankr. S.D.N.Y. 2012) ("Executoriness normally is measured as of the petition date, yet post-petition events may occur that render an executory contract non-executory (citing *In re Penn Traffic Co.*, 524 F.3d at 381)). Thus, a contract that could have been considered executory when a bankruptcy petition was first filed may lose its executory-status by the time that a plan of reorganization goes into effect.

To assess whether the Unit Grant Agreement was executory, I first must determine whether either party had any outstanding obligations to perform on the date Wheel Pros filed its bankruptcy petition. Under the Unit Grant Agreement, Wheel Pros offered Lanzello "employment with [Wheel Pros]" and "the issuance of the Executive Securities by the Partnership on the Issuance date" in exchange for Lanzello's agreement to be bound by the confidentiality, non-compete, non-solicitation provisions, among other terms. (Unit Grant Agreement at 7–10.) Thus, Wheel Pros owed Lanzello continued employment and issuance of the Executive Securities specified in the agreement. Lanzello, in return, was prohibited from disclosing any of Wheel Pros' confidential information and, during his employment and for five years following his separation from the company, competing with Wheel Pros and soliciting Wheel Pros' employees to leave their employment to work for a competitor. (*Id*. at 7–10.)

When the bankruptcy petition was filed on September 8, 2024, Lanzello's equity interests in Wheel Pros had already been automatically extinguished under Paragraph 3 of the Unit Grant Agreement due to his breach of the non-compete and non-solicitation agreements through efforts to establish ASR Motorsport, misappropriate Wheel Pros' confidential information, and solicit

Wheel Pros' customers, among other violations, between February 4, 2024, and September 8, 2024. (*See generally* PI Order at 8–16.) Nevertheless, Wheel Pros continued to employ Lanzello, and Lanzello remained bound by the restrictive covenants set forth in the Unit Grant Agreement. Thus, on September 8, 2024, the Unit Grant Agreement was an executory contract because both Wheel Pros and Lanzello had obligations that, if not carried out, would constitute a breach of the contract: Lanzello was still bound by the restrictive covenants, and these covenants were still supported by Wheel Pros' continued employment of him.

However, "post-petition events may indicate that no executory contract remains for the bankruptcy plan to assume or reject at the time it takes effect." *In re Worldcom, Inc.*, 2010 WL 2465362, at *4. Wheel Pros' termination of Lanzello's employment for cause on November 20, 2024 constitutes a post-petition event of significance to the determination that the agreement ceased to be an executory contract on that date. After Lanzello's termination for cause, Wheel Pros no longer had any obligations left to perform under the Unit Grant Agreement: Wheel Pros had already provided him the promised equity interests in the company, and Lanzello's employment was appropriately terminated due to his violation of the restrictive covenants of the agreement. Nevertheless, pursuant to Paragraph 9 of the Unit Grant Agreement, Lanzello had a continuing obligation to abide by the restrictive covenants until November 20, 2029—five years after the date of his separation from Wheel Pros.[10] Where the only "remaining obligation on the part of the non-debtor under an employment or a termination of employment contract is compliance with restrictive covenants, such continuing obligation generally does not rise to the requisite level of materiality necessary to be considered executory." *In re Spectrum Info. Techs.,*

---

[10] Paragraph 9 provides that the non-compete restriction applies "for five (5) years following any Separation" from Wheel Pros. (Unit Grant Agreement at 9.)

*Inc.*, 190 B.R. 741, 750 (Bankr. E.D.N.Y. 1996). Accordingly, after November 20, 2024, the Unit Grant Agreement was no longer an executory contract. Therefore, by the time Wheel Pros' Reorganization Plan went into effect on December 2, 2024,[11] the Unit Grant Agreement was already a non-executory contract and it remains so today.

For all of these reasons, Defendants' arguments that the restrictive covenants are no longer in force under Article V, Section G.1 of the Reorganization Plan are without merit. Article V specifically applies to the treatment of *executory* contracts and therefore does not apply to the Unit Grant Agreement, which was a *non-executory* contract on the date the Reorganization Plan went into effect. (*See* Reorganization Plan at 37.)

Nor do Defendants make a persuasive argument that the Unit Grant Agreement falls within the Reorganization Plan's definition of an "Interest" and is therefore cancelled as an "Existing Equity Interest" under Article IV, Section G of the Reorganization Plan. As addressed above, Section G provides that all "*Existing* Equity Interests, shall, be cancelled" and that any rights of a holder of such existing equity interests "shall be deemed cancelled and of no force or effect . . . ." (Reorganization Plan at 32 (emphasis added); *see supra* Discussion § I (a)(i)(3)(a).) "Existing Equity Interests" are defined as "any Interests in Wheel Pros Holdings, L.P., existing immediately prior to the occurrence of the Effective Date" of the Reorganization Plan. (Reorganization Plan at 8.) An "Interest," in turn, is defined as:

> . . . any Equity Security, equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, agreements to acquire the common stock, preferred

---

[11] *See In re Wheel Pros, LLC*, No. 24-11939 (ECF No. 359, Notice of Effective Date // Notice of (I) Entry of Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtor's Amended Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and (II) Occurrence of Effective Date) (Bankr. D. Del. Dec. 2, 2024).

stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (*whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security*).

(Reorganization Plan at 11 (emphasis added).) Defendants focus on the fact that the definition of "Interests" includes an "*agreement*[] to acquire . . . profit interests" and "any other *agreements*, arrangements or commitments of any character relating to, or whose value is related to, any such interest or ownership interest by the Debtor." (Motion at 6–7 (emphasis supplied).) But Defendants read out the word "existing" from Article IV, Section G, which provides only that all "*Existing* Equity Interests, shall be cancelled." (Reorganization Plan at 32 (emphasis added).) And Defendants entirely ignore the definition of "Existing Equity Interests" as equity interests in Wheel Pros "*existing immediately* prior to the occurrence of the Effective Date" of the Reorganization Plan. (*Id*. at 8 (emphasis added).)

As explained above, Lanzello's equity interests were automatically cancelled as early as February 2024 because of his violations of the restrictive covenants and, at the latest, by November 20, 2024, when Wheel Pros terminated him for cause due to his violations. Either way, by the time the Reorganization Plan went into effect in December 2024, Lanzello had no "existing" equity interests by virtue of the Unit Grant Agreement due to his own misconduct. Therefore, Article IV, Section G's treatment of "Existing Equity Interests" simply does not apply to the Unit Grant Agreement.[12] Moreover, even if it did, the restrictive covenants would still be

---

[12] For similar reasons, the Court finds unpersuasive Defendants' argument that Article V, Section G (1) cancels the Unit Grant Agreement because it should be considered a "Compensation and Benefits Program" that was recognized as an executory contract and expressly terminated by the Reorganization Plan. (Defendants' Supplement at 5–8.) Article V specifically pertains to the

in effect because, as Wheel Pros points out, the definition of "Interest" in the Reorganization

Plan distinguishes between stand-alone grants of equity and grants of equity that are a part of, or

"in connection with any employment agreement, separation agreement, or employee incentive

plan . . . ." (Opposition at 7 citing (Reorganization Plan at 11).) This distinction in the definition

of "Interest" applies to the term "Existing Equity Interests" in Article IV, Section G.

Accordingly, the Reorganization Plan cancelled all existing securities and grants of equity,

including grants of equity set forth in other agreements, but did *not* cancel every single document

that confers a grant of equity. Adopting Defendants' interpretation of the plain text of Article IV,

Section G would have the perverse consequence of cancelling, in its entirety, every single

agreement that sets forth a grant of Wheel Pros equity, without regard to whether the equity at

issue *had already been* automatically cancelled prior to entry of the Reorganization Plan and

regardless of whether the agreement at issue contains restrictive covenants protecting Wheel

Pros' trade secrets and confidential information, which the company sought to preserve in the

reorganization process. Either way, the restrictive covenants set forth in Lanzello's Unit Grant

Agreement are unaffected by the Reorganization Plan and remain in effect. As a result, I do not

reach the parties' arguments as to whether equitable considerations weigh in favor of enforcing

the restrictive covenants even if they no longer remain in effect.[13]

---

"Treatment of Executory Contracts and Unexpired Leases." (Reorganization Plan at 37.) As
established above (*supra* Discussion § I (a)(i)(3)(b) at 44–46), at the time the Reorganization
Plan went into effect, the Unit Grant Agreement was not an executory contract and therefore the
provisions of Article V do not reach it.

[13] Defendants rely on *North American Fire Ultimate Holdings, LP v. Doorly*, 2025 WL 736624
(Del. Ch. Mar. 7, 2025), to rebut Wheel Pros' argument that failing to enforce the Unit Grant
Agreement's restrictive covenants would offend notions of fairness and equity in light of
Lanzello's numerous violations of his non-compete and non-solicitation obligations.
(Defendants' Supplement at 9.) I decline to reach this argument because I find that the
Reorganization Plan did not cancel the Unit Grant Agreement's restrictive covenants.

### ii.  *Rule 65(d)(1)(C)*

Defendants argue they are likely to succeed on appeal from the preliminary injunction because the PI Order does not describe the enjoined conduct in sufficient detail as required by Rule 65(d)(1)(C), Fed. R. Civ. P. Specifically, Defendants contend that Paragraphs 4 and 5 of the PI Order, which refer to Wheel Pros' "Confidential Information" and "Developments," are vague because the parties dispute the meaning of these terms and Defendants "do not have 'explicit notice of precisely what conduct is outlawed.'" (Motion at 20 (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000)).) Defendants further argue that the preliminary injunction runs afoul of Rule 65(d) because it refers to the Individual Defendants' Non-Disclosure Agreements for the definitions of "Confidential Information" and "Developments," and purportedly does not "describe[e] in reasonable detail what acts are forbidden or required from Defendant in the injunctive order itself." (*Id*. at 21.)

Wheel Pros makes three arguments in opposition. First, it contends that the term "Developments" used in the PI Order includes at least some ASR Motorsport products in light of the evidentiary record, which shows that "Lanzello actively directed ASR's design and product decisions based on Wheel Pros' sales information" and the Individual Defendants, too, were "heavily involved in determining style and design elements, engineering specifications, and incorporating work done for Wheel Pros in ASR's wheel designs." (Opposition at 14 (citing Wheel Pros' PI Reply Brief, ECF No. 35, at 14).) On this basis, Wheel Pros asserts that "Defendants cannot credibly claim that *no ASR products* are Developments," and any insistence otherwise is Defendants' attempt to feign confusion about the preliminary injunction rather than a genuine concern about vagueness. (*Id*. at 14 (emphasis in Opposition).) Second, Wheel Pros contends that preliminary injunctions "can track language from documents in order to add

specificity to the injunction" without violating Rule 65. (*Id.* at 15 (quoting *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88–89 (2d Cir. 2011).) Third, Wheel Pros argues that even if the PI Order is insufficiently specific, the proper remedy is to clarify its terms—not to stay the injunction outright. (*Id.* at 15–16.)

Under Rule 65(d), an order granting a preliminary injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). The rule "is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed." *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997). For an injunction to comply with Rule 65(d), it need only be "specific and definite enough to apprise *those within its scope* of the conduct that is being proscribed." *New York State Nat'l. Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (emphasis supplied); *see also GMA Accessories, Inc. v. Eminent, Inc.*, No. 07-cv-3219, 2008 WL 2355826, at *3 (S.D.N.Y. May 29, 2008) (same). In other words, a preliminary injunction is sufficiently clear if it apprises the enjoined party of the proscribed conduct, leaving "no uncertainty in the minds of those to whom it is addressed . . . ." *King v Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *see also Fed. Trade Comm'n*, 2024 WL 1026010, at *3 (recognizing that under Rule 65(d), "an injunction must be specific and definite enough to apprise those within its scope of the conduct that is being proscribed").

Once a party has filed a notice of appeal of a preliminary injunction, the court may not alter the posture of the case on appeal. *See Ideal Toy*, 302 F.2d at 625. However, a court's power to preserve the status quo includes the power to clarify the terms of an injunction. *Broker Genius, Inc., v. Seat Scouts LLC*, No. 17-cv-8627, 2019 WL 5203474, at *3 (S.D.N.Y. Sept. 23, 2019).

*1. Confidential Information*

50

The preliminary injunction relating to Wheel Pros' Confidential Information is set forth in Paragraphs 1 and 4 of the PI Order:

> (1) Defendants are enjoined from using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information as defined in any written agreement between Wheel Pros and any Individual Defendant, including without limitation, the Non-Disclosure Agreements executed by Lanzello, Noori, Leahy, Palacios, Thompson, and Huallanca . . .

> (4) Defendants shall destroy and dispossess themselves of any of Wheel Pros' sensitive, proprietary, and confidential information, or other Wheel Pros' Confidential Information (as defined in the Individual Defendants' Non-Disclosure Agreements), or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party.

(PI Order at 55.) The PI Order provides the definition of "Confidential Information" set forth in Lanzello's Non-Disclosure Agreement as part of the factual findings on page five, as follows:

> [I]nformation that is not generally known in the industry in which Wheel Pros is engaged, in the possession, ownership or control of Wheel Pros or its employees. Confidential Information includes, but is not limited to, information related to wheel and cap designs (whether patentable, patented or not), trade secrets, programs, business plans, inventions (whether patentable, patented or not), processes, formulas, existing or contemplated products, technical data, services, technology, concepts, computer programs, plans, studies, techniques, designs, specifications, patterns, contracts, presentations, and business information, and including information related to any research, development, manufacture, purchasing, engineering, know-how, sales or marketing methods, competitive analyses, methods of doing business, customer lists, or customer usages or requirements.

(*Id*. at 5.) The PI Order sets forth the factual finding that "Noori, Palacios, Leahy, Tompson and Huallanca all signed the same form non-disclosure agreement as the Lanzello Non-Disclosure Agreement," and cited where those agreements are located in the record. (PI Order at 8 & n.3.)

The PI Order also contains numerous findings of fact relating to the specific Confidential Information that the Individual Defendants disclosed, demonstrating a likelihood of success on the merits of Wheel Pros' claims that the Individual Defendants violated the Defend Trade Secrets Act and their Non-Disclosure Agreements with Wheel Pros. Specifically, I found that

"ASR Motorsport took and leveraged a large volume of Wheel Pros' confidential information" constituting trade secrets protected by the Defend Trade Secrets Act, which  includes the following:

> proprietary drawings of unreleased wheel designs (Stip. Exs. 11, 13), aggregated data regarding Wheel Pros' best-selling wheels and their associated fitments (Stip. Ex. 8), detailed information concerning sales volumes (Stip. Ex. 4), and customer lists with customer-specific pricing schemes (Stip Exs. 29, 31.) Furthermore, Wheel Pros took steps to keep this confidential information secure, including by: (1) requiring employees with access to trade secrets to sign non-disclosure agreements, (2) requiring employees to use a two-factor authentication protocol in order to access trade secrete or otherwise confidential information, and (3) limiting access to trade secrets within the company. (July 10, Hr'g T. 81:22–82:9.)

(PI Order at 41; *see also id*. at 29–31 (describing in detail Defendants' disclosure of Wheel Pros' confidential information in violation of the Individual Defendants' Non-Disclosure Agreements with the company).) As shown in the excerpt above, the PI Order includes citations to evidence in the record containing or identifying the specific confidential information at issue. Moreover, the PI Order also identifies specific information that falls into each identified category of Confidential Information.

First, with respect to Wheel Pros' unreleased wheel designs, the PI Order sets forth the specific finding that emails from Junjie Chen, a former Wheel Pros employee, to Hale, Lanzello, Jeff Claunch, and Jose Valenzuela (a third party contractor), on August 9 and 10, 2024, disclosed confidential drawings corresponding to two specific Wheel Pros wheel designs and a photograph of a Wheel Pros spreadsheet with purchasing and sales data regarding specific stock keeping units ("SKUs"). (*Id*. at 29–30; Stip. Ex. 11, ECF No. 47-1 at 89–102; Stip Ex. 13, ECF No. 47-1 at 129–33.)[14] One of those designs was "still in sample stage in May [2024]." (PI Order at 11 (citing Stip. Ex. 11 at 89–102).) It also includes the finding that in the August 10, 2024 email,

---

[14] (*See also* July 10, 2025 Hr'g Tr. 244:7–11; 246:21–23.)

Chen disclosed to those same recipients the confidential information that Wheel Pros "started to

use ███████████████." (PI Order at 12; *see* Stip. Ex. 13 at 132.) And the PI Order

sets forth the finding that on August 12, 2024, Chen emailed the same group additional wheel

drawings and confidential descriptions of the wheel specifications pertaining to the drawings (PI

Order at 12; Stip. Ex. 15, ECF No. 47-1 at 143.) I further found that, on August 16, 2024,

Lanzello forwarded to A.D. Hale, Arthur Hale's son, an email thread providing him access to:

> (1) descriptions of the specifications set forth in the confidential drawings attached to the
> August 10, 2024 email (2) discussions about "brand new" Wheel Pros wheel styles,
> including one not yet in production as of May 2024, (3) the fact that Wheel Pros had
> "started to use ██████████████████]" as of the date of the
> email thread, and (4) a link to download a zip file, apparently containing the attached
> confidential and proprietary Wheel Pros wheel drawings.

(PI Order at 30 (citing Stip. Ex. 15, ECF No. 47-1 at 140); *see also id*. at 45 (citing Stip. Ex. 15,

ECF No. 47-1).) The PI Order also sets forth the finding that Eric Grieving, Wheel Pros' Product

Director, characterized some of the drawings sent by Chen as "a schematic for how to build the

wheels." (PI Order at 12 (citing July 10, 2025 Hr'g Tr. 201:5–6).)

Second, with respect to aggregated data regarding Wheel Pros' best-selling wheels and

their associated fitments, I specifically found in the PI Order that, on July 16, 2024, Lanzello

texted Hale Wheel Pros' spreadsheets showing the company's 100 top-selling SKUs for 2023

and year-to-date top 100 selling SKUs for 2024, including the average selling price of those

SKUs and the corresponding gross profit margin. (PI Order at 10, 45 (citing (Stip. Ex. 8, ECF

No. 47-1 at 63–76; July 10, 2025 Hr'g Tr. 124:23–125:1 ("[Tiffin]: This appears to be our SKUs,

looks like our top selling SKUs in order of volume, it looks like, with . . . average selling price

and gross margin."))).) As explained in the PI Order, "SKU numbers used by Wheel Pros to

identify its approximately 12,000 wheel products contain five data points: (1) the wheel's style

or design; (2) the wheel's size; (3) the wheel's bolt pattern; (4) the wheel's finish; and (5) the

wheel's offset. (PI Order at 10 (citing July 10, 2025 Hr'g Tr. 84:3–8; 91:4–8).) Collectively, this information provides a given wheel's 'fitment'—that is, what types of vehicles a particular wheel will fit." (*Id*. (citing July 10, 2025 Hr'g Tr. at 178:16–23).)

Third, with respect to detailed information concerning Wheel Pros' sales volumes, I specifically found in the PI Order that on February 14, 2024, Lanzello emailed Art Hale a summary of Wheel Pros February 2024 year-to-date sales data. (PI Order at 9, 45 (citing Pl.'s Rebuttal Ex. E, ECF No. 47-4 at 14–16).) And I also found that, on April 30, 2024, Lanzello texted two screenshots to Hale showing Wheel Pros' month-to-date and total daily sales revenue by region. (*Id*. at 9, 45 (citing Stip. Ex. 4, ECF No. 47-1 at 42–46); *see also* Tiffin, July 10, 2025 Hr'g Tr. 86:15–17.)

Fourth, as for customer lists with customer-specific prices, I found that "the customer-related information [Defendants] took from Wheel Pros goes far beyond a list of the names of customers to include sales volume and prices for ranges of products under *private pricing arrangements*." (PI Order at 43 (citing Stip. Exs. 29, 31, ECF No. 47-2; July 10, 2025 Hr'g Tr. 104:8–106:4 (emphasis supplied)).) The PI Order expressly references the Parties' Stipulated Exhibit 29, which includes a link to a spreadsheet containing Wheel Pros part numbers, which the PI Order found to consist of confidential information. (*Id*. at 43.) Similarly, the PI Order expressly references Stipulated Exhibit 31, which refers to the "inventory file" that Defendant Noori was "working on" and ultimately sent to Tire Agent, a Wheel Pros' customer, by FTP on January 31, 2025. (Stip. Ex. 31, ECF No. 47-2; *see also* PI Order at 43.) The email thread shows that Noori sent Tire Agent the Wheel Pros' inventory file in an effort to poach the client for ASR Motorsport by offering lower prices. (Stip. Ex. 31, ECF No. 47-2.)

Thus, contrary to Defendants' contentions, the PI Order provides the definition of

"Confidential Information" set forth in the Individual Defendants' Non-Disclosure Agreements, albeit in the factual findings set forth in the "Background" and "Discussion" sections of the order. More importantly, the PI Order details specific categories of Confidential Information disclosed by Defendants in violation of those agreements *and* identifies where such information is either located or identified in the record. Paragraph 1 of the PI Order enjoins Defendants from "using, disclosing, accessing, reviewing or transferring any confidential, proprietary or trade secret information relating to Wheel Pros' business, including Confidential Information . . . ." (PI Order at 55, ¶ 1.) Paragraph 4 of the PI Order requires that Defendants "shall destroy and dispossess themselves of" that Confidential Information "or any derivations thereof, which Defendants still possess or control, subject to supervision and verification by a neutral third party." (*Id.*, ¶ 4.) Thus, contrary to Defendants' suggestion that the PI Order simply refers to "Confidential Information" without description or elaboration, the PI Order defines the term and provides numerous illustrative examples. *Cf. Corning Inc. v. PicVue Elecs., Ltd*, 365 F.3d 156, 157–58 (2d Cir. 2004) (finding preliminary injunction to violate Rule 65(d) where it referred only to "trade secrets" and "copyrighted works" without any definition). Because of this detail, the PI Order is "specific and definite enough to apprise *those within its scope*," *New York State Nat'l. Org. for Women*, 886 F.2d at 1352—namely Defendants, who are fully aware of the proprietary drawings of unreleased wheel designs, aggregated data regarding Wheel Pros' best-selling wheels and their associated fitments, detailed information concerning sales volumes, and customer lists with customer-specific pricing schemes, that they impermissibly disclosed, which include but are not limited to the specific information identified in the PI Order.

Accordingly, the term "Confidential Information," as used in Paragraphs 1 and 4 of the PI Order, is defined as:

- proprietary drawings of Wheel Pros' wheel designs, including, but not limited to:

  o two Wheel Pros' wheel designs attached to August 9 and 10, 2024 emails from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch;

  o drawings and confidential descriptions of the specifications pertaining to the wheel drawings attached to August 12, 2024 emails from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

  o the fact that "Wheel Pros started to use ███████████████████" on or around August 10, 2024, as disclosed in an August 10, 2024 email from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

- aggregated data regarding Wheel Pros' best-selling wheels and their associated fitments, including but not limited to:

  o Wheel Pros' spreadsheets showing the company's 100 top-selling SKUs for 2023 and year-to-date top 100 selling SKUs for 2024, including the average selling price of those SKUs and the corresponding profit margin, which Lanzello disclosed to Art Hale by text message on July 16, 2024;

  o information contained in the "INNER PURCHASE SKUS.jpg" attached to an August 10, 2024 email from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch;

- detailed information concerning Wheel Pros' sales volumes, including but not limited to:

  o Wheel Pros' spreadsheets showing the company's April 2024 month-to-date sales revenue by region and April 30, 2024 daily total sales revenue by region, screenshots of which were sent by Lanzello to Art Hale by text on April 30, 2024; and

  o Wheel Pros' February 2024 year-to-date sales data, which was texted by Lanzello to Art Hale on February 14, 2024;

- Wheel Pros' customer lists with customer-specific prices for products, including but not limited to:

  o a Google Docs spreadsheet containing Wheel Pros' part numbers sent by Ray Noori to Tire Agent on December 16, 2024; and

  o an inventory file sent by Ray Noori to Tire Agent on or around January 31, 2025.

56

I provide this clarification of the definition of the term "Confidential Information" in exercise of the Court's power to preserve the status quo pending adjudication of Defendants' appeal of the PI Order in a manner that is "consistent with the spirit" of the original preliminary injunction and that does not "alter the posture of the case on appeal." *Flatiron Health, Inc.*, 602 F. Supp. 3d at 486 (citing *Ideal Toy Corp.*, 302 F.2d at 625). As detailed above, this clarification reflects the clear intent and factual findings set forth in the PI Order.

## 2. Developments

The preliminary injunction relating to Wheel Pros' Developments is set forth in Paragraph 5 of the PI Order as follows:

> Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to all 'Developments,' as defined in the respective Individual Defendants' Non-Disclosure Agreements, including, but not limited to, aftermarket wheels and automotive accessories, created or contributed to, in whole or in part, by any Individual Defendant while employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.

(PI Order at 56.) In its factual findings, the PI Order provides the definition of "Developments" set forth in Lanzello's Non-Disclosure Agreement with Wheel Pros as follows:

> Paragraph 1(b) defines "Developments" as "inventions (whether or not patentable), product designs (whether or not patentable), new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property created during [the employee's] employment."

(PI Order at 6 n.2.) As noted above, the PI Order also includes the factual finding that "Noori, Palacios, Leahy, Thompson, and Huallanca all signed the same form non-disclosure agreement as the Lanzello Non-Disclosure Agreement" and cited where those agreements are located in the record. (*Id.* at 8 & n.3.)

As discussed at length in Discussion § I (a)(ii)(1), the PI Order sets forth specific factual

findings concerning the Individual Defendants' disclosure of Wheel Pros' Confidential Information in order to launch ASR Motorsport and develop products that the new company could use to capture Wheel Pros' market share. For example, I found that Junjie Chen's emails dated August 9 and 10, 2024 to Hale, Lanzello, Valenzuela, and Claunch "makes clear that the purpose of sharing Wheel Pros' proprietary wheel designs was to assist the development of wheels for a new endeavor involving others on the email thread." (PI Order at 29.) I also found that Lanzello's August 16, 2024 reply to Chen's August 9 and 10, 2024 emails, which provided A.D. Hale with access to Wheel Pros' proprietary wheel designs, discussions of new wheel styles, and "a link to download a zip file, apparently containing the attached confidential and proprietary Wheel Pros wheel drawings" was for the "purpose of launching ASR Motorsport." (*Id.* at 30.) Furthermore, I found that "Defendants sent confidential Wheel Pros information to customers in an attempt to poach their business from Wheel Pros." (*See id*. at 30–31).) The PI Order thus described Wheel Pros' trade secrets and further found that "Defendants have already engaged in conduct that threatens to compromise the value of those trade secrets, which include proprietary wheel designs, SKU inventory system data, and pricing information." (PI Order at 31 (discussing factual findings in pages 29–31 of the PI Order).) Defendants' unsupported assertion that "the Individual Defendants did not participate in the development of any of ASR's wheels or accessories while they were employed by Wheel Pros," is thus squarely contradicted by factual findings in the PI Order. (Decl. of Martin S. Krezalek, Esq. ("Krezalek Decl.), ECF No. 63-1 at ¶ 6). Supported by these factual findings, I concluded that the preliminary injunction factors— irreparable harm, Wheel Pros' strong showing of a likelihood of success on the merits of its Defend Trade Secrets Act and breach of contract claims, the balance of the equities, and the public interest—considered together, support a preliminary injunction against Defendants'

"marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to" products developed by the Individual Defendants during their employment with Wheel Pros. (*Id*. at 56.)

Accordingly, "consistent with the spirit" of the original preliminary injunction and the factual findings set forth in the PI Order, *Flatiron Health, Inc.*, 602 F. Supp. 3d at 486, this Opinion and Order clarifies that the preliminary injunction set forth in Paragraph 5 of the PI Order enjoins the following specific conduct, which simply incorporates the definition of "Developments" set forth on page 6 n.2 of the PI Order into the preliminary injunction itself:

> Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to any "Developments," which are defined as inventions (whether or not patentable), product designs (whether or not patentable), new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property created during the Individual Defendants' employment with Wheel Pros, including but not limited to aftermarket wheels and automotive accessories that any Individual Defendant created or contributed to, in whole or in part, while still employed by Wheel Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.

While Defendants contend that the preliminary injunction regarding "Developments" lacks clarity because the parties dispute what material falls within the scope of this term, Rule 65(d)'s requirement that a preliminary injunction must be clear and unambiguous "does not mean that every conceivable example of the prohibited conduct must be spelled out in the text of the order" because "[i]njunctions necessarily rely on descriptive language." *GMA Accessories*, 2008 WL 2355826, at *3. For this very reason, in the trademark context, "it is not necessary for an injunction to anticipate and name every variation on a trademark that a creative infringer must use in order to skirt a judgment." *Id*. Similarly, here, notwithstanding Defendants' arguments that the parties dispute what ASR Motorsport work product falls within the definition of Developments, the preliminary injunction is not required to specify all of the specific ASR

59

Motorsport products—whether in development or fully launched—that constitute Developments. Rather, Defendants are aware of the inventions, product designs, new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property that the Individual Defendants created or to which they contributed for ASR Motorsport *while they were still employed by Wheel Pros*. Moreover, as the Second Circuit has recognized, a preliminary injunction that "track[s] language from [extrinsic documents]" may provide adequate specificity to apprise the enjoined party of the proscribed conduct. *IDG USA*, 416 Fed. App'x at 89. Defendants have identified no terms in the definition of "Developments" set forth in their Non-Disclosure Agreements that are vague or contested. Even had they done so, the Second Circuit has made clear that the "[t]erms of an injunction are construed according to the general interpretive principles of contract law." *Fed. Trade Comm.*, 2024 WL 1026010 at *3. The preliminary injunction relating to Developments therefore provides adequate specificity "to apprise *those within its scope*" of the proscribed conduct. *New York State Nat'l. Org. for Women*, 886 F.2d at 1352.[15]

* * *

As set forth above, Defendants fail to show that they are likely to succeed on the merits of their appeal with respect to their position that the PI Order erred in enforcing the Unit Grant Agreement's restrictive covenants and in failing to adequately define the proscribed conduct as

---

[15] In Paragraphs 2 and 3, the PI Order also incorporates by reference the definition of "Business" and "Company Employees" from the Unit Grant Agreement. In the clarified preliminary injunction below, the Court specifically defines those terms as they are defined in the Unit Grant Agreement, thereby removing the parties' need to refer to any external documents to understand the scope of the preliminary injunction. This clarification too is "consistent with the spirit" of the original preliminary injunction and the factual findings set forth in the PI Order. *Flatiron Health, Inc.*, 602 F. Supp. 3d at 486.

required under Rule 65(d).

Defendants have not met their burden to show that the restrictive covenants are likely unenforceable on any of the theories they advance. These restrictions were supported by two forms of consideration at their inception, which is the relevant point of inquiry. (*See* PI Order at 52; *supra* Discussion § I (a)(i)(1).) The temporal and geographic restrictions imposed on Lanzello, considered as a whole, are likely reasonable under Delaware law, as I found in the PI Order. (PI Order at 50–52; *supra* Discussion § I (a)(i)(2).) Moreover, because Lanzello repeatedly violated the restrictive covenants from February 4, 2024 through his termination for cause on November 20, 2024, the equity interests in Wheel Pros conveyed to him through the Unit Grant Agreement were automatically cancelled before the Wheel Pros' Reorganization Plan went into effect, rendering the Reorganization Plan's treatment of Existing Equity Interests inapplicable to Unit Grant Agreement and leaving the agreement a non-executory contract. (*See supra* Discussion § I (a)(i)(3).)

Moreover, Defendants do not show that they are likely to succeed in demonstrating that the PI Order fails to describe the conduct from which Defendants are enjoined with sufficient specificity under Rule 65(d). The PI Order included the definitions of both "Confidential Information" and "Developments" drawn from the Individual Defendants Non-Disclosure Agreements, albeit in its factual findings and legal conclusions. More importantly, the PI Order identifies in detail specific categories of Confidential Information that Defendants disclosed as well as where such information is described or located in the record, providing adequate notice to Defendants of the specific information they must destroy or otherwise dispossess themselves of and that they are enjoined from using, disclosing, access, reviewing, and transferring. (PI Order Paragraphs 1, 4.)

Finally, the PI Order provided the definition of "Developments" set forth in the

Individual Defendants' Non-Disclosure Agreements, albeit in its factual findings. Nevertheless,

the definition of "Developments" is clarified consistent with the spirit of the PI Order to ensure

that Defendants are fully aware of what they are enjoined from marketing, selling, exploiting,

assigning, or otherwise exercising any rights of ownership or control over. Accordingly,

Defendants fail to show a likelihood of success in their claim that Paragraphs 4 and 5 of the PI

Order, as clarified in this Opinion and Order, fail to provide explicit notice of precisely what

conduct is outlawed under Rule 65(d).[16]

### b. Irreparable Harm

Next, the Court considers whether Defendants will be irreparably harmed absent a stay.

*See Mahdawi,* 136 F.4th at 449. Irreparable harm and likelihood of success on the merits "are the

most critical" factors that courts evaluate when assessing a motion for a stay pending appeal.

*New York v. United States Dep't of Homeland Sec.*, 974  F.3d 210, 214 (2d Cir. 2020); *see also*

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-cv-585, 2015 WL

5051769, at *2 (S.D.N.Y. Aug. 26, 2015), *aff'd*, 836 F.3d 153 (2d Cir. 2016), *and aff'd*, 843 F.3d

48 (2d Cir. 2016)) ("Irreparable harm is 'perhaps the single most important prerequisite' before a

---

[16] Under Rule 65(c), before issuing a preliminary injunction, the court typically must order the moving party to provide a security in an amount the court determines would cover damages sustained in the event a party has been wrongfully enjoined. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). Here, the Court did not order Wheel Pros to provide a security. However, "where the party opposing an injunction order does not request security, the district court does not err in failing to order it." *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 143 (2d Cir. 2023). Defendants did not request a security and thus the Court did not err in ordering the preliminary injunction without one. (*See generally*, Defs. Mem. In Opp. To Pl.'s Mot. For Prelim. Injunction, ECF No. 28-1; Defs. Supp. Mem. of Law In Opp. To Pl.'s Mot. For Prelim. Injunction, ECF No. 48.)

stay" of a preliminary injunction pending appeal (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983)). A showing of irreparable harm pending the stay of an injunction cannot be "remote or speculative, but [must be] actual and imminent." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 64 (2d Cir. 2011). "Conclusory assertions" will not satisfy Defendants' burden. *Id.*

Defendants argue that they—and in particular, ASR Motorsport and Lanzello—will be irreparably harmed if the Court does not stay the preliminary injunction pending appeal due to the risks of unintentional non-compliance with the terms of the PI Order because it is purportedly not clear what constitutes "Developments" in Paragraph 5 of the Order, what constitutes "Confidential Information" as that term is used in the PI Order, and when Lanzello is required to resign from ASR Motorsport in order to comply with the restrictive covenant not to compete. (Motion at 22.) Defendants also argue that they will all suffer "irreparable harm simply from losing their President for a prolonged period of time" while their appeal is pending. (*Id.*) Additionally, Defendants argue that they will face irreparable harm because the Unit Grant Agreement is unenforceable—a contention that I find unpersuasive, as explained above. (Motion at 23.)

In response, Wheel Pros contends that Defendants fail to provide any support for their position that "the threat of judicial sanctions resulting from inadvertent noncompliance with an injunction constitutes irreparable harm." (Opposition at 3–4.) It also argues that such a threat is speculative at best. (*Id.*)

Contrary to Defendants' position, to the extent Defendants are concerned that the PI Order fails to provide them sufficient notice of enjoined conduct with respect to the definitions of "Confidential Information" and "Developments" or the date on which Lanzello is required to

resign to comply with the non-compete provision of his agreement with Wheel Pros, the proper course was to file a motion to clarify the terms of the PI Order—not a motion to stay—which Defendants did not do. *See Nat'l Rsch. Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979) ("[T]he alleged ambiguity of an order is no excuse. If an order is ambiguous, which this one does not appear to be, then a clarification should be sought before acts are performed in the ambiguous area."); *Heary Bros. Lightning Prot. Co. v. E. Coast Lightning Prot., Inc.*, No. 96-cv-2796, 2008 WL 11531041, at *4 (D. Ariz. Oct. 10, 2008) ("[W]here there is any doubt, Plaintiffs may petition the Court for clarification of its order . . . Respondents [have] an affirmative duty to petition for a clarification, modification, or construction of the Order before performing acts in the ambiguous area.").

Moreover, as addressed above, the terms of the PI Order that Defendants perceive to be vague—"Confidential Information" and "Developments"—are sufficiently clear. *Supra* § I (a)(ii). Contrary to Defendants' contentions, the PI Order itself includes the definition of both terms in its factual findings and provides significant detail concerning the scope of "Confidential Information" subject to the preliminary injunction. Moreover, this Opinion and Order clarifies the relevant definitions consistent with the spirit of the PI Order.

Additionally, Defendants' purported confusion as to "when Lanzello is required to resign from ASR Motorsport in order to comply with the restrictive covenant not to compete" is contradicted by the plain terms of the PI Order. (Motion at 22.) The PI Order includes detailed factual findings supporting the legal conclusion that "the record shows that Lanzello likely violated" the non-compete and non-solicitation provisions of the Unit Grant Agreement. (PI Order at 49; *see id*. at 8–16.) The PI Order clearly and unambiguously enjoined Lanzello from immediately working at ASR Motorsport when it ordered that:

> Lanzello is enjoined from owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity which directly or indirectly engages in the Business (as defined in the Unit Grant Agreement), including ASR Motorsport, in accordance with the terms set forth in the Unit Grant Agreement.

(PI Order at 55 ¶ 2.) Defendants' contention that the PI Order failed to notify Lanzello when to resign from ASR Motorsport in order to comply with the five-year non-compete provision is belied by the plain text of the order itself. *See A*DT, LLC v. Sec. Networks, LLC, No. 12-cv-81120, 2018 WL 6978699, at *11 (S.D. Fla. Nov. 16, 2018) (finding that a defendant "cannot avoid actual notice and knowledge of the injunction by acting in a deliberately ignorant manner or by consciously avoiding the injunction terms"), *report and recommendation adopted*, 2019 WL 438998 (S.D. Fla. Jan. 30, 2019).

Defendants also assert that, absent a stay, "Lanzello will lose his livelihood, and ASR will effectively lose its entire leadership during the pendency of this appeal." (Motion at 23.) Defendants' counsel attests that Lanzello's responsibilities at ASR Motorsport include managing inventory, ASR Motorsport's internal systems, the dealer portal site, and the online ordering system, serving as the signatory on ASR Motorsport bank accounts and as a point of contact for vendors and accounts, developing and managing "SKU/MSRP/pricing," and leading the sales team. (Krezalek Decl. ¶¶ 3–4.) Defendants assert that Lanzello's "immediate resignation could plunge ASR into chaos and severely impact its prospects for survival." (*Id*. at 25.)

I recognize now, as I did when issuing the PI Order, that during the pendency of this action, Lanzello may face some hardship from being required to abide by his non-compete agreement with Wheel Pros and ASR Motorsport may face some hardship from being required to assign another individual to perform Lanzello's functions. However, Lanzello exercised his right to freedom of contract and freely entered into the agreement with Wheel Pros that he would not compete with Wheel Pros during his employment with the company and for five years following

any separation. *See* Unit Grant Agreement at ¶ 9(a); *Gen. Mills, Inc.*, 2020 WL 915824, at *9 ("The Court recognizes, of course, the hardship associated with enforcement of a non-compete obligation. However, Plaintiff was free to accept employment in a non-competitive industry."). Indeed, nothing in the PI Order prevents Lanzello from working in an industry that does not compete with Wheel Pros in the United States. It was Lanzello's own "decision to accept employment [with ASR Motorsport] in precisely the industry in which he worked, and with a direct competitor" to Wheel Pros, "his previous employer." *Id*. More to the point, it was Lanzello's own choice to *begin establishing the competitor*—ASR Motorsport—*while he was employed at Wheel Pros*, and to nevertheless remain at Wheel Pros for another nine months before he was terminated for cause when his competitive activities were finally discovered by Tiffin. Lanzello freely agreed to the non-compete and non-solicitation restrictions in exchange for securing continued at-will employment at Wheel Pros at a substantial salary and the grant of significant equity in the company, both in exchange for his agreement not to compete with Wheel Pros or to solicit Wheel Pros staff for the duration of his employment with Wheel Pros and five years after any separation. *See* July 11, 2025 Hr'g Tr. 350:10–13, 351:10–352:8 (Lanzello testifying he received "a few million dollars" worth of shares in Wheel Pros); Tiffin, July 10, Hr'g Tr. 130:9–24 (testifying that Lanzello's salary was "close to a half a million dollars" in 2023 and 2024); *see also Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819, 2018 WL 6786338, at *27 (S.D.N.Y. Oct. 25, 2018) (finding that defendants would not "suffer significant harm if an injunction is reinstated" because "they were each paid substantial amounts . . . and they each agreed to participate in the equity incentive plan"), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020). The factual record also demonstrates that Lanzello was well aware of the risks associated with violating his non-compete provisions, but

he chose to do so anyway, thereby causing his termination from Wheel Pros and triggering the five-year non-compete period. (*See* Affidavit of Katharine J. Liao "Liao Aff.", ECF No. 26-2, Ex. R (Lanzello warning a realtor about mentioning him in connection with ASR Motorsport, saying: "Need it kept quiet I'm still at wheel pros and don't want to be sued.")); Liao Aff., Ex. HH ("Ok can't go public. Make sure no name or anything showing please . . . Nobody at wheel pros can know either . . . I could get sued.").

Lanzello's willful, knowing violation of his non-compete agreement counsels against a finding that Defendants have made a sufficient showing of irreparable harm to Lanzello or ASR Motorsport from enforcement of Lanzello's non-compete agreement with Wheel Pros. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 64 (2d Cir. 2011) (declining to find irreparable harm where movants "themselves are responsible for some of these purported injuries"). Further, Wheel Pros' filing of a motion in February 2025 seeking, among other things, an order temporarily and preliminarily enjoining Lanzello from working for ASR Motorsport in accordance with the terms of the Unit Grant Agreement put Defendants on notice that this Court could temporarily or preliminarily enjoin Lanzello from working at ASR Motorsport during the pendency of this action or until November 20, 2029, whichever is earlier. (*See* ECF No. 1 at 24; *see also* Am. Compl. ¶ 68 (stating that Lanzello was terminated for cause by Wheel Pros on November 20, 2024); Unit Grant Agreement ¶ 9 (providing that the non-compete restriction applies "for five (5) years following any Separation" from Wheel Pros).) Defendants do not show how Lanzello's resignation in compliance with the PI Order, which was issued nearly eight months later, would "abruptly decapitate" ASR Motorsport (Krezalek Decl. ¶ 11), when Wheel Pros' efforts to enforce the restrictive covenants of the Unit Grant Agreement were a central focus of the February 18, 2025 motion for a temporary restraining order (ECF No. 1), the May 16, 2025

preliminary injunction motion (ECF No. 25), the July 10 and 11, 2025 hearing on the preliminary injunction motion,[17] and the parties' supplemental briefing throughout June through August 2025 (Defs.' Suppl. Br., ECF No. 48; Pl.'s Suppl. Br., ECF No. 50).

Accordingly, Defendants fail to carry their burden to demonstrate that they will be irreparably harmed from the enforcement of the preliminary injunction. Instead, the alleged harm Defendants may experience is the predictable outcome from the enforcement of the agreements that the Individual Defendants, including Lanzello, freely and willingly entered with Wheel Pros.

c.  Substantial Injury to Wheel Pros

The third factor courts consider when assessing a motion to stay a preliminary injunction is whether the issuance of a stay would substantially injure other parties interested in the proceedings. *Mahdawi*, 136 F.4th at 449. With respect to this factor, Defendants essentially argue that Wheel Pros will not be substantially harmed by a stay because any harm Wheel Pros is currently experiencing cannot get any worse while the appeal is pending. (*See* Motion at 24 ("Moreover, if the injunction on Lanzello's employment is stayed, Lanzello will serve as ASR's president pending the resolution of this appeal, *as he has been since ASR's inception*" (emphasis added)); *id.* ("Further, it is clear that Wheel Pros can only suffer so much damage at the hands of ASR during the pendency of this appeal.").)

Defendants ignore the factual record and demonstrate as cavalier an attitude with respect to Wheel Pros' injuries pending appeal as they did when the Individual Defendants actively worked to establish ASR Motorsport while employed by Wheel Pros, including by brazenly disclosing Wheel Pros' Confidential Information to third parties. As detailed in the PI Order, I

---

[17] (*See, e.g.,* July 10, Hr'g Tr. 34:8–11, 51:14–19, 170:17–171:1; July 11, Hr'g Tr. at 349.)

have already found that Wheel Pros has demonstrated irreparable harm absent a preliminary injunction:

> Wheel Pros has sufficiently shown irreparable harm in the form of substantial, ongoing risks: (1) that Defendants will continue to disseminate Wheel Pros' trade secret information beyond Defendants to a wider audience and will otherwise irreparably impair the value of those secrets; and (2) that Wheel Pros will experience a loss of customer goodwill due to Defendants' use of Wheel Pros' trade secrets, solicitation of customers, and other competitive activities undertaken in violation of the Non-Disclosure Agreements and the Unit Grant Agreement.

(*See* PI Order at 28–29.) Moreover, I found that the record on the PI Motion demonstrated that "Defendants *already have disclosed* Wheel Pros' trade secret information to third parties" and that "Defendants' challenged conduct has led to *the actual loss* of Wheel Pros goodwill" with at least one customer, Rayco. (*Id*. at 33, 36 (emphasis added).)

Defendants fail to point to evidence in the record or marshal any legal arguments showing that Wheel Pros would not suffer irreparable harm from a stay of the preliminary injunction. Accordingly, it would be "logically inconsistent" to now find that Wheel Pros would not suffer irreparable harm from a stay of the preliminary injunction. *Rodriguez ex rel. Rodriguez*, 175 F.3d at 235. Therefore, based on the extensive factual record on the PI Motion and the record on this Motion, Wheel Pros will face irreparable harm from a stay of the preliminary injunction.

   d.   Public Interest

The final factor courts consider when assessing a motion to stay a preliminary injunction is whether the issuance of a stay is in the public interest. *Mahdawi*, 136 F.4th at 449.

Defendants argue that a stay of the preliminary injunction would not harm public interest because their appeal "presents genuine questions regarding the enforceability of the Unit Grant Agreement and how Defendants are expected to comply" with the PI Order. (Motion at 24.)

Defendants also argue that permitting Lanzello to continue serving as ASR Motorsport's president while their appeal is pending will purportedly "advance[] the public policy of protecting an individual's ability to support himself and his family financially." (*Id*.) In response, Wheel Pros argues that the public's interest weighs in favor of denying the requested stay of the preliminary injunction, primarily because the preliminary injunction upholds the parties' freedom of contract and further enjoins defendants from engaging in conduct that I have determined to be harmful, if not unlawful. (Opposition at 17–18.)

Defendants fail to cite any authority supporting the notion that it is in the public's benefit to stay a preliminary injunction simply because the parties raised "genuine questions" in litigating a motion for a preliminary injunction. Indeed, as addressed above, in order to secure a motion to stay, Defendants must show that the balance of factors—the likelihood of success on the merits of their appeal, irreparable harm to Defendants, any substantial injury to other parties, and the public interest—weigh in favor of a stay. *Mahdawi*, 136 F.4th at 449.

Additionally, notwithstanding the general public's interest in ensuring that people can earn a living, "to the extent that [Lanzello's] success is built on unsavory business practices . . . it is, of course, not at all in the public interest for it to be perpetuated." *Usherson v. Bandshell Artist Mgmt.*, No. 19-cv-6368, 2020 WL 4228754, at *6 (S.D.N.Y. July 22, 2020). Indeed, here, it serves the public interest to issue a tailored preliminary injunction that prohibits Defendants from continuing to disseminate and impair the value of Wheel Pros' trade secrets in violation of the Individual Defendants' agreements with Wheel Pros and from engaging in conduct that has led to the loss of Wheel Pros' goodwill with customers and will imminently lead to the loss of goodwill with other customers. This Court held a two-day preliminary injunction hearing and reviewed a substantial factual record in which overwhelming evidence demonstrated that

Defendants have (1) misappropriated Wheel Pros' trade secrets and engaged in conduct that threatens to compromise the value of those secrets; (2) engaged in conduct that has led to a loss of Wheel Pros' goodwill with customers; (3) with respect to the Individual Defendants, violated the terms of their Non-Disclosure Agreements with Wheel Pros; and (4) with respect to Lanzello, violated the noncompete and non-solicitation provisions of his Unit Grant Agreement with Wheel Pros. (PI Order at 29–31.) Issuing a stay that would allow Defendants to continue benefiting from the misappropriation of Wheel Pros' trade secrets and that would allow Lanzello to compete with Wheel Pros and solicit Wheel Pros' employees in violation of the restrictive covenants set forth in the Unit Grant Agreement would not benefit the public. *See, e.g.*, *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 243 (E.D.N.Y. 2024) (finding that the public interest is serving by an injunction "prohibiting Defendants from further using what the court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets").

## II.    Modifying the Preliminary Injunction

Defendants seek a modification of the PI Order only as it pertains to the preliminary injunction against Lanzello's continued work as ASR Motorsport's president. Defendants requested permission for "Lanzello to continue to serve as ASR's president for a short period of time (e.g., until November 14, 2025) so that ASR Motorsport may complete an orderly transition to a successor," arguing that Lanzello's immediate resignation "could plunge ASR into chaos and severely impact its prospects for survival." (Motion at 25.) In the alternative, Defendants request a temporary stay to permit them to move for a stay pending appeal before the Second Circuit pursuant to Rule 8(a) of the Federal Rules of Appellate Procedure. *Id*; *see also* Fed. R. App. P. 8(a) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of the district court pending appeal.")

71

I decline to modify the preliminary injunction. Lanzello and ASR Motorsport have been on notice since February 18, 2025 that Wheel Pros has been seeking a temporary restraining order and preliminary injunction enjoining Lanzello from working for ASR Motorsport. The PI Order clearly stated that Lanzello must cease "managing . . . or participating in" ASR Motorsport as of October 2, 2025. (PI Order at 55.) Defendants had nearly eight months to arrange for a transition of Lanzello's functions in the event Wheel Pros secured preliminary relief. Accordingly, I decline to modify the PI Order's requirement that Lanzello cease working for ASR Motorsport on October 2, 2025.

For the same reason, I decline to grant a temporary stay to permit Defendants to move for a stay pending appeal before the Second Circuit. More than three months have passed since Defendants filed a notice of appeal regarding the PI Order, providing ample time for Defendants to file a motion for a temporary stay pending appeal under Rule 8 of the Federal Rules of Appellate Procedure. Defendants could have filed a motion in the Second Circuit to stay the PI Order pending appeal, but they have not done so. *See* Federal Rules of Appellate Procedure ("Fed. R. App. P.") 8(a) (providing that while a "party must ordinarily move first in the district court" for a motion to stay pending appeal, the motion nonetheless "may be made to the court of appeals or to one of its judges" if "moving first in the district court would be impracticable"); *Agudath Israel of Am. v. Hochul*, No. 22-38, 2023 WL 2637344, at *2 (2d Cir. Mar. 27, 2023) (recognizing that a party may file a motion directly before the Second Circuit to stay a district court's order ruling on a preliminary injunction before moving in the district court itself).

## CONCLUSION

Wheel Pros' Motion to Stay the preliminary injunction issued by this Court on October 2, 2025 (ECF No. 63) is denied for the reasons explained above. Based on the factual findings and

legal conclusions set forth in the PI Order (ECF No. 61 at 4–16, 24–55 (factual findings); *id.* at 24–55 (legal conclusions)), and for the reasons set forth above, the preliminary injunction is clarified to read, in its entirety, as follows.

## CLARIFIED PRELIMINARY INJUNCTION

It is hereby ORDERED that the term "Confidential Information" as used in this Order shall refer to:

1. proprietary drawings of Wheel Pros' wheel designs, including, but not limited to:

    a. two Wheel Pros' wheel designs attached to August 9 and 10, 2024 emails from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

    b. drawings and confidential descriptions of the specifications pertaining to the wheel drawings attached to August 12, 2024 emails from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

    c. the fact that "Wheel Pros started to use ███████████████████" on or around August 10, 2024, as disclosed in an August 10, 2024 email from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

2. aggregated data regarding Wheel Pros' best-selling wheels and their associated fitments, including but not limited to:

    a. Wheel Pros' spreadsheets showing the company's 100 top-selling SKUs for 2023 and year-to-date top 100 selling SKUs for 2024, including the average selling price of those SKUs and the corresponding profit margin, which Lanzello disclosed to Art Hale by text message on July 16, 2024; and

    b. information contained in the "INNER PURCHASE SKUS.jpg" attached to an August 10, 2024 email from Junjie Chen to Lanzello, Art Hale, Jose Valenzuela, and Jeff Claunch; and

3. detailed information concerning Wheel Pros' sales volumes, including but not limited to:

    a. Wheel Pros' spreadsheets showing the company's April 2024 month-to-date sales revenue by region and April 30, 2024 daily total sales revenue by region, screenshots of which were sent by Lanzello to Art Hale by text on April 30, 2024; and

    b. Wheel Pros' February 2024 year-to-date sales data, which was texted by Lanzello

to Art Hale on February 14, 2024; and

4. Wheel Pros' customer lists with customer-specific prices for products, including but not limited to:

   a. a Google Docs spreadsheet containing Wheel Pros' part numbers sent by Ray Noori to Tire Agent on December 16, 2024; and

   b. an inventory file sent by Ray Noori to Tire Agent on or around January 31, 2025.

It is further ORDERED that:

1. during the pendency of this action, Defendants are enjoined from using, disclosing, accessing, reviewing or transferring Wheel Pros' Confidential Information;

2. during the pendency of this action, or until November 20, 2029, whichever is earlier, Lanzello is enjoined from owning, managing, controlling, or participating in (as an employee, consultant or otherwise) any business or entity, including ASR Motorsport, which directly or indirectly engages in supplying, manufacturing, marketing, and/or wholesale distributing after-market wheels, tires or accessories anywhere in the United States for vehicle models or brands that are supplied, manufactured, and or distributed by Wheel Pros Holdings, L.P. or Wheel Pros, LLC, or any of their subsidiaries;

3. during the pendency of this action, or until November 20, 2029, whichever is earlier, Lanzello is enjoined from directly or indirectly soliciting, hiring, retaining or engaging any officer, manager, or employee of Wheel Pros Holdings, L.P. or Wheel Pros, LLC;

4. Defendants shall destroy and dispossess themselves of any of Wheel Pros' Confidential Information that Defendants still possess or control, subject to supervision and verification by a neutral third party; and

5. during the pendency of this action, Defendants are enjoined from marketing, selling, exploiting, assigning, or otherwise exercising any rights of ownership or control with respect to any "Developments," which are defined as inventions (whether or not patentable), product designs (whether or not patentable), new technology, Confidential Information, copyrightable works, mask works, trademarks or other intellectual property created during the Individual Defendants' employment with Wheel Pros, including but not limited to aftermarket wheels and automotive accessories that any Individual Defendant created or contributed to, in whole or in part, while still employed by Wheel

Pros that relate to Wheel Pros' business, or result from or are suggested by any work performed for Wheel Pros.


Dated: Central Islip, New York
January 13, 2026


_____/s/ Nusrat J. Choudhury_____
NUSRAT J. CHOUDHURY
United States District Judge